**RANDY J. RISNER**
Interim City Attorney, SBN 172552
**CITY OF VALLEJO**, City Hall
555 Santa Clara Street, 3rd Floor
Vallejo, CA  94590
Tel:    (707) 648-4545
Fax:    (707) 648-4687

John R. Whitefleet, SBN 213301
Kavan J. Jeppson, SBN 327547
PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA
Tel: (916) 929-1481
Fax: (916) 927-3706
Email: jwhitfleet@porterscott.com

Attorneys for Defendants: CITY OF VALLEJO, ANDREW BIDOU, JARRETT TONN

UNITED STATES DISTRICT COURT

EASTERN DISTRICT

ROBERT STRONG,

                    Plaintiff,

v.

CITY OF VALLEJO, JARRETT TONN;
ANDREW BIDOU, and DOE VALLEJO
POLICE OFFICER,

                    Defendants.

Case No.: 2:18-CV-01246-WBS-AC

**INDEX OF EXHIBITS IN SUPPORT OF DEFENDANTS CITY OF VALLEJO AND JARRETT TONNS' MOTION FOR SUMMARY JUDGMENT**

Date: June 1, 2020
Time: 1:30 p.m.
Courtroom: 5, 14th Floor

/ / /
/ / /
/ / /

{02185172.DOCX}

1

INDEX OF EXHIBITS

Defendants CITY OF VALLEJO AND JARRETT TONN hereby submits the following Index of Exhibits in support of its motion for summary judgment:

| EXHIBIT A | Deposition Transcript of Robert Strong |
|---|---|
| EXHIBIT B | Deposition Transcript of Jarrett Tonn |
| EXHIBIT C | Vallejo Police Department Use of Force Manual |
| EXHIBIT D | Request for Production Responses |
| EXHIBIT E | Request for Production Verification |
| EXHIBIT F | Officer Tonn Police Report |
| EXHIBIT G | Initial_Stop_148_PC [10] Body Warn Camera |
| EXHIBIT H | Suspect_given_miranda_admonishment [11] Body Warn Camera |
| EXHIBIT I | Conversation_with_suspect [8] Body Warn Camera |
| EXHIBIT J | Conversation_and_citing_out_suspect [7] Body Warn Camera |
| EXHIBIT K | Video-3[0] Cell Phone Video |

Dated: March 31, 2020

Respectfully submitted,

PORTER SCOTT
A PROFESSIONAL CORPORATION


By /s/ John R. Whitefleet
    John R. Whitefleet
    Attorney for Defendants CITY OF VALLEJO,
    ANDREW BIDOU, JARRETT TONN

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA 95825
TEL: 916.929.1481
FAX: 916.927.3706

{02185172.DOCX}

2

# EXHIBIT A

Page 1

1              UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF CALIFORNIA
3                   SACRAMENTO DIVISION
4                       --oOo--
5   ROBERT STRONG,                    )
                                      )
6            Plaintiff,               )
                                      )
7            VS.                      ) No. 2:18-CV-01246-
                                      )     WBS-AC
8   CITY OF VALLEJO, JARRETT TONN,    )
    ANDREW BIDOU and DOE VALLEJO      )
9   POLICE OFFICERS 1-25,             )
                                      )
10           Defendants.              )
                                      )
11                                    )
12
13                      --oOo--
14    VIDEOTAPED DEPOSITION OF ROBERT EVERETT STRONG
15                      --oOo--
16
17
18                 Vallejo, California
                 Friday, August 9, 2019
19                   10:47 a.m.
20                      --oOo--
21
22               DOUCETTE & ASSOCIATES
                  1219 Marin Street
23            Vallejo, California 94590
                  (707) 554-9970
24
25  REPORTED BY: REBECCA K. DOWELL, CSR, RPR
                CSR License Number 8043

Page 10

```
 1   number of inches or whatever --
 2   A.     Right.
 3   Q.     -- but you could give me an estimate for the
 4   length.
 5   A.     Right.
 6   Q.     If I were to ask you the length of my dinner
 7   table at my house, you haven't been to my house, as
 8   far as I know, and so you would have no idea.
 9   A.     Right.
10   Q.     So that's -- do you understand the
11   difference?
12   A.     I get what you're saying, yeah.
13   Q.     Okay.  So you're entitled to breaks.
14   A.     Okay.
15   Q.     I'm going to try and take breaks about an
16   hour -- every hour or so, but if at any time you need
17   a break, please feel free to ask and I'll do my best
18   to accommodate you.
19   A.     M-hm.
20   Q.     The only thing I ask is that you try not to
21   take a break in the middle of a question.
22   A.     Okay.
23   Q.     So we'll try to get an answer, and then we
24   can take a break.
25   A.     Okay.
```

Page 11

```
 1   Q.     So -- yeah.  Your attorney is here, he's
 2   going to be making objections through the deposition.
 3   An objection to a question doesn't necessarily mean
 4   do not answer, it's just to preserve rights on
 5   objections for the record, if we were to take this to
 6   trial or otherwise.
 7         So unless he instructs you not to answer,
 8   then I'm entitled to an answer to my questions; do
 9   you understand
10   A.     I understand.
11   Q.     Okay.  Great.
12         So I think that's pretty much it, and so
13   let's go ahead and start with the substance.
14         Are you -- have you taken any drugs or
15   alcohol that would impact your ability to testify
16   today?
17   A.     No.
18   Q.     Okay.  Is there any reason why you don't
19   believe your testimony should be heard today?
20   A.     No.
21   Q.     Okay.  Did you prepare for your deposition?
22   A.     Yes.
23   Q.     And what did you do to prepare for your
24   deposition?
25   A.     I went over the e-mails he sent me.
```

Page 12

```
 1   Q.     Your counsel?
 2   A.     My attorney, yes.
 3   Q.     Okay.  And so I'm not entitled to the
 4   substance between communications between yourself and
 5   your attorney, so did you speak to anyone other than
 6   your attorney regarding your deposition today?
 7   A.     No.
 8   Q.     Okay.  Did you review any documents in
 9   preparation for your deposition today, aside from
10   e-mails from your attorney that I'm not entitled
11   to --
12   A.     No.
13   Q.     -- know about?
14         Okay.  And you stated your date of birth is
15   3/10/94?
16   A.     Correct.
17   Q.     Okay.  And do you go by any other names,
18   aliases, that kind of thing?
19   A.     Rob, Robert.  That's it.
20   Q.     Okay.  Just iterations of your first name?
21   A.     Yeah.  Correct.
22   Q.     Have you ever had a felony conviction?
23   A.     No.
24   Q.     Okay.  Do you wear any glasses or contacts?
25   A.     No.
```

Page 13

```
 1   Q.     Okay.  Are you at all hard of hearing?
 2   A.     No.
 3   Q.     Are you right- or left-handed?
 4   A.     Right.
 5   Q.     Okay.  And currently do you have a driver's
 6   license?
 7   A.     Yes.
 8   Q.     Is it currently valid?
 9   A.     Yes.
10   Q.     Okay.  Do you know if it was valid at the
11   time of the incident that we're here to speak about,
12   which is April 19, 2017?
13   A.     It was not.
14   Q.     It was --
15   A.     I believe it was not.
16   Q.     Okay.  Was it expired or was it suspended or
17   something for another reason?
18   A.     Suspended.
19   Q.     Okay.  And for what reason was it suspended?
20   A.     Traffic tickets from years ago.
21   Q.     Okay.  So just unpaid traffic tickets?
22   A.     Yes.
23   Q.     Do you know approximately how long preceding
24   the incident it was suspended for?
25   A.     I do not.
```

UMF 23

4 (Pages 10 to 13)

UMF 23

Page 14

1    Q.    Was it --
2    A.    Are you saying before the incident how long
3    was it suspended?
4    Q.    Yes.
5    A.    Oh.  Okay.  I would say most likely two
6    months.
7    Q.    Two months?
8    A.    Yeah.
9    Q.    Okay.  And on the day of the incident you
10   were driving a vehicle?
11   A.    No.
12   Q.    Okay.  You -- there was a vehicle that you
13   were sitting in on the day of the incident, correct?
14   A.    Correct.
15   Q.    Okay.  And were you -- was that vehicle one
16   that was lent to you?
17   A.    Lent to me?
18   Q.    Lended to you?
19   A.    There was no vehicle lended to me.  It was my
20   vehicle.
21   Q.    Oh, it was your vehicle?
22   A.    Yeah, it was my vehicle.
23   Q.    Okay.  And --
24   A.    I have a cosigner, but there was no vehicle
25   lent to me.

Page 15

1    Q.    Okay.  So let me just clarify for the -- so
2    that was your vehicle that you were sitting in?
3    A.    Correct.
4    Q.    Okay.  And who was the cosigner?
5    A.    My grandfather.
6    Q.    And who is that?
7    A.    Claudy Kelly.
8    Q.    Okay.  Okay.  So that was your vehicle at the
9    time of the incident cosigned with your grandfather?
10   A.    Correct.
11   Q.    Okay.  And just as a matter of background,
12   what is your current address?
13   A.    133 Leonard Street, Vallejo, California
14   94589.
15   Q.    Is that the location of your residence at the
16   time of the incident?
17   A.    Yes.
18   Q.    And how long, approximately, have you lived
19   there for?
20   A.    Oh, years, ten plus.  Ten years plus.
21   Q.    So since childhood?
22   A.    Since childhood, yeah.  Grew up in the house.
23   Q.    All right.  And you're relatively young so --
24   A.    Yeah.
25   Q.    It's pretty standard questions, but are you

Page 16

1    married?
2    A.    No.
3    Q.    Okay.  And are you currently engaged?
4    A.    No.
5    Q.    Are you seeing anybody?
6    A.    Yeah.  Her (indicating).  That's my
7    girlfriend.
8    Q.    And she's in the room with us today?
9    A.    M-hm.
10   Q.    Can you -- was she your girlfriend at the
11   time of the incident?
12   A.    Yes.
13   Q.    Okay.  Do you mind telling me her name?
14   A.    Shelby Rae.
15   Q.    Okay.  Can you spell her last name?
16   A.    R-a-e.
17   Q.    And -- okay.  And you have no children?
18   A.    No.
19   Q.    Okay.  And just in terms of your -- well,
20   actually, who do you currently live with?
21   A.    My grandfather and my grandma.
22   Q.    And anyone else who lives in the house?
23   A.    Shelby.
24   Q.    And how long has she lived with you?
25   A.    About a year.  A year.

Page 17

1    Q.    Okay.  And what is -- so let's go into your
2    education.
3    A.    M-hm.
4    Q.    What is your highest level of education?
5    A.    High school.
6    Q.    Did you graduate?
7    A.    Yes.
8    Q.    Have you had any post-high-school education
9    or training?
10   A.    No.
11   Q.    No vocational training or otherwise, that
12   kind of thing?
13   A.    No.
14   Q.    Okay.  In terms of your work history, are you
15   currently employed?
16   A.    Yes.
17   Q.    And where are you employed?
18   A.    It's Michelin Tires in San Francisco.
19   Q.    Okay.  And how long have you worked there
20   for?
21   A.    Three months.
22   Q.    Okay.  Did you have a job before that?
23   A.    Yes, I did.
24   Q.    And where did you work before Michelin?
25   A.    Michelin.  I was working at Silverado Resort

Page 38

1  circle, and how -- were you on the phone the entire
2  time?
3  A.    Yes.
4  Q.    Okay.  And when you arrived to your vehicle
5  were you still on the phone?
6  A.    Yes.
7  Q.    Okay.  And what was -- and you were actually
8  speaking to persons on the other side during that
9  time?
10 A.    No.  I was on my phone regular, and I had the
11 card in my hand for the phone number.
12 Q.    Okay.  So you were trying to make the call?
13 A.    Yeah.
14 Q.    You were punching in --
15 A.    Correct.
16 Q.    -- as you were walking?
17 A.    Correct.
18 Q.    So when you actually arrived at your car had
19 you actually been able to dial the number yet?
20 A.    No.
21 Q.    So the entire walk you were punching in, but
22 you didn't actually get a call --
23 A.    Correct.
24 Q.    -- going?
25 A.    Correct.

Page 39

UMF 3

1  Q.    So when you arrived to your vehicle then what
2  did you do?
3  A.    Sat down with one foot out and one foot in
4  the car.
5  Q.    Okay.  And then as you were sitting there
6  were you -- you were still trying to make the phone
7  call?
8  A.    He pulled up in front of my car at that time.
9  Q.    So approximately how long before he pulled up
10 were you sitting in the car?
11 A.    Twenty, 30 seconds.
12 Q.    Okay.  So you were in the car, you sat down,
13 he -- within the next 20, 30 seconds he actually
14 pulled up?
15 A.    Yep.  I'm on my phone, I look up, and I see
16 lights in front of me.
17 Q.    Okay.  And did you happen to see him at all
18 before that moment?
19 A.    Yes.
20 Q.    Okay.  And where or when did you see him
21 beforehand?
22 A.    When I was walking he was coming on the
23 opposite way, so I'm like this, and he's like this
24 (indicating).
25 Q.    So while you were walking he was driving by,

Page 40

1  and you were not in the car yet?
2  A.    Correct.
3  Q.    And he was driving, so if you're walking I
4  guess, if this map is directionally correct, you were
5  walking north on Lassen, which is up?
6  A.    Up.  Yep.  Yep.  And he was coming down.
7  Q.    He was going south --
8  A.    Yeah.
9  Q.    -- or down on Lassen Street?
10       MR. GOFF:  It might be more clear to say the
11 plaintiff was walking towards Lassen and Glenwood.
12       MR. SMYTH:  Sure.
13 BY MR. SMYTH:
14 Q.    So he's walking towards Lassen and Glenwood,
15 and then the car of Tonn, Officer Tonn, you
16 understand that was the officer involved in this?
17 A.    I do.
18 Q.    He was driving towards the intersection of
19 Spring -- is that Spring --
20 A.    Springs Road --
21 Q.    Springs Road.
22 A.    -- is this long road.
23 Q.    Okay.
24 A.    So he was already on Lassen --
25 Q.    Okay.

Page 41

1  A.    -- at the time.
2  Q.    So you saw that exchange.  He drove by and
3  you were walking, correct?
4  A.    I'm looking at him as how me and you are
5  looking at right now.
6  Q.    And then at the time you got into your
7  vehicle had you seen him any point between that?
8  A.    When I just got into my vehicle?
9  Q.    Yeah.  So you said that he pulled up
10 approximately 20 to 30 seconds --
11 A.    Correct.
12 Q.    -- after you sat down.
13       Between the time that you first saw him
14 driving by to the point when you saw him in the car
15 with the lights going --
16 A.    Okay.  No, I did not -- I did not see him.  I
17 didn't see him do any U turns or anything.
18 Q.    Okay.
19 A.    I was concentrated on what was going on on my
20 phone.
21 Q.    Okay.  So -- and then where was he -- his car
22 positioned in relation to yours?
23 A.    So I'm here (indicating), and he's in front
24 of me, so our cars are nose to nose.
25 Q.    Okay.  So he pulled kind of on the -- he

UMF 9

Page 50

1  Officer Tonn was with you?
2  A.    When he was with me I still had my phone in
3  my hand, like I was on the dial pad about to hit
4  call.
5  Q.    So he approached, and you had the phone out,
6  and did you tell him you were trying to make a phone
7  call?
8  A.    Yes, I did.
9  Q.    Okay.  And what did he -- how did he respond
10  to that?
11  A.    He did not respond to it.
12  Q.    So he didn't say anything?
13  A.    Towards my phone call, no.
14  Q.    He didn't say no, he didn't say yes, it's
15  okay --
16  A.    No.
17  Q.    -- put down the phone, anything?
18  A.    No.
19  Q.    So then did you make the call?
20  A.    No, I didn't.
21  Q.    So if he didn't respond why did you not make
22  the call?
23  A.    Because he was there trying to talk to me, so
24  I just hung it up, locked my phone.
25  Q.    Okay.  So -- and that was -- let's just go

UMF 7

Page 52

1  that it expires April 2nd, and I was not aware that
2  tags had an exact date.
3  Q.    Yeah.
4  A.    So -- yeah.
5  Q.    So in your exchange, so it was -- he told you
6  that the tags are expired, you said that -- and how
7  did you respond?  What did you say?  That no, they
8  are not expired, they're in April?
9  A.    I told him no, they don't expire till the end
10  of April.
11  Q.    Do you remember the exact words, or is that
12  just the gist of what it was?
13  A.    That's the gist of what it was.  That's what
14  I said.  I'm like:  No, they don't expire until the
15  end April, and he said, "No, they expired April 2nd."
16  Q.    Okay.  And then -- then what -- did you --
17  what did you say at that point?
18  A.    At that point he told me he was recording on
19  his body camera, and I told him that I'm recording on
20  my phone.
21  Q.    So in the moment that -- did you ask him
22  anything about why you were being -- why he was
23  pulling you over?
24  A.    No, I didn't.
25  Q.    So you -- so after he told you about the

UMF 2

Page 51

1  back even further.  What was the first thing that
2  you -- who spoke first, you or Tonn?
3  A.    Tonn.
4  Q.    And what did he say?
5  A.    "What are you doing in this neighborhood."
6  He said, "This is like a crime neighborhood."
7  Q.    So were those all the words that he spoke
8  before you spoke?
9  A.    Correct.
10  Q.    So he says, "What are you doing in this
11  neighborhood.  This is a high crime neighborhood," or
12  something to this effect?
13  A.    He said, "What are you doing in this
14  neighborhood."
15  I respond, "I just got off of work."
16  And he responds that this is a crime
17  neighborhood or a crime area.
18  Q.    Okay.  And then how did you respond to that?
19  A.    Um, I didn't.  He brought up about my tags
20  being expired on my car, and this was in April, he
21  said they expired April 2nd.
22  Q.    Okay.  And how did you respond to that?
23  A.    I told him that we're still in April, they expire at the end
24  him that we're still in April, they expire at the end
25  of the month, when it gets to May, and he told me

'MF 7

Page 53

1  April 2nd expiration he started recording you?
2  A.    On his body camera.
3  Q.    And he said something to that effect?
4  A.    Yeah.  He said, "I'm recording on my body
5  camera."
6  And I said, "Okay, I'm going to record you on
7  my phone," and I slid up, and I hit the camera, and I
8  hit record.
9  Q.    Okay.  And when you were -- so at no point
10  did you tell him -- or -- well, strike that.
11  Did he ask you for a license or registration?
12  A.    No, he didn't.
13  Q.    Did you tell him that he was wrong, that the
14  expiration wasn't until the end of the month?
15  A.    Yeah, I did.
16  Q.    And was his only response that, no, they are
17  expired?
18  A.    April 2nd.
19  Q.    And there was no other conversation at all
20  before he turned on his body camera?
21  A.    No.
22  Q.    And you stated earlier you haven't seen his
23  body camera footage?
24  A.    Footage, I have not.
25  Q.    Okay.  So then after he turned on his body

Page 54

1  camera you turned on your cell phone; is that
2  correct?
3  A.    M-hm.
4  Q.    And what did you do with your cell phone?
5  A.    I slid up, and I hit camera on the bottom
6  left, and I hit record.
7  Q.    Okay. And then what were you -- how were you
8  recording?
9  A.    The camera was faced my way, so you're
10 holding it like this taking a selfie like that
11 (indicating), so it was faced towards me, and I
12 didn't want to flip and I go like that (indicating),
13 so I went like this to get his face (indicating).
14 Q.    So you were sitting in the car. You did
15 still have kind of a leg out and a leg in or --
16 A.    Yeah. So I'm like this (indicating), and I'm
17 like listening to him getting his -- getting his
18 face.
19 Q.    So you brought your hand towards the center
20 of the car?
21 A.    Yep.
22 Q.    And with Tonn outside the car you can see him
23 in the background of the phone, as well as yourself,
24 kind of in a selfie mode?
25 A.    Correct.

**VMF 13, 14**

Page 55

1  Q.    And what -- did Officer Tonn say anything
2  about that at that time?
3  A.    He said, "I'm going to take this phone," and
4  he reached for it. And I said, "Hey, hey, hey, hey,"
5  like don't do that, and that's when he grabbed me by
6  my hair and pulled me down.
7  Q.    Okay. So after he grabbed you can you
8  describe for me what you initially felt or how
9  that -- what was going through in your mind?
10 A.    I was scared. I was scared. I didn't know
11 what he was gonna do. When he reached for my phone I
12 just moved my hand like, hey, like don't do that,
13 you're all in my personal -- you're in my bubble.
14        And he said, "I'm gonna take this phone."
15 And then he grabbed me by my dreads, I used to have
16 dreadlocks, and he threw me on the ground and put me
17 in a choke hold.
18 Q.    Okay. And when you say, "a choke hold," can
19 you describe -- well, let's first go back.
20        So he grabbed you by the dreadlocks and
21 pulled you, correct?
22 A.    Correct.
23 Q.    And you then -- did he throw you on the
24 ground, or did he --
25 A.    Yeah.

Page 56

1  Q.    -- pull you?
2  A.    He grabbed me with a good amount of force and
3  threw me on the ground with a good amount of force.
4  Q.    Okay. So you landed on the pavement?
5  A.    Correct. Stomach -- belly down.
6  Q.    And at that time were you trying to get out
7  of his holding of you, like wrestle your way loose,
8  or what was going on?
9  A.    No, I wasn't.
10 Q.    Okay. So then what were you doing at that
11 time?
12 A.    Letting him do his thing. I had the camera,
13 as soon as he reached for it all I did was move, he
14 grabbed me, I went straight to the ground, no
15 resisting, no pulling back, I just let him do his
16 thing.
17 Q.    All right. And so on the -- so you had a
18 camera in your hand -- or the phone in your hand,
19 what happened with the phone as he's pulling you out?
20 A.    I'm still holding the phone while I'm on the
21 ground, so he has one hand behind my back, right, and
22 I'm still -- I'm like this (indicating), you know,
23 holding it like this try to -- I can't see if I'm
24 actually recording him or not.
25        And then he takes my phone and just kind of

**VMF 17, 18**

**VMF 17, 18**

Page 57

1  tosses it out of my hand, like he tosses it on the
2  ground.
3         And then he pulls me up by my dreadlocks,
4  handcuffed my other hand, pulls me up by my
5  dreadlocks and starts pulling my hair back like that
6  (indicating).
7  Q.    Did -- when he's pulling your hand -- I
8  guess -- so you have the phone in your right hand,
9  right?
10 A.    Yes, I do.
11 Q.    And he has your left hand?
12 A.    Yes.
13 Q.    Does he need to kind of move it into place
14 behind your back?
15 A.    He does. I -- when he first grabbed my left
16 hand when I'm recording you can see it on the
17 footage, it goes straight back like that
18 (indicating), and then he throws me on the ground.
19 Q.    Oh. So -- yeah. So he had your hand behind
20 your back --
21 A.    M-hm.
22 Q.    -- before you actually were out of the
23 vehicle, correct?
24 A.    Yeah. You could see he grabbed this hand,
25 and he goes just like this, just like that

Page 58

1  (indicating).
2  Q.    Okay.  So when you're on the ground he had
3  his arm around your neck?
4  A.    M-hm.  Yes.
5  Q.    Okay.  And did you say anything to him in
6  that --
7  A.    I was trying, but he was choking me, I
8  couldn't breathe to the point where, you know, where
9  you see little dots, clear little dots.
10 Q.    So you were seeing -- at some point you were
11 light-headed?
12 A.    Yes.
13 Q.    So you weren't able to talk at all while he
14 had his arm around your neck?
15 A.    When he let go then I was able -- I told him
16 to stop, I just got off work.  I told him to let
17 me go.
18 Q.    Okay.  Did -- and you've obviously seen your
19 own footage, correct?
20 A.    Yeah.  Yeah.
21 Q.    Okay.  So while on the ground did you -- were
22 you yelling at him?  Were you -- how were you --
23 A.    At first when he put me in the choke hold you
24 can hear me in my video like (making sound), like
25 that.  And then when he lets go I'm yelling:  Stop,

Page 59

1  let me go.  I just got off work.  I didn't do
2  anything.  I had worked.                    *WMF 21*
3  Q.    And so how long, approximately, did he have
4  you in a -- just the hold?
5  A.    The choke hold?  I would say a good minute or
6  a minute or over, a minute and 30 seconds, a minute.
7  Q.    During that time approximately how long did
8  he have it where he was applying pressure?
9  A.    When he was applying pressure to the choke
10 hold?
11 Q.    Yeah.
12 A.    Like how long was it?
13 Q.    Yeah.
14 A.    Is that what you said?
15      It lasted a good 45 seconds to a minute for
16 the actual pressure, you know.
17 Q.    To the point -- you know, so at the end of
18 that 45 seconds to a minute of him holding your
19 neck --
20 A.    Uh-huh.
21 Q.    -- that's when you started seeing the dots,
22 or --
23 A.    No.  No.  I started seeing -- so when he
24 started choking me, he was choking me for a good 45
25 seconds to a minute, and I'm gasping for air (makes

Page 60

1  sound), and then -- then I started seeing the dots,
2  and he lets me go, and I told him:  Let me go, I
3  didn't do nothing wrong, I just got off of work.
4  Q.    And was it during that 45 seconds that he was
5  holding you that he slapped your phone away, or was
6  that after?
7  A.    No, that was after.  I was able to talk when
8  he did that, and I told him:  You just broke my
9  phone.  You can hear it in my video.
10 Q.    Okay.  So you're on the ground, choke hold
11 applied, approximately 45 minutes (sic), you're
12 seeing dots, you can't talk for those 45 seconds-ish,
13 then he un --
14 A.    He lets go.
15 Q.    Relieves the pressure, I guess?
16 A.    Yeah.  Then he -- before, actually when he's
17 handcuffing me he puts his knee on top of my head, so
18 my lip is face down to the concrete.
19      So while he's putting my second handcuff he
20 does that; puts his knee to top of my head, scraped
21 my lip onto the concrete.
22 Q.    Okay.  And so between -- so basically after
23 the -- he was cuffing you, that was after he knocked
24 the phone out of your hand, he pulled the other hand
25 back --

Page 61

1  A.    M-hm.
2  Q.    -- that was holding the phone, correct?
3  A.    Correct.
4  Q.    So he put that behind you while you were on
5  the ground?
6  A.    Correct.
7  Q.    Put you in the cuffs while you were still on
8  the ground, and he had his knee on the back of your
9  head?
10 A.    Correct.
11 Q.    And then how long was -- from the point where
12 after you were able to breathe for air to the point
13 where he was able to get you into cuffs,
14 approximately how long was that for?
15 A.    Like and get me stood up?
16 Q.    Well, just from the point where you were in
17 cuffs.                                      *VMF 20*
18 A.    Like how long did it take for him to get me
19 in cuffs and fully just have me laying down on the
20 ground?
21 Q.    Yeah.
22 A.    It took about two minutes.
23 Q.    So you were on the ground for about two
24 minutes?
25 A.    Yeah.  Two to three minutes I was.

Page 62

1  Q.      And then during that two to three minutes,
2  just trying to make it completely clear here, so 45
3  seconds to about a minute you were being in a choke
4  hold with pressure?
5  A.      M-hm.
6  Q.      At the conclusion of that he -- was the first
7  thing he did is he slapped the phone away?
8  A.      The first thing he did when I was on the
9  ground?
10  Q.      Yes.
11  A.      No.  When I was on the ground I already had
12  one cuff on my hand on my back, so I'm recording on
13  the ground.
14        And then, yes, he takes my hand and he just
15  tosses my phone, and I say, "You just broke my
16  phone."
17        And then he does take my other hand and put
18  it behind my back and put his knees on my head while
19  he's doing that, and I'm face down onto the concrete,
20  and my lip is scraped.
21  Q.      Okay.  So -- all right.  So then he lifts you
22  up --
23  A.      Yes.
24  Q.      -- correct?
25  A.      By my dreadlocks, not by my arms while I'm

Page 63

1  cuffed, strictly by my hair.
2  Q.      Okay.  So he picks you up by the hair?
3  A.      M-hm.
4  Q.      Okay.  Then at that time had other officers
5  arrived?
6  A.      Yes.  There was a total of three officers.
7  Q.      Three other officers or --
8  A.      Well, three in total.  One including Tonn,
9  and then two other officers.
10  Q.      Okay.  And then did you get any of the other
11  officers' names?
12  A.      I don't remember their names.  I do have them
13  in my e-mail, but I don't remember their names off
14  the top of my head.  I strictly remember Tonn.
15  Q.      But none of the officers actually used force
16  to --
17  A.      No.  No.  It was mainly him.  You know, they
18  were there as backup.
19  Q.      Okay.  Did you notice Tonn through -- at any
20  point during your interaction with him at the car or
21  during the detention portion where he's radioing for
22  backup.
23        MR. GOFF:  Objection; compound.
24        THE WITNESS:  No.        //
25  //

Page 64

1  BY MR. SMYTH:
2  Q.      You didn't notice him talking to anyone else
3  like over the radio at any point?
4  A.      No.
5  Q.      Were you -- okay.
6        So after you were detained you were walked to
7  the -- to a police cruiser, correct?
8  A.      Correct.
9  Q.      Okay.  And then someone placed you into a
10  police cruiser?
11  A.      They threw me into the police cruiser, and I
12  hit my head on the window, and then they put me in
13  about -- not too long after Tonn said, "Get him outa
14  here."
15  Q.      Which -- so you were thrown into the car, and
16  you hit your head on which window?
17  A.      On the back window.  The driver's side, and
18  then the back one from that.
19  Q.      Like the rear windshield?
20  A.      Yeah.  The left one on the back.
21  Q.      Okay.  And so your car was towed; is that
22  correct?
23  A.      Correct.
24  Q.      Okay.
25  A.      Yeah.

Page 65

**UMF 23**

1  Q.      And what -- what happened with the car?
2  A.      Um, it was sold at a tow yard.  I couldn't
3  get it back out, it was too much money.  It was on a
4  30-day hold.
5  Q.      Did they tell you how much it would cost to
6  get it back?
7  A.      Over five grand.
8  Q.      Did they say why it costed -- was it --
9  A.      Because it was on the 30-day hold, and they
10  added like over a hundred dollars every day, so it
11  just added up, totaling five grand.
12  Q.      Did they say anything about having tickets or
13  anything like that causing the money portion to be
14  higher?
15  A.      No.  My -- because they told my grandpa
16  because it's under his name, so the only thing that
17  he told me was they sent him a letter saying that
18  they sold the vehicle.
19  Q.      And you -- how long did you own that car?
20  A.      I owned that car for a good year.  I was
21  making payments on the car.
22  Q.      And who were you making payments with?
23  A.      Toyota.
24  Q.      What kind of car was it?
25  A.      It was a 2010 Kia Optima.

Page 78

```
 1   Q.      Okay.  Did -- I think you said that she said
 2   that it would go away within, you know, a few days --
 3   A.      Yes.
 4   Q.      -- the pain in your neck?
 5   A.      Yes.
 6   Q.      Did it go away within a few days?
 7   A.      Yes, as she said.
 8   Q.      So as you're sitting here today your neck is
 9   not still suffering from any sort of neck sprain?
10   A.      No, it's not.
11   Q.      And your bruises all recovered?
12   A.      Yes, bruises all recovered on my arm and my
13   wrist.
14   Q.      And how long did you have those bruising last
15   for?
16   A.      About a week.
17   Q.      And it's true that you're not claiming any
18   other form of injury as a result of the incident on
19   April of 2017 that we're here to talk about today?
20   A.      Correct.
21   Q.      Okay.  So at the -- when you were taken to
22   the police station you were in a holding cell for --
23   you said I think it was approximately two hours; is
24   that correct?
25   A.      M-hm.  Correct.
```

Page 79

```
 1   Q.      Did you know that Officer Tonn was recording
 2   you during those interactions?
 3   A.      I did not.
 4   Q.      Okay.  So at the outset he came and read
 5   Miranda rights to you; is that correct?
 6   A.      When I was in there.
 7   Q.      Yes.
 8   A.      Yes.
 9   Q.      Do you remember how many times,
10   approximately, he came to talk to you?
11   A.      He came to talk to me one time.  At first I
12   didn't even know if it was him.  I was asking him are
13   you the officer that arrested me because I could not
14   remember.  And he was like: Yes, I am.
15           And I basically asked him, I was like: What
16   did I do?  Like: Why did you do that?
17           And we were just talking, going back and
18   forth from there.
19   Q.      And what did he say?
20   A.      Um, he didn't really say anything because I
21   was crying a lot, and I was trying to call my
22   girlfriend, her (indicating), and the phone in there
23   wasn't working, and I was trying to call, and he -- I
24   asked him if I could just use his phone to call her
25   just to let her know I'm in jail and I won't be
```

Page 80

```
 1   coming back the same day, and he let me use his
 2   phone.
 3           And I couldn't stop crying, so he -- I asked
 4   him if he could just tell her that I'm in jail
 5   because I couldn't talk, like I was just crying too
 6   much, and, yeah, he told her, and that was pretty
 7   much about it.
 8   Q.      Did you discuss at all the -- how you felt
 9   about being -- Officer Tonn approaching you?
10   A.      I told him that -- yeah.  I told him that
11   you're mistreating me, you did me wrong.  I felt that
12   I was racially profiled, I told him that.
13           And he said, "I don't want to be one of these
14   officers on YouTube, you know, doing something to
15   another person."  And he asked me what I was doing on
16   my phone in there.  I told him: I recorded you.
17           And yeah, that's -- that's how that went in
18   there.
19   Q.      So you told him you were upset with him
20   pulling you over?
21   A.      Yeah.  Yeah.  And I told him that I didn't do
22   anything wrong, you had no reason to even come up to
23   me.
24           He was listening to me, but he -- then he let
25   me out saying that, "Oh, you seem like a good guy,
```

Page 81

```
 1   you're working."  He was like: If you would have
 2   just told me that you were working I wouldn't even
 3   have took you here.  When we were talking in the cell.
 4   Q.      Is there -- at any point did you talk about
 5   you having anger issues?
 6   A.      Yes.  He -- because the officers -- the
 7   officer that was driving me up there was saying that
 8   I need to calm down, that I was angry.
 9           I had a right to be angry for being
10   mistreated, and I told him that, yeah, I have anger
11   problems.  I had anger management in middle school,
12   but that was years ago, but that was just 'cause a
13   teacher, I got in trouble in class, and the teacher
14   wanted me to do anger management class with her, but
15   other than that, no.
16   Q.      Did you talk at all about your -- what Tonn
17   was perceiving as your inability to listen?
18   A.      What do you mean?  What do you mean
19   inability?
20   Q.      Well, I'm trying to think of the right way to
21   phrase it, but did Officer Tonn express to you issues
22   that he had with your listening to him during the
23   interaction?
24   A.      He did.  He said that he wanted me to just
25   listen and basically just be quiet, just listen, but
```

VMF 31

Page 82

1   I was -- I was telling him like: No, I didn't do
2   anything wrong, I have a right to talk, I have a
3   right to say how I feel.  And I told him how I felt.
4   Q.      Did you think that you had a right to not
5   listen during the traffic stop?
6           MR. GOFF:  Objection; calls for a legal
7   conclusion.
8           THE WITNESS:  No, I didn't.  I -- no.
9   BY MR. SMYTH:
10  Q.      I'm sorry, your answer is no?
11          THE WITNESS:  Because you --
12          MR. GOFF:  I objected.  You can answer.
13          MR. SMYTH:  You can answer, yeah.
14          THE WITNESS:  Oh.  Okay.  I was listening at
15  the stop.
16  BY MR. SMYTH:
17  Q.      Okay.  And at the stop -- so did he tell you
18  or convey to you that he did not believe you were
19  listening during the traffic stop?
20  A.      He didn't -- he didn't say that -- he didn't
21  say that, no.
22          It just all happened so fast.  As soon as he
23  came up to me at the traffic stop, asked for my -- he
24  told me about my tags, and I said, "No, they don't
25  expire till the end of April."

Page 83

*UMF 11*

1           He said, "April 2nd," and told me that I'm
2   being recorded on his body camera.
3           I said, "Okay.  I'm going to record too," and
4   that's when I go like that (indicating).  But no, he
5   didn't say anything like that.
6           At the end when everything was done, yes, he
7   was like:  You need to listen.
8           I was like:  Dude, I'm telling you to
9   listen while I'm on the ground, so you need to listen
10  too.
11          That's -- he wants me to listen, but he won't
12  listen to me.
13  Q.      So during the traffic stop, just kind of
14  going back --
15  A.      Yeah.
16  Q.      -- what -- what were you trying to tell him
17  that he wouldn't listen to?
18  A.      That I just got off work, and that I didn't
19  do anything wrong, I literally just got off the
20  school bus, walking to my car, that's what I was
21  trying to tell him.  And I had witnesses tell him the
22  same thing, and he -- the officer saying, "I don't
23  care, get back.  I don't care, get back."
24  Q.      He was saying, "I don't care, get back," to
25  who?

Page 84

1   A.      The witnesses.  They're recorded on the
2   video.
3   Q.      Did -- okay.  So let me ask you about --
4   break that apart.
5           So there were -- so during the interaction
6   between you and Officer Tonn now there were other
7   people standing around?
8   A.      Oh yeah, there were other people standing
9   around.
10  Q.      And Officer Tonn was talking to them?
11  A.      No.  Officer Tonn was dealing with me.  The
12  other officers were telling them to get back.
13  Q.      Okay.  So this was after you were already
14  detained --
15  A.      Yes.
16  Q.      -- you're talking about those witnesses?
17  A.      Yes.  They're recording the whole thing of
18  what happened, the other witnesses.  So they see me,
19  they see the officer come up to me and pull me out of
20  my car by my hair and throw me on the ground.
21  They're recording the whole thing.
22  Q.      Did anyone give you any camera footage?
23  A.      Yes.
24  Q.      And who else gave you camera footage?
25  A.      I don't know his name off the top of my head.

Page 85

1   I have his information, and I have the footage.
2   Q.      Is there a reason you haven't given that to
3   your attorney?
4   A.      I have.
5   Q.      The other -- so other body -- or other cell
6   phone footage you have provided in this litigation?
7   A.      Yes.  All footage I have I have sent to my
8   lawyer.
9           MR. SMYTH:  Just ask that you provide --
10          MR. GOFF:  Sure.
11          MR. SMYTH:  -- any other video.
12          MR. GOFF:  Sure.
13  BY MR. SMYTH:
14  Q.      And do you -- do you know who this person is?
15  A.      Um, I don't know him, but I know him just
16  because he lived across the street from my client, so
17  he seen the whole thing happen.  And I would just
18  walk by and wave at him just to be nice everyday I go
19  to work.
20  Q.      And how did it come to be that he sent you
21  body camera -- or I mean cell phone camera
22  footage?
23  A.      When he was recording, after I got released,
24  my mom took me to his house of where it happened, and
25  I asked for the footage.

Page 86

1  Q.    And you knew that he had it beforehand?
2  A.    Um, no, I did not.
3  Q.    So how did you find out that he had footage?
4  A.    Because I went back and I saw them while they
5  were yelling:  Hey, he just got off work, he works
6  for special needs.
7        So I went back to go and talk to 'em.
8  Q.    Okay.  So -- but that is -- all that stuff is
9  after you were already in handcuffs, correct?
10  A.    Correct.
11  Q.    Did they have any of the footage -- did any
12  of the footage that they gave you, did that depict
13  anything before you were in handcuffs?
14  A.    Depict anything before I was in handcuffs?
15  Q.    Did they videotape anything of the
16  interaction between you and Tonn before you were
17  already in handcuffs?
18  A.    Oh.  No.
19  Q.    So the camera footage that they gave you was
20  all afterwards?
21  A.    The camera footage that they gave me was when
22  I was on the ground.
23  Q.    So you were on the ground by the time they
24  started the footage?
25  A.    Yes.

Page 87

1  Q.    So they don't see, you know, anything like
2  Tonn pulling up or whatever was occurring before you
3  and -- before Tonn actually removed you from the
4  vehicle?
5  A.    They see -- they see him pulling -- they were
6  all standing outside, I saw them.  I saw them
7  standing outside.  They were standing outside in
8  front of their house on their porch.
9  Q.    Well, I mean the footage.
10  A.    Oh.  The footage, no, they don't have that,
11  just me on the ground.  I have that footage, me
12  personally.
13  Q.    Okay.  So in the -- so we're kind of still
14  talking about -- so there was -- so Officer Tonn and
15  you were talking about listening when you were in the
16  holding cell --
17  A.    Okay.
18  Q.    -- so that's what we were -- how we kind of
19  got on this line of questioning.
20  A.    Yeah.
21  Q.    So I want to kind of just go back and try and
22  bring it together here.
23        So with regard to your -- his and your
24  discussion on who should be listening to who,
25  basically, during this, is there anything that he

Page 88

1  should have been listening to you, as far as you
2  understood it, before he removed you from the
3  vehicle?
4  A.    Could you repeat that question?
5  Q.    Sure.  Let me ask it this way:  Is there
6  anything you were trying to tell him that he wasn't
7  listening to while -- before you were removed from
8  the vehicle?
9  A.    Other than that I just got off work and that
10  I didn't do anything wrong, no.  That was what I was
11  trying to get past him, that I was getting fresh off
12  working, I'm literally walking to my car, and that's
13  it.  I just wanted him to know that, like I just got
14  off work, like there's no reason for you to come up
15  to me right now.
16  Q.    And so when -- and you communicated all that,
17  you were telling him during the traffic stop that he
18  didn't do anything wrong -- that you didn't do
19  anything wrong, and that he shouldn't be approaching
20  you?
21  A.    Yeah.
22  Q.    And how did he respond when you said, "You
23  shouldn't" -- he shouldn't be approaching you?
24  A.    He didn't -- he didn't respond.  He didn't
25  respond to that.

UMF 4                                    Page 89

1  Q.    And did you at any point come to understand
2  that the car registration was expired at the time?
3  A.    Um, no, because the tags said April 2017, and
4  from my understanding they don't have -- they don't
5  have certain dates, like oh, it ends April 2nd, I
6  didn't know that.  So from my understanding from the
7  tags, they ended the end of April 2017.
8  Q.    Is that still your understanding?
9  A.    Well, from now on, because he said they have
10  certain dates they end, so -- I didn't know that at
11  the time.
12  Q.    So because you didn't know at the time of the
13  traffic stop was there a reason you believe he
14  shouldn't have been pulling you over then?
15  A.    Yeah.  I believe he --
16  Q.    Sorry, ignore that, that's --
17        MR. GOFF:  Objection; calls for a legal
18  conclusion.  He's not a lawyer.
19        THE WITNESS:  Could you repeat the question?
20        MR. SMYTH:  Sure.  I'll -- we'll try and do
21  that question, then we'll go on a quick break.
22        THE WITNESS:  Okay.
23  BY MR. SMYTH:
24  Q.    Is there an understanding you have that
25  because you didn't know at the time of the

VMF 4

Page 90

1    April 19th, 2017, traffic stop that he should not
2    have pulled you over?
3         MR. GOFF:  Same objection.
4         You can answer.
5         THE WITNESS:  I believe he shouldn't have
6    pulled me over.
7    BY MR. SMYTH:
8    Q.    Even though the registration was expired?
9    A.    Yes.  I was not driving the vehicle, I
10   wasn't.  He shouldn't have pulled me over regardless.
11        MR. SMYTH:  Okay.  Let's go on a break.
12        THE VIDEOGRAPHER:  Okay.  This is going to
13   conclude media number one of the August 9th, 2019,
14   deposition of Robert Strong.
15        Off the record at 12:47.
16        (Recess taken from 12:47 p.m. to 1:00 p.m.)
17        THE VIDEOGRAPHER:  This begins media number
18   two of the August 9th, 2019, deposition of Robert
19   Strong.
20        On the record at 1:00 o'clock, approximately.
21   BY MR. SMYTH:
22   Q.    Okay.  So we were still kind of talking about
23   the time inside the -- inside the holding cell with
24   Officer Tonn and the conversations that you were
25   having at that time, but before we get back into the

Page 91

1    conversation itself, I understand that you had --
2    you -- he what you called cited you out; does that
3    sound familiar?
4    A.    Cited me out?
5    Q.    Yeah.
6    A.    Like when he released me?
7    Q.    So he gave -- had you fill out a paper, a
8    document, to --
9    A.    He had me fill out a ticket.
10   Q.    Yeah.  So let me hand you this, tell me does
11   this look familiar to you?
12   A.    Yes.
13        MR. SMYTH:  Okay.  If you want to mark that
14   next document in order.
15        (Photocopy of Notice to Appear was marked
16        as Defendants' Exhibit No. 4 for
17        identification.)
18        MR. SMYTH:  Here you go.
19        MR. GOFF:  Thank you.
20   BY MR. SMYTH:
21   Q.    So do you understand this, what we just
22   marked as Exhibit 4, to be the ticket that you filled
23   out?
24   A.    Yes.
25   Q.    And that is your signature at the bottom; is

Page 92

1    that correct?
2    A.    Yes.
3    Q.    And after filling this out you were released
4    from the Vallejo Police Department?
5    A.    Yes, I was.
6    Q.    And the time on here at the top is 2:25, does
7    that look about correct?
8    A.    At the top?
9    Q.    There's a time -- there's a date of
10   violation, time, and day of the week, case number at
11   the very first row of the ticket.
12   A.    Okay.  I see here.  It's in military time?
13   Q.    Yeah.  Does that look familiar or sound
14   familiar to you?
15   A.    Yes.
16   Q.    So --
17   A.    Was this -- 2:00 o'clock?  What was 2:00
18   o'clock?
19   Q.    That is the time that this was filled out.
20   A.    So then that's inaccurate then.  That can't
21   be 2:00 o'clock when it happened at 2:15.
22   Q.    Okay.  So it's your understanding that this
23   ticket may have been filled out prior to your
24   release?
25   A.    Yes.  And it's -- the time is wrong.

Page 93

1    Q.    Okay.
2    A.    Couldn't have been 2:00 o'clock when that
3    happened 2:15.
4    Q.    Does the -- so what time did you understand
5    you were released from custody with the VPD?
6    A.    At least around 4:00 o'clock.
7    Q.    Okay.  Does -- at the middle of the ticket it
8    notes the code sections of violations for the ticket;
9    do you see that?
10   A.    Correctable violation?
11   Q.    Well, yeah.  Under there there's rows related
12   to particular codes and descriptions of the offenses.
13   A.    I see.
14   Q.    Do you have any understanding of either of
15   those codes and what the offense was for?
16   A.    This one says suspended license, and I don't
17   know what the second one is, obstruct?  I don't know
18   what that is, 148, obstruct.
19   Q.    Do you remember discussing any of these codes
20   and charges with anybody after receiving the
21   citation?
22   A.    All I remember is just him having me say I'm
23   gonna give you a ticket and, you know, I want you to
24   sign it, and you're going to get let go.  That's all
25   I remember.

VMF 27

1   A.     Being a black male, I mean we don't get
2   treated the same as everybody else, you know, I mean
3   that's just the truth.  We don't get treated the
4   same, I mean, and being -- having dreadlocks at
5   that -- at that time too, I mean a person can look
6   intimidating, their facial features, maybe could look
7   like a drug dealer, maybe could, I don't know, could
8   be robbing stores, something, probably up to no good,
9   you know, your appearance.  Probably my appearance,
10  he probably didn't like it.  It was something.
11         I don't know -- I'm not going to say I know
12  what it is, but I'm going to say what I feel like it
13  is, and from how he was talking to me and how he
14  approached that's how he brought it off as, so I
15  mean --
16  Q.     And at the time he approached you you felt
17  you were being racially profiled, and based upon the
18  fact you weren't doing anything wrong --
19  A.     Yeah.
20  Q.     -- in your mind at the time?
21  A.     Yeah.  I mean I don't see how walking to your
22  car being on the phone is doing something wrong,
23  unless you do.
24  Q.     Do you remember during the interchange,
25  exchange here with Officer Tonn, talking about there

1         (Video playing on computer.)
2         MR. SMYTH:  It might be a different video,
3   this is why it's difficult.
4         (Video playing on computer.)
5         MR. SMYTH:  Here, let me see --
6         (Video playing on computer.)
7   BY MR. SMYTH:
8   Q.     So I went back to the suspect, underscore,
9   given, underscore, Miranda, underscore, admonishment
10  video, and I think around here is what I was looking
11  for, and we're at about the four-minute mark of the
12  video, we had stopped earlier around the three-minute
13  mark when we were listening earlier, so this might be
14  what I was referring to.
15         You know, after we do this one, if you want
16  to watch more videos, but I want to get us moving and
17  then --
18  A.     Oh yeah.
19  Q.     -- you know --
20  A.     That's all right.
21         (Video playing on computer.)
22         THE WITNESS:  Can we pause this?  So you
23  heard him say that I didn't drive up.
24  BY MR. SMYTH:
25  Q.     Which part?

1   was nothing that he could have done differently that
2   would have changed your belief that he shouldn't have
3   approached you?
4   A.     I don't remember that.  I remember him saying
5   something differently.  Can you play it back?  Can
6   you play it back?
7   Q.     I'm going to have to find that.
8   A.     I mean --
9   Q.     So I'm going to -- I think it was in a
10  different video entirely, and this one I'm playing --
11  this one, for the record, it's called conversation,
12  underscore, with, underscore, suspect.  The video
13  goes for 12 minutes and nine seconds, I'm going to
14  bounce around, and I'll try and find --
15  A.     Okay.
16         (Video playing on computer.)
17         MR. SMYTH:  Girlfriend, that was what --
18         THE WITNESS:  I don't remember that.
19         MR. SMYTH:  So anyway --
20         (Video playing on computer.)
21         MR. SMYTH:  So I almost forgot what I was
22  looking for here as part of the audio as we're
23  listening.  What did I say I was looking for?  Sorry.
24         (The record at Page 114, Page 24, through
25         Page 115, Line 3, was read by the reporter.)

1   A.     That I didn't drive up.  He just said that I
2   didn't drive up.  If you go back a little bit --
3         (Video playing on computer.)
4         THE WITNESS:  He said, "When you drove up,"
5   correction, "When I drove up."
6         (Video playing on computer.)
7         MR. SMYTH:  Is that --
8         MR. GOFF:  That's it.
9   BY MR. SMYTH:
10  Q.     So in that you told Tonn that you knew what
11  was happening before it even started.
12  A.     Oh yeah.  When I saw him go like this
13  (indicating), when we made eye contact like this, I
14  already knew.  I knew he was gonna come up to me, I
15  knew it, I knew it.
16  Q.     And when you say you made eye contact with
17  him --
18  A.     Like this (indicating).  When he's driving by
19  he's looking out the window, I'm looking at him like
20  this (indicating), eye to eye, we make eye contact.
21  Q.     Was he -- he was wearing sunglasses, wasn't
22  he?
23  A.     I believe he was.  Jeans, blue jeans, a
24  police shirt, I believe he was wearing some
25  sunglasses.  I think he was.  I don't know.

Page 118

```
 1   Q.     So you couldn't see his eyes?
 2   A.     No. I seen him. He looked out the window.
 3   He looked at me, he was looking like this
 4   (indicating). Just 'cause somebody's got glasses on
 5   that doesn't mean you can't see.
 6   Q.     Well, I mean you can't see his eyes.
 7   A.     I can see him looking at me.
 8   Q.     So you can see him turn his head?
 9   A.     I see him look at me.
10   Q.     Like look over --
11   A.     I see him drive by and look at me.
12   Q.     Okay.
13   A.     That's what I seen.
14   Q.     And so when -- even at that point you knew in
15   your head that he was going to approach you?
16   A.     I said in my head: I bet you he come up to
17   me. That's what I said in my head: I bet you he
18   come up to me, as I'm walking to my car.
19   Q.     And you're --
20   A.     And, sure enough, that's what he did.
21   Q.     Okay. I mean there's much more.
22   A.     Oh yeah, I already -- way more.
23   Q.     There's -- I don't intend to go through all
24   of it.
25   A.     Okay.
```

Page 120

```
 1   arrest and now he was going to pull you out of the
 2   car?
 3   A.     No, he didn't.
 4   Q.     Did you ever threaten Officer Tonn during the
 5   incident at that moment in time?
 6   A.     No, I didn't.
 7   Q.     Did you ever swing at Officer Tonn?
 8   A.     No, I didn't.
 9   Q.     Did you ever kick at Officer Tonn?
10   A.     No, I didn't.
11   Q.     Were you ever on the phone -- once Officer
12   Tonn approached you and you were sitting in the car
13   were you ever talking to someone on the phone?
14   A.     I wasn't talking to anyone. I was dialing on
15   the dial pad.
16   Q.     So you weren't talking to anybody on the
17   phone?
18   A.     No.                        UMF 11
19   Q.     And you told Officer Tonn that you were
20   recording him, or you were going to record him; is
21   that correct?
22   A.     Yes.
23   Q.     And this was after Officer Tonn said he was
24   going to record you?
25   A.     Yes.
```

Page 119

```
 1   Q.     We do have lunch and another deposition this
 2   afternoon.
 3   A.     Okay.
 4          MR. SMYTH: But I think for now I appreciate
 5   your time, thank you for coming in.
 6          That will be it for me, unless Stanley --
 7          MR. GOFF: Yeah, I've got a couple questions.
 8          MR. SMYTH: -- has questions.
 9          MR. GOFF: Yeah.
10                EXAMINATION
11   BY MR. GOFF:
12   Q.     Let me ask you this: Did Officer Tonn ever
13   tell you that he had a warrant to seize your phone?
14   A.     Are you asking me?
15   Q.     I'm talking to you.
16   A.     Oh. No, he didn't.
17   Q.     Okay. He just -- did he ever give you a
18   command that if you did not give you -- give him your
19   phone he was going to pull you out of the car and
20   place you under arrest?
21   A.     No, he didn't.
22   Q.     Did he ever give you any commands to step out
23   of the car or else you would be placed under arrest?
24   A.     No, he didn't.
25   Q.     Did he ever tell you that you were under
```

Page 121

```
 1   Q.     Did Officer Tonn tell you that you were under
 2   arrest for trying to record him?
 3   A.     No.
 4   Q.     Did Officer Tonn give you a command that you
 5   could not record him?
 6   A.     No.
 7   Q.     For the 45 seconds that Officer Tonn had his
 8   arm around your neck it was difficult for you to
 9   breathe or -- were you able to breathe at all?
10   A.     No. I was gasping for air.
11   Q.     And this lasted for about 45 seconds?
12   A.     Correct.
13   Q.     And you said that you started seeing spots
14   or --
15   A.     Yeah, little white dots.
16   Q.     Or, as Counsel has stated earlier for you,
17   that you were becoming light-headed?
18   A.     Correct.
19   Q.     And then this light-headedness continued to
20   go -- continued until Officer Tonn let go or released
21   some of the force around your neck?
22   A.     Correct.
23   Q.     But even after he released some the force
24   around your neck he still had his arm around your
25   neck?
```

UMF 15

1   A.      Say that one more time.
2   Q.      Excuse me.  Even after Officer Tonn released
3   some of the force from the hold that he had around
4   your neck, his arm remained around your neck; is that
5   correct?
6   A.      Correct.
7   Q.      When Officer Tonn had you on the ground with
8   his arm around your neck -- strike that.
9           When you were on the ground and Officer Tonn
10  had his arm around your neck, is that the time that
11  Officer Tonn told you to put your hands behind your
12  back?
13  A.      Yes.
14  Q.      Were you physically able to put your hands
15  behind your back while you were being choked --
16  A.      No.
17  Q.      -- by Officer Tonn?
18  A.      No.
19  Q.      Were you trying to comply with his orders
20  while he had his arm choking you around your neck?
21  A.      Yes.
22  Q.      But you were physically unable to do so at
23  the time because his arm was choking you around your
24  neck; is that correct?
25  A.      Correct.

1           MR. SMYTH:  Leading.
2   BY MR. GOFF:
3   Q.      You -- and you were never -- were you ever
4   convicted of the charges that were issued on this
5   ticket?
6   A.      No.
7   Q.      Were you ever even prosecuted for the
8   charges?
9   A.      No.
10  Q.      Why is that?
11          MR. SMYTH:  Relevance.
12  BY MR. GOFF:
13  Q.      Why is that?
14          MR. SMYTH:  And calls for a legal conclusion.
15          THE WITNESS:  I don't know.
16          MR. SMYTH:  Calls for speculation.
17  BY MR. GOFF:
18  Q.      Were you ever summoned to court to answer for
19  the charges that were on this ticket?
20          Did you ever have to go to court based on
21  this ticket?
22  A.      No.
23  Q.      Okay.  How long were you on the ground once
24  Officer Tonn pulled you out of the car, do you
25  recall?

1   A.      I was on the ground for a good two minutes.
2   Two to three minutes I was on the ground, total.
3   Q.      And you said that Officer Tonn, when he
4   pulled you up, you were already handcuffed -- strike
5   that.
6           Once -- Officer Tonn winded up pulling you up
7   from the ground by your hair?
8   A.      Yes.
9   Q.      When he pulled you up from the ground by your
10  hair were you handcuffed?
11  A.      Yes.
12  Q.      When he pulled you up from the ground by your
13  hair did it hurt?
14  A.      Yes.
15  Q.      On a scale of one to ten, what level of pain
16  did you experience when he pulled you up by your
17  hair?
18  A.      Ten.
19  Q.      Did he even try to pull you up by your arms?
20  A.      No.
21  Q.      And at that time that he pulled you up by
22  your hair were there other officers present?
23  A.      Yes.
24  Q.      How many?
25  A.      Two.  Three in total.

1   Q.      And you said you were thrown -- when you were
2   thrown in the police cruiser you hit your head on the
3   window?
4   A.      Yes.
5   Q.      What officer was that that put you in the
6   police cruiser?
7   A.      Tonn.
8   Q.      It was Officer Tonn?
9   A.      Yes.
10  Q.      Did you hit your head on the window with a
11  lot of force, or just -- or just skinned the window?
12  A.      With a good amount of force.
13  Q.      Did it hurt?
14  A.      Yes.
15  Q.      Scale of one to ten, how much did it hurt?
16  A.      Eight.
17  Q.      Officer Tonn asked you what are you doing
18  in the neighborhood?
19  A.      Just got off work.
20  Q.      No, I'm saying --
21  A.      Oh.
22  Q.      -- he asked you what are you doing in the
23  neighborhood?
24  A.      Oh.  Yes.
25  Q.      So before -- strike that.

# EXHIBIT B

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF CALIFORNIA
 3                     SACRAMENTO DIVISION
 4                         --oOo--
 5   ROBERT STRONG,                    )
                                       )
 6          Plaintiff,                 )
                                       )
 7          VS.                        )  No. 2:18-CV-01246-
                                       )       WBS-AC
 8   CITY OF VALLEJO, JARRETT TONN,    )
     ANDREW BIDOU and DOE VALLEJO      )
 9   POLICE OFFICERS 1-25,             )
                                       )
10          Defendants.                )
                                       )
11                                     )
12
13                         --oOo--
14              DEPOSITION OF JARRETT TONN
15                         --oOo--
16
17
18                 Vallejo, California
                   Friday, August 9, 2019
19                     2:42 p.m.
20                       --oOo--
21
22              DOUCETTE & ASSOCIATES
                  1219 Marin Street
23             Vallejo, California 94590
                   (707) 554-9970
24
25   REPORTED BY: REBECCA K. DOWELL, CSR, RPR
              CSR License Number 8043
```

*VMF 1*

```
 1          Where do you work?
 2    A.    I work for the Vallejo Police Department.
 3    Q.    What is your title there?
 4    A.    A detective.
 5    Q.    And how long have you been a detective?
 6    A.    Been a detective since January 2016, and before
 7    that I was a patrol officer.
 8    Q.    And how long have you worked for Vallejo as a
 9    police officer, period?
10    A.    I have worked for Vallejo Police five years
11    yesterday, I think, or a couple days ago.
12    Q.    Congratulations.
13    A.    Thank you very much.  Thank you.
14    Q.    What materials or documents have you reviewed in
15    preparation for your deposition today?
16    A.    I have read my written report, I've watched all
17    the relevant body camera footage, I reviewed another
18    video that was taken by Mr. Strong.
19    Q.    M-hm.  Okay.
20    A.    I think that's it.
21    Q.    All right.  Have you talked to anybody about
22    this case?
23          MR. SMYTH:  Vague.
24    BY MR. GOFF:
25    Q.    Have you talked to any coworkers about this case
```

```
 1    since the lawsuit was filed?
 2    A.    I don't know if I talked to 'em about it since.
 3    I talked to 'em about it before.
 4    Q.    Before the lawsuit was filed?
 5    A.    Yeah.
 6    Q.    And if you recall, that was a while back, if you
 7    recall, who was it?
 8    A.    The people in my unit.  So I talked to Sergeant
 9    Bautista, Detective Wagoner, Detective Barreto.  That's
10    all that really comes to mind.
11    Q.    Okay.  And do you recall what you -- what kind
12    of conversation you had with them about this before the
13    lawsuit got filed?
14    A.    Most of them, or if not all of them, were
15    working the day of the incident.  Not that they were
16    there for the incident.  So, you know, just normal talk
17    about what happened and work talk.
18    Q.    Okay.  And are you familiar with the plaintiff,
19    Robert Strong, in this case, the plaintiff in this case?
20    A.    I am.
21    Q.    And how are you familiar with him?
22    A.    Only through that one contact from the day that
23    resulted in this lawsuit.
24    Q.    And are you familiar with the day of the
25    incident regarding the suit, which was April 19th, 2017?
```

*VMF 3, 5, 6*

```
 1    A.    Yes.
 2    Q.    And how are you familiar with the date?
 3    A.    Because it's tied to that incident.
 4    Q.    How did you become involved with the plaintiff
 5    on April 19th, 2017?
 6    A.    I initiated a traffic stop on his vehicle.
 7    Q.    And what was the purpose for initiating the
 8    traffic stop, if you recall?
 9    A.    The vehicle had an expired registration.
10    Q.    Did you ever -- strike that.
11          You never observed the plaintiff operating his
12    vehicle at the time that you detained him for
13    unregistered tags; is that correct?
14    A.    I'll maybe take issue with the word "operating."
15    Did I see the car moving --
16    Q.    Sure.
17    A.    -- no.  I believe the Vehicle Code standard he
18    was operating the motor vehicle; it was running, and he
19    was in the driver's seat.
20          It was not driving, if that's what you're asking
21    me.
22    Q.    Sure.  So your observation was the car was on,
23    or it was running?
24    A.    It appeared to be running, and when I approached
25    it closer I believe it was running, but not driving.  It
```

```
 1    was on the side of the road, if that's what you're asking
 2    me.
 3    Q.    And the plaintiff was eventually arrested, he
 4    was eventually arrested that day; is that correct?
 5    A.    That's correct.
 6    Q.    Okay.  Was one of the reasons that he was
 7    arrested because he had expired registration tags?
 8    A.    No.  That is an infraction, that is not
 9    arrestable, it's only citable.
10          He was arrested for 148(a) of the Penal Cole,
11    which was resisting or obstructing.
12    Q.    Okay.  Now, was he -- based on your observation
13    was the plaintiff obstructing, or was he resisting?
14    A.    One led to another.  He was obstructing and
15    resisting.
16    Q.    So let's talk about the obstructing.  How was he
17    objecting that day?
18    A.    During my initial approach or contact with him
19    during the traffic stop he kept trying to use his cell
20    phone to make a phone call, and I believe made a comment
21    about making a phone call.
22          And I said, you know, "Please don't make a phone
23    call."  And the reason I instructed him not to make a
24    phone call, I have gone on numerous traffic stops where
25    people will call relatives, friends, and then you get a
```

*VMF 10*

UMF 10                                          Page 10

1   bunch of people showing up, and it becomes very unsafe.
2        So for my safety I don't want people calling
3   people, and especially nowadays you have people live
4   streaming, all sorts of stuff, but at the end of the day
5   I don't want anything done that's going to draw more
6   people to this location, especially when I'm by myself
7   and I don't even know who this person is.
8        So I instructed him not to use his cell phone.
9   Q.   Okay.  And did the plaintiff tell you that he
10  was simply trying to record you on his phone versus that
11  he was talking on the phone?
12  A.   He did not.
13  Q.   Did you tell the plaintiff that you were
14  recording him?
15  A.   I did.
16  Q.   And -- strike that.
17       Is there a law that a person is not allowed to
18  record an officer while they're performing their duties?
19       MR. SMYTH:  Calls for expert opinion.
20       MR. GOFF:  If you know.
21       THE WITNESS:  I don't believe there's a law
22  stating they cannot.
23  BY MR. GOFF:
24  Q.   Okay.  And at the time that you were interacting
25  with the plaintiff on the day of this incident you were,

                                                Page 11

1   in fact, performing your duties as a public servant; is
2   that correct?
3   A.   I was.
4   Q.   Did you ever issue a command to the plaintiff to
5   put his phone away before you tried to take it from him?
6   A.   I might take issue with the exact wording.  I
7   told him to put his phone down or stop using it.  I don't
8   remember my exact words, but it was made clear to him to
9   put the phone down and stop using it.
10  Q.   Okay.  But you never said, "Put your phone away
11  or else I'm going to take it from you"?
12  A.   I don't believe I said those exact words.
13  Q.   And you didn't have a warrant to seize his
14  phone; is that correct?
15  A.   I did not.
16  Q.   And you never gave the plaintiff commands to
17  step out of the car on his own; is that correct?
18  A.   I did not.
19  Q.   You did subsequently grab the plaintiff by his
20  arm and took him out of his car to the ground; is that
21  correct?
22       MR. SMYTH:  Objection; vague as to subsequent.
23  BY MR. GOFF:
24  Q.   On the day of the incident -- on the day of the
25  incident you wound up taking the plaintiff -- or grabbing

UMF 13                                          Page 12

1   the plaintiff by the arm and taking him out of his car;
2   is that correct?
3   A.   That is correct.  There are events that led up
4   to that, so I don't want it to seem out of place, but
5   that in and of itself is correct.
6   Q.   Okay.  All right.  Let's go through some of the
7   events that led up to that.
8   A.   Sure.
9   Q.   Can you expound to me what were the events that
10  led up to that?
11       MR. SMYTH:  Calls for narration.
12       THE WITNESS:  You want me to narrate, or do you
13  want a question?
14  BY MR. GOFF:
15  Q.   You can give a brief narrative.                UMF 11
16  A.   I asked him several times to stop using his
17  phone, he would not.  I told him I was going to then take
18  his phone so he could not keeping using it.
19       I was afraid he was either in the middle of a
20  call or already called, so I tried to grab his phone to
21  stop it, stop whatever phone call was possibly in
22  progress.
23       When I went to take his cell phone he then
24  started to pull away and started to kind of twist his
25  body away.

UMF 12                                          Page 13

1        At that point, being that he was physically
2   resisting, not knowing anything about him or what might
3   be in the car, I did remove him from the vehicle by
4   grabbing him and pulling him out of the vehicle down to
5   the ground.
6   Q.   Okay.  Now, let me ask you this:  Prior to you
7   grabbing the plaintiff by his arm and taking him out of
8   the car did you say, "You're under arrest, I'm placing
9   you under arrest"?
10  A.   I did not.
11  Q.   And prior to you grabbing the plaintiff and
12  taking him out of his car did he ever swing at you?
13  A.   He did not.
14  Q.   And prior to you grabbing the plaintiff and
15  taking him out of his car, did he ever lunge at you in
16  any kind of way?
17  A.   He did not.
18  Q.   And prior to you grabbing the plaintiff and
19  taking him out of his car, did he threaten you?
20       MR. SMYTH:  That's vague.
21  BY MR. GOFF:
22  Q.   Did he threaten to hit you?
23  A.   He did not give me any verbal threats.
24  Q.   Okay.  Now, once you took the plaintiff out of
25  his car he was placed in a choke hold; is that correct?

UMF 13

Page 14

1  A.    No.
2      MR. SMYTH:  Vague.
3      THE WITNESS:  No, he was not.
4  BY MR. GOFF:
5  Q.    He was never placed in a choke hold the whole
6  time?
7  A.    He was not placed in a choke hold.
8      And if you want me to clarify that I'd be happy
9  to clarify that.  I don't know if it matters.
10     MR. SMYTH:  You can wait -- if he wants you to
11  then they'll ask you.
12     THE WITNESS:  Sure.
13  BY MR. GOFF:
14  Q.    Let me ask you this:  Plaintiff was unarmed
15  during this whole incident; is that correct?
16  A.    He turned out to be unarmed, yes.
17  Q.    And the plaintiff was subsequently cited out
18  based on the charges that were brought against him; is
19  that correct?
20  A.    Yes.  He was issued a citation at the Vallejo
21  Police Department.
22     MR. GOFF:  Okay.  So I have for exhibit -- so
23  what exhibit are we on?
24     (Discussion had off the record.)
25  //                      //

Page 15

1      (Response to Requests for Admission, Set One,
2      was marked as Plaintiff's Exhibit No. 5 for
3      identification.)
4  BY MR. GOFF:
5  Q.    And I would like to direct your attention to
6  request for admission number ten, and let me know when
7  you finish reading that particular request.
8  A.    Go ahead.
9  Q.    Okay.  So request for admission number ten
10  states:
11     Admit that you placed the plaintiff in
12     a carotid hold, in parentheses choke hold,
13     on the date of the incident.
14     And the response was:
15     Admit, admit that responding party placed
16     Plaintiff in a carotid hold to detain
17     Plaintiff as he resisted Officer Tonn.
18     Now, this response to my -- to the plaintiff's
19  the request for admissions states that you admit to
20  placing the plaintiff in a carotid hold; is that correct?
21     MR. SMYTH:  This is -- just vague, may be
22  overstating what -- the understanding of what carotid and
23  choke hold mean in connectin to each other, but if you
24  can explain.
25     THE WITNESS:  Yeah, I would be happy to.

Page 16

1      So I was kind of going to say the same thing.
2  I don't really know what a -- I don't know what
3  -- a carotid hold without applying pressure, if that
4  makes sense.
5      MR. GOFF:  Sure.
6      THE WITNESS:  I don't see as there's a carotid
7  hold that you don't apply pressure.
8      MR. GOFF:  Right.
9      THE WITNESS:  I mean because, in essence,
10  putting your arm around someone's neck or that area I
11  mean is not a carotid -- the hold and the pressure are
12  all one thing, there's not a -- now, you can get set --
13  defensive tactic speaking, you can get set up in a
14  position where you could do a carotid move if necessary,
15  but at least in my thinking I equate the -- I don't -- we
16  don't -- I don't know what a choke hold is, but a carotid
17  I can speak to.
18      The carotid hold is the pressure.  I don't think
19  you can separate the two, if that makes sense.
20  BY MR. GOFF:
21  Q.    Sure.  So --
22  A.    My arm was around the front of his neck, if
23  that's what you're asking.  I can say that, yes.
24  Q.    Okay.  All right.
25      MR. SMYTH:  And just to clarify the record,

Page 17

1  these are -- this is my words that I was trying to
2  explain what I understood when the maneuver to place a
3  person into a carotid maneuver, or whatever it is, as to
4  say, but as I tried to explain in that second portion of
5  the admission that there was no pressure applied, so --
6      THE WITNESS:  Yeah.  I think that's -- I think
7  my -- you can be in a position where you could apply a
8  carotid if necessary.
9      MR. GOFF:  Sure.
10      THE WITNESS:  But I think the hold and the
11  pressure are all one thing.  I see that as one thing.
12      MR. GOFF:  Okay.  So -- okay.  So let's go to
13  Exhibit Number 6.
14      (Investigation Narrative Report was marked as
15      Plaintiff's Exhibit No. 6 for identification.)
16  BY MR. GOFF:
17  Q.    And this would be the third to the last
18  paragraph says -- last paragraph is a small paragraph,
19  the one right above that -- no, the one above that.
20  A.    Which page?
21  Q.    I'm sorry, the first page, very first page, so
22  the third to the last paragraph, if you could read that,
23  then let me know when you're done.
24      Oh, excuse me, the second to last paragraph.
25  Let me know when you're done.  Sorry.

*(handwritten: VMF 15, 34)*

Page 18

1   A.     I'm done.
2   Q.     So in your police report it states that, "I did
3   not conduct a carotid." When you say that, what are you
4   referring to?
5   A.     Again, it's really hard to describe without
6   demonstrating, but in essence, you know, your arm can be
7   in front like this (indicating) where it's over someone's
8   front neck area, not necessarily like -- I'm not talking
9   sort of right on the Adam's Apple, the neck area.
10  Q.     Right.
11  A.     When I say I did not apply, so I could have
12  applied the carotid if necessary, but I did not conduct a
13  carotid, meaning I did not at any point tighten up on
14  that and I didn't apply any pressure to his carotid
15  arteries with my bicep or my forearm.
16  Q.     During the time that you had your arm around the
17  plaintiff's neck, at any time did it appear that he could
18  not breathe or that he was having problems breathing --
19  A.     No.
20  Q.     -- based on your observation?
21  A.     No. In fact, the opposite. He was talking
22  during that time. The carotid would have made someone
23  pass out in several seconds, and he was talking clearly.
24  Q.     And I'm glad you said that. So if someone was
25  placed in a carotid hold would it have caused them to

Page 19

1   become light-headed?
2   A.     If someone was placed --
3          MR. SMYTH: That's vagus, and may call for
4   speculation.
5          But, go ahead, just generally.
6          THE WITNESS: If a proper carotid was applied
7   the person would pass out within a matter of seconds.
8   BY MR. GOFF:
9   Q.     Okay. Forty-five seconds? Thirty seconds?
10  A.     It could be as quick as five or six seconds.
11  Depends how much pressure you're applying and how
12  properly, just depends.
13  Q.     Okay. So let me ask you this: Prior to --
14  strike that.
15         *(handwritten: VMF 15)* When you had your arm around the plaintiff's
16  neck, and it wasn't a carotid hold, but when you had your
17  arm around his neck you guys were on the ground; is that
18  correct?
19  A.     That's correct.
20  Q.     And how did you guys wind up on the ground? Did
21  the plaintiff wrestle you to the ground or was he taken
22  to the ground?
23  A.     He was taken to the ground.
24  Q.     And prior to the plaintiff being taken to the
25  ground and you placing your arm around his neck, he did

Page 20

1   not swing at you; is that correct?
2   A.     Correct.
3   Q.     Okay. And prior to you placing the plaintiff --
4   prior to placing your arm around the plaintiff's neck
5   while he was on the ground he did not lunge at you; is
6   that correct?
7   A.     That's correct.
8   Q.     Okay. And prior to you placing the plaintiff --
9   or placing your arm around his neck when you guys were on
10  ground he did not verbally threaten you; is that correct?
11  A.     Correct.
12  Q.     And same question: He didn't kick at you; is
13  that correct?
14  A.     Correct.
15  Q.     Okay. Let me ask you this: Once you took the
16  plaintiff to the ground and had your arm around his
17  neck, then did you place him under arrest then?
18         MR. SMYTH: Vague.
19         MR. GOFF: If he remembers.
20  BY MR. GOFF:
21  Q.     Did you say, "You're under arrest"?
22  A.     Did I -- are you asking me if I said, "You are
23  under arrest"?
24  Q.     Well, yes.
25  A.     Did I --

Page 21

1   Q.     First question: Did you say, "You're under
2   arrest"?
3   A.     I did not.
4   Q.     Okay. Was he placed under arrest?
5   A.     My understanding of a lawful arrest, at that
6   point, yes, he would be arrested.
7   Q.     Okay. And what were the grounds for lawfully
8   arresting him at that time, once you guys were on the
9   ground?
10  A.     Yes. I would say the grounds for arrest in my
11  mind occurred when he pulled the cell phone away from me
12  and tried to turn away from me. I felt that to be a
13  violation of the Penal Code Section 148(a), resisting or
14  obstructing an investigation of a police officer.
15  Q.     Okay. So he conducted or engaged in the 148
16  offense before you even put your hands on him; is that
17  correct?
18  A.     That's correct.
19  Q.     And this was because when you grabbed his phone
20  he tried to not let you grab his phone?
21  A.     Correct. And I could even clarify, actually,
22  the initial part of the 148 violation was the continuous
23  use of his phone after me telling him not to, but the --
24  you were kind of splitting up.
25         The resisting portion definitely happened on

Page 26

1  zero discipline in this department.
2       MR. GOFF:  Okay.  I figured that.  I always
3  gotta ask that.
4  BY MR. GOFF:
5  Q.    Did you ever place your knee in the plaintiff's
6  head or on the plaintiff's head while he was on the
7  ground?
8  A.    No.  It might have been over or near it.  I
9  don't believe I like -- I was squatting over him trying
10  to handcuff him at some point.
11  Q.    Okay.  Based on your -- strike that.
12       Prior to pulling the plaintiff out of the car
13  did he pose an immediate threat to you?
14       MR. SMYTH:  Vague, calls for a legal conclusion.
15       MR. GOFF:  You can answer.
16       THE WITNESS:  Repeat that again, I'm sorry,
17  before when?
18  BY MR. GOFF:
19  Q.    Sure.  Prior to you pulling the plaintiff out of
20  the car, grabbing his arm, pulling him out of the car,
21  did he pose an immediate threat to you?
22  A.    I mean he -- that's a very hard question to
23  answer because -- I mean if you ask me was there a
24  visible threat that I saw --
25  Q.    Yes.

Page 27

1  A.    -- I could say no, but I think it's the unknown
2  threat of I have a guy in a car that I don't know what
3  they might have, and now they're not listening, they're
4  not obeying what I'm saying, and now they're pulling away
5  so -- I mean I think there's always a threat when there's
6  an unknown and unsecured person who I have no clue -- you
7  know, I always tell people when they say they're scared
8  of the police I go:  You know who I am because I'm
9  wearing a badge and a name tag.  I have no clue who you
10  are.
11  Q.    Right.  Right.
12  A.    So, you know, there's always a threat.  You
13  know, did I see any weapons, no, if that helps.
14  Q.    Yeah.  It does help because that's my question.
15  Like at that moment in time did it appear -- did you feel
16  threatened that he was going to immediately try to harm
17  you, engage and try to harm you?
18  A.    I --
19       MR. SMYTH:  Overbroad.
20  BY MR. GOFF:
21  Q.    Like was he reaching for a weapon?  Was he
22  reaching for a stick?  Was --
23  A.    So when he turned away I did become very
24  concerned because he pulled his phone away and started
25  turning away, and I'm always concerned when people are

Page 28

1  knot listening to the police and being uncooperative.
2       A high percentage of the time, in my experience
3  and in all the training that I've done, it means there's
4  a high likelihood that there's some other crime that I
5  don't know of, probably bigger than the one I'm currently
6  investigating, in this case a registration because if it
7  was merely a registration, and in other traffic stops
8  where that -- it is what it appears on its face, people
9  are compliant.
10       So when people are not compliant, and I kind of
11  say like partial compliance is noncompliance.  If you're
12  only halfway listening to what I'm saying, you're not
13  listening to what I'm saying, and there's a reason you're
14  doing that.
15       And we deal with so many people with guns, and,
16  you know, I was already in that neighborhood because so
17  many stolen cars, and we've had people with guns in that
18  neighborhood, specifically in that block radius, so when
19  people start not complying, not listening, and then
20  pulling away I am fearful, yeah.  Are they going to hide
21  a weapon or are they going to access a weapon, are they
22  gonna grab the car and put it in drive?
23       So yes, I am fearful about that type of
24  behavior, and I was specifically fearful about what he
25  might try to do next in that case, not knowing who he

Page 29

1  was.
2  Q.    Okay.  But he didn't threaten you?
3  A.    He made no verbal threats.
4  Q.    Okay.  And he didn't swing at you?
5  A.    He did not.
6  Q.    And he did not have a weapon in the car?
7  A.    He did not.
8       I should clarify that.  I don't know if they
9  found any small knives or un -- or minor weapons.  There
10  was no firearms or anything like that.
11  Q.    Well, you didn't find weapons in the car?
12  A.    I don't believe I was the person to even search
13  that car at that point.  I did not find any weapons.
14  Q.    All right.  Let me ask you this:  Regarding the
15  use of force, when is it -- based on the policies of the
16  Vallejo Police Department, when is it appropriate to use
17  force?
18       MR. SMYTH:  It's vague, overbroad, and the
19  policy document may speak for itself, so if it's written,
20  then refer to that.
21       But to the ability you can summarize or --
22       THE WITNESS:  Sure.
23       MR. GOFF:  Just a summary, yeah.
24       THE WITNESS:  So I am authorized by law and by
25  policy to use physical force as necessary and reasonable

UMF 2

UMF 22

UMF 22    Page 30

1   to effect an arrest.
2        Specifically I'm authorized by both of those
3   things to use greater amount of force than is being used
4   against me if there is someone resisting, meaning if
5   someone is just pulling away I could potentially Tase
6   them or use a baton.  I don't have to equal the amount of
7   force to overcome, and I'm allowed to use a greater force
8   to overcome that resistance as is reasonable and as is
9   necessary.
10       So that's my understanding.
11   BY MR. GOFF:
12   Q.    All right.  And if the person is not -- if the
13   person is not resisting then it wouldn't be necessary to
14   use force; is that correct?
15       MR. SMYTH:  Overbroad, vague, calls for a legal
16   conclusion, and resisting being a term of art as a legal
17   conclusion.
18       MR. GOFF:  You can answer if you can.
19       THE WITNESS:  You're always using against some
20   force, whether you're picking up someone's arm to
21   handcuff him.  Again, the amount of force you use is
22   dependent on the person you're dealing with.
23       MR. GOFF:  Right.
24   No further questions.  I'm good.
25       --oOo--

Page 31

1        (The deposition concluded at 3:18 p.m.)
2        --oOo--
3
4
5        _____
6        JARRETT TONN
7        --oOo--
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 32

1   STATE OF CALIFORNIA    )
                           ) ss:
2   COUNTY OF SOLANO       )
3
4        I, REBECCA K. DOWELL, a duly licensed Certified
5   Shorthand Reporter, State of California, hereby certify
6   that the witness in the foregoing deposition, named
7            JARRETT TONN,
8   was duly sworn to testify to the truth, the whole truth
9   and nothing but the truth in the within-entitled cause;
10   that said deposition was taken at the time and place
11   therein named; that the testimony of said witness was
12   reported by me, and was thereafter transcribed under my
13   direction by computer-aided transcription; that the
14   foregoing is a full, complete, and true record of said
15   testimony.
16       I further certify that I am not related to any
17   party or counsel or attorney for any of the parties to
18   said deposition, nor in any way interested in the outcome
19   of the cause named in said caption.
20       I have hereunto set my hand this 20th day of
21   August, 2019.
22
23
24       _____
25       REBECCA K. DOWELL, RPR
         CSR License No. 8043

# EXHIBIT C

# Use of Force

## 300.1  PURPOSE AND SCOPE
This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial and reasonable manner.

### 300.1.1  DEFINITIONS
Definitions related to this policy include:

**Deadly force** - Force reasonably anticipated and intended to create a substantial likelihood of causing death or very serious injury.

**Force** - The application of physical techniques or tactics, chemical agents or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed or restrained.

## 300.2  POLICY
The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

### 300.2.1  DUTY TO INTERCEDE
Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. An officer who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

## 300.3  USE OF FORCE
Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably

Vallejo Police Department
Policy Manual

*Use of Force*

appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1   USE OF FORCE TO EFFECT AN ARREST
Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835a).

### 300.3.2   FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include, but are not limited to:

(a)  Immediacy and severity of the threat to officers or others.

(b)  The conduct of the individual being confronted, as reasonably perceived by the officer at the time.

(c)  Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

(d)  The effects of drugs or alcohol.

(e)  Subject's mental state or capacity.

(f)  Proximity of weapons or dangerous improvised devices.

(g)  The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(h)  The availability of other options and their possible effectiveness.

Vallejo Police Department

Policy Manual

*Use of Force*

---

(i)    Seriousness of the suspected offense or reason for contact with the individual.

(j)    Training and experience of the officer.

(k)    Potential for injury to officers, suspects and others.

(l)    Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

(m)    The risk and reasonably foreseeable consequences of escape.

(n)    The apparent need for immediate control of the subject or a prompt resolution of the situation.

(o)    Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

(p)    Prior contacts with the subject or awareness of any propensity for violence.

(q)    Any other exigent circumstances.

### 300.3.3   PAIN COMPLIANCE TECHNIQUES

Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

(a)    The degree to which the application of the technique may be controlled given the level of resistance.

(b)    Whether the person can comply with the direction or orders of the officer.

(c)    Whether the person has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

### 300.3.4   CAROTID CONTROL HOLD

The proper application of the carotid control hold may be effective in restraining a violent or combative individual. However, due to the potential for injury, the use of the carotid control hold is subject to the following:

(a)    The officer shall have successfully completed department-approved training in the use and application of the carotid control hold.

(b)    The carotid control hold may only be used when circumstances perceived by the officer at the time indicate that such application reasonably appears necessary to control a person in any of the following circumstances:

    1.    The subject is violent or physically resisting.

    2.    The subject, by words or actions, has demonstrated an intention to be violent and reasonably appears to have the potential to harm officers, him/herself or others.

---

Copyright Lexipol, LLC 2017/01/12, All Rights Reserved.
Published with permission by Vallejo Police Department

Vallejo Police Department
Policy Manual

*Use of Force*

(c)   The application of a carotid control hold on the following individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective, or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of applying a carotid control hold:

  1.   Females who are known to be pregnant

  2.   Elderly individuals

  3.   Obvious juveniles

  4.   Individuals who appear to have Down syndrome or who appear to have obvious neck deformities or malformations, or visible neck injuries

(d)   Any individual who has had the carotid control hold applied, regardless of whether he/she was rendered unconscious, shall be promptly examined by paramedics or other qualified medical personnel and should be monitored until examined by paramedics or other appropriate medical personnel.

(e)   The officer shall inform any person receiving custody, or any person placed in a position of providing care, that the individual has been subjected to the carotid control hold and whether the subject lost consciousness as a result.

(f)   Any officer attempting or applying the carotid control hold shall promptly notify a supervisor of the use or attempted use of such hold.

(g)   The use or attempted use of the carotid control hold shall be thoroughly documented by the officer in any related reports.

300.3.5   USE OF FORCE TO SEIZE EVIDENCE
In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by the Vallejo Police Department for this specific purpose.

**300.4   DEADLY FORCE APPLICATIONS**
Use of deadly force is justified in the following circumstances:

(a)   An officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.

(b)   An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the officer reasonably

Copyright Lexipol, LLC 2017/01/12, All Rights Reserved.
Published with permission by Vallejo Police Department

*Use of Force*

___

believes that there is an imminent risk of serious bodily injury or death to any other person if the subject is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.

Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if an officer reasonably believes any of the following:

1.  The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the officer or another.

2.  The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.

### 300.4.1   SHOOTING AT OR FROM MOVING VEHICLES
Shots fired at or from a moving vehicle are rarely effective. Officers should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

### 300.5   REPORTING THE USE OF FORCE
Any use of force by a member of this department shall be documented promptly, completely and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances. To collect data for purposes of training, resource allocation, analysis and related purposes, the Department may require the completion of additional report forms, as specified in department policy, procedure or law.

### 300.5.1   NOTIFICATION TO SUPERVISORS
Members are required to notify their supervisor when they:

(a)   Use any force which results in visible injury to the subject, or the subject claiming injury.

(b)   Use a weaponless strike such as a palm, poke, punch, elbow, kick, knee, foot stomp, leg sweep,

or any takedown.

(c)   Use OC or another chemical agent on a subject.

(d)   Use a Taser.

(e)   Strike a subject with an impact weapon, including specialty (less-lethal) munitions.

(f)   Use a hobble restraint.

(g)   Apply a carotid restraint.

Copyright Lexipol, LLC 2017/01/12, All Rights Reserved.
Published with permission by Vallejo Police Department

Vallejo Police Department
Policy Manual

*Use of Force*

(h)     Deploy a K-9 which bites and/or injures a subject.

(i)     Use any force which results in an injury requiring medical clearance, hospital admittance or medical treatment, including basic first aid.

(j)     Discharge a firearm.

(k)     Use any force which creates a substantial risk of causing death or serious bodily injury, whether intentional or not.

**300.5.2   REPORTING TO CALIFORNIA DEPARTMENT OF JUSTICE**
The Records Supervisor or the authorized designee shall ensure that data required by the Department of Justice (DOJ) regarding all officer-involved shootings and incidents involving use of force resulting in serious bodily injury is collected and forwarded to the DOJ as required by Government Code § 12525.2.

**300.6   MEDICAL CONSIDERATION**
Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.

Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

Copyright Lexipol, LLC 2017/01/12, All Rights Reserved.
Published with permission by Vallejo Police Department

Vallejo Police Department
Policy Manual

*Use of Force*

## 300.7   SUPERVISOR RESPONSIBILITY

When a supervisor is notified of a use of force, whether or not the supervisor is able to respond to the incident, the supervisor is expected to complete a Supervisor's Use of Force Report.

When a supervisor is able to respond to an incident in which there has been a reported application of force, the supervisor is expected to:

(a)   Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

(b)   Ensure that any injured parties are examined and treated.

(c)   If deemed necessary by the supervisor, separately obtain a recorded interview with the subject upon whom force was applied. If this interview is conducted without the person having voluntarily waived his/her *Miranda* rights, the following shall apply:

1.   The content of the interview should not be summarized or included in any related criminal charges.

2.   The fact that a recorded interview was conducted should be documented in a property or other report.

3.   The recording of the interview should be distinctly marked for retention until all potential for civil litigation has expired.

(d)   Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas. These photographs should be retained until all potential for civil litigation has expired.

(e)   Identify any witnesses not already included in related reports.

(f)   Review and approve all related reports.

(g)   Determine if there is any indication that the subject may pursue civil litigation.

1.   If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

(h)   Evaluate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy non-compliance or if for any reason further investigation may be appropriate.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported application of force, the supervisor is still expected to complete as many of the above items as circumstances permit.

## 300.7.1   WATCH COMMANDER RESPONSIBILITY

The Watch Commander shall review each use of force by any personnel within his/her command to ensure compliance with this policy and to address any training issues.

Copyright Lexipol, LLC 2017/01/12, All Rights Reserved.
Published with permission by Vallejo Police Department

Vallejo Police Department
Policy Manual

*Use of Force*

---

**300.8   TRAINING**

Officers will receive periodic training on this policy and demonstrate their knowledge and understanding.

**300.9   USE OF FORCE ANALYSIS**

At least annually, the Professional Standards Division should prepare an analysis report on use of force incidents. The report should be submitted to the Chief of Police. The report should not contain the names of officers, suspects or case numbers, and should include the identification of any trends in the use of force by members. The Chief of Police should convene a board of his/ her choosing to identify possible:

(a)   Training needs recommendations.

(b)   Equipment needs recommendations.

(c)   Policy revision recommendations.

---

Copyright Lexipol, LLC 2017/01/12, All Rights Reserved.
Published with permission by Vallejo Police Department

# EXHIBIT D

1 **REQUEST FOR PRODUCTION NO. 4:**

2     Any and all photographs of the scene of the incident.

3 **RESPONSE NO. 4:**

4     Responding party objects to this request as vague, ambiguous, and overbroad.  Without

5 waiving the foregoing objections, responding party does not possess any photographs from the

6 scene of the incident.

7 **REQUEST FOR PRODUCTION NO. 5:**

8     Any and all photographs of the Defendant

9 **RESPONSE NO. 5:**

10     Responding party objects to this request as vague, ambiguous, grossly overbroad, and

11 overly burdensome and harassing.  Furthermore, this request seeks private information protected

12 from disclosure pursuant to the official information privilege (*see Sanchez v. City of Santa Ana*,

13 936 F.2d 1027, 1033 (9th Cir. 1991); Cal. Penal Code section 832.7, Cal. Evid. Code sections

14 1043 and 1045).  *See* Declaration of Lieutenant Cheatham served herewith.  This request also

15 seeks documents which are not reasonably calculated to lead to the discovery of admissible

16 evidence.  Subject to these objections, Defendant shall not respond to this request to the extent it

17 seeks photographs unrelated to the incident.  Responding Party is not in possession of any

18 photographs taken of the Officer Tonn in relation to the incident.

19 **REQUEST FOR PRODUCTION NO. 6:**

20     Any and all photographs of the Plaintiff.

21 **RESPONSE NO. 6:**

22     Responding party objects to this request as vague, ambiguous, and overbroad.  Without

23 waiving the foregoing objections, Responding Party is not in possession or control of any such

24 records.

25 **REQUEST FOR PRODUCTION NO. 7:**

26     Any and all departmental policies regarding the use of force by the Vallejo Police

27 Department.

28 //

---

1    **RESPONSE NO. 7:**

2        Responding party objects to this request as vague, ambiguous, and overbroad.  Without

3    waiving the foregoing objections, Responding Party shall produce responsive policy documents

4    currently in effect in its possession, custody or control.

5    **REQUEST FOR PRODUCTION NO. 8:**

6        Any and all documents in your possession, custody or control evidencing that the City of

7    Vallejo is covered by liability insurance at the time of the subject incident and what is the total

8    amount of coverage.   Such documents shall include, but are not limited to, a legible copy of said

9    policy, declaration page and insurance card.

10   **RESPONSE NO. 8:**

11       Objection is made that this request is vague, ambiguous, overbroad and seeks information

12   outside the scope of permissible discovery. Without waiving these objections. Responding Party

13   shall produce copies all responsive, non-privileged documents in its possession, custody or

14   control, including its risk-pooling agreement with its Joint Powers Associate, California Joint

15   Powers Risk Management Authority, in effect on the date of the incident

16   **REQUEST FOR PRODUCTION NO. 9:**

17       Any and all body camera footage or dash camera footage taken before, during and after

18   the incident in question.

19   **RESPONSE NO. 9:**

20       Responding Party objects to this request as grossly overbroad and outside the scope of

21   discovery in that Plaintiffs' request is not limited in time or limited to footage related to the

22   incident underlying Plaintiffs' complaint.    Without waiving the foregoing objections,

23   Responding Party shall produce body camera footage related to the incident in its custody,

24   possession, and control.

25   **REQUEST FOR PRODUCTION NO. 10:**

26       Any and all written departmental policies relating directly to the use of departmental

27   issued body cameras.

28   //

# EXHIBIT E

1    *Strong v. City of Vallejo, et al.*
2    USDC, EDCal., Case No. 2:18-cv-01246-WBS-AC

3

4                                    <u>VERIFICATION</u>

5

6        I, Joni Brown, hereby declare and state:

7        I am an administrative analyst and custodian of records with the Vallejo Police
8    Department of the City of Vallejo, a municipal corporation, Defendant in the foregoing legal
9    action.  I am authorized to make this verification on its behalf.  I have read the foregoing
10   Responses to Plaintiff's Interrogatories, Set One, and Response to Request for Production of
11   Documents, Set One, and know the contents of each thereof which has been prepared from
12   information obtained from City records, employees, and/or agents.  I am informed and believe
13   that a reasonable investigation has been conducted to prepare the foregoing document.  I am
14   informed and believe and, in my capacity as the designated agent for the City, verify that the
15   foregoing document is true and correct.

16       I declare under penalty of perjury under the laws of the State of California that the
17   foregoing is true and correct, and this verification was executed in Vallejo, California.

18

19

20   DATED: June  12 , 2019          _____
21                                   JONI BROWN
22                                   Administrative Analyst – Vallejo Police
                                     Department
23

24

25

26

27

28

                                    **VERIFICATION**

# EXHIBIT F

| | **VALLEJO POLICE DEPARTMENT** | Page 1 |
|---|---|---|
| | **111 AMADOR ST    VALLEJO, CA 94590** | |
| | **NARRATIVE** | 17-5032 |

VALLEJO POLICE DEPARTMENT CONTROL DOCUMENT

Vallejo Police Department

Investigation:

*VMF 1, 2*

On 4-19-17 at approximately 1312 hours I was driving north on Lassen Street near Glenwood while on patrol in a all-black Ford Police SUV. I was wearing a marked Vallejo Police tactical vest. From my prior dealings I know this to be a high crime are, especially the area of Lassen Street at Eastwood Street.

*VMF 3, 5, 7*

As I drove north on Lassen I saw a vehicle parked on Glenwood, just east of Lassen Street. I saw a black male adult sitting in the driver's seat. I ran the vehicle's registration and found it to be expired on 4-2-17. I also saw that the vehicle was registered to an address in north Vallejo. I made a U-Turn and pulled in front of the vehicle. I activated my emergency red/blue lights.

The driver, identified as Brandon Strong, attempted to exit the car. Strong aggressively said something similar to "What do you want, why are you stopping me." I told him to get back inside the car and place his hands on the steering wheel. Strong sat back in the car, but did not put his hands on the steering wheel. I immediately told him his vehicle registration was expired in an attempt to de-escalate the situation and accommodate his questions.

Strong began to argue *VMF 8* about how his registration isn't expired and he told me to look at the tab. I tried to explain that it had expired on 4-2-17, but he would not listen. I activated my body camera approximately 20 seconds into the contact. Strong was extremely hostile and appeared angry. He kept leaning in toward the center of the vehicle. I had not patted him down for weapons and did not know if there were any weapons in the car. I could not even ID Strong as he would not listen to me.

Strong did not place his hands on the steering wheel. *VMF 9, 10* He attempted to make a phone call. I told him to put his phone down. I did not want him to be able to call someone over my location that could potentially be a threat to my safety. Strong did not put his phone down. Several seconds later he attempted to make what I believed to be a phone call. I attempted to grab the phone and told him to hand it to me. He pulled the phone away from me and pulled his body toward the center of the vehicle. Fearing that he might be calling "backup" and also not knowing if he had a weapon on him or in the vehicle and not knowing who he was I decided to pull him out of the car. *VMF 12*

I attempted to place Strong's arm in a rear wrist lock. I then grabbed his hair and conducted a hair pull take down out of the vehicle onto the ground. I then placed my arm around his neck area. I did this so that I was ready to apply a carotid maneuver if he became more combative. I did not conduct a carotid. It should be noted that during my struggle with Strong my body camera shut off, presumable from laying on the button or the switch getting bumped.

*VMF 20*

I told Strong to place his arm behind his back. At one point he yelled "Bitch" and continued to refuse to place his hands behind his back. I gave him commands and eventually was able to handcuff him.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 673 | TONN, JARRETT | 04/19/2017 | 563 | RODRIGUEZ, FABIO | 10/06/2017 |

VALLEJO POLICE DEPARTMENT CONTROL DOCUMENT

After being handcuffed Strong was extremely agitated and would not listen to officers commands on where to walk.  He tried walking away in the wrong direction and had to be pulled back towards a patrol car and placed in the rear.

VMF 23    VMF 24

He was found to have a suspended license and his vehicle was towed.  At Vallejo PD I explained Strong his rights per Miranda.  Strong stated he understood those rights.  I had a lengthy conversation with him.  Strong admitted that he thinks the police harass people and that he was angry from the beginning of the stop.  He said something to the affect that there was nothing I could have said to satisfy him during the stop. Strong admitted that he does not listen well and that people tell him all the time he is a poor listener.  He also admitted that he has anger problems and that he has received anger management courses.  He later acknowledged his understanding that he should have listened.  All of my conversations with him were documented via body camera and downloaded.

VMF 33

By the end of my conversation with Strong he had calmed down and expressed remorse for his actions.  He was cited out of Vallejo PD.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 673 | TONN, JARRETT | 04/19/2017 | 563 | RODRIGUEZ, FABIO | 10/06/2017 |

Vallejo Police Department
**NOTICE TO APPEAR** ☑ MISDEMEANOR **No. A 337009**

☐ Traffic ☐ Nontraffic | (Citation No.)

| Date of Violation | Time | ☐ AM ☐ PM | Day of Week | Case No. |
|---|---|---|---|---|
| 4 / 19 / 17 | 1425 | ☐ AM ☑ PM | S M T W T F S | 17-50320 |

Name (First, Middle, Last) | ☐ Owner's Responsibility (Veh. Code, § 40001)
ROBERT STROW

Address
133 LEONARD

| City | State | ZIP Code |
|---|---|---|
| VALLEJO | CA | 94590 |

| Driver Lic. No. | State | Class | Age | Birth Date | (Phone #) |
|---|---|---|---|---|---|
| D6461411 | CA | C | 3 | 10 94 | |

| Sex | Hair | Eyes | Height | Weight | Race | Other Description |
|---|---|---|---|---|---|---|
| M | BLK | BRN | 600 | 190 | B | ☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b)) |

| Veh. Lic. No. or VIN | State |
|---|---|
| 7FUL457 | |

| Yr. of Veh. | Make | Model | Body Style | Color |
|---|---|---|---|---|
| 10 | KIA | | VDL | 51 |

Evidence of Financial Responsibility | Reg. Exp. | ☐ HAZARDOUS MATERIAL (Veh. Code, § 353)

Registered Owner or Lessee | ☑ Same as Driver
CLAUDY FELLY

Address | ☑ Same as Driver

Correctable Violation (Veh. Code, § 40610) | ☐ Booking Required | Misdemeanor or Infraction (Circle)

| Yes | No | Code and Section | Description | |
|---|---|---|---|---|
| ☐ | ☑ | 14601.1 cn | SUSP LICCA | Ⓜ I |
| ☐ | ☑ | 148 PC | OBSTRU | Ⓜ I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |

| Speed Approx. | P.F./Max. Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s) at LASSEN | City/County of Occurrence GREENWOOD

Clothing / Refer to YSS ☐ | Accident Y ☐ N ☐

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

Arresting or Citing Officer | Badge No. 615 | Dates off to

/ / Date | Name of Arresting Officer, if different from Citing Officer | Badge No. | Dates off to

**WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.**
X Signature

WHEN: ON THIS DATE: 5 / 29 / 17 Time 1530 ☐ AM ☐ PM
WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE.
WHERE: ☐ Solano Co. Superior Court • 321 Tuolumne St., Vallejo, CA 94590 • (707) 561-7860
☐ Solano Co. Hall of Justice • 600 Union Ave., Fairfield, CA 94533 • (707) 207-7360
☐ To be notified - Juvenile Ct./Probation
☐

IF THE "BOOKING REQUIRED" BOX IS CHECKED, YOU ARE REQUIRED TO BE BOOKED AND RELEASED PRIOR TO GOING TO COURT. TAKE THIS CITATION ALONG WITH ID TO SOLANO CO. SHERIFF'S OFFICE, 530 UNION AVE., FAIRFIELD BETWEEN THE HOURS OF 8:00 A.M. - 3:00 P.M., MONDAY THROUGH FRIDAY, EXCLUDING HOLIDAYS. (Pen. Code, § 853.6(g))

Judicial Council of California Form
Rev. 08/10 (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

**COURT COPY**
**SEE REVERSE**
TR-130