STANLEY GOFF (Bar No. 289564)
15 Boardman Place Suite 2
San Francisco, CA 94103
Telephone: (415) 571-9570
Email: scraiggoff@aol.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT STRONG;<br><br>　　Plaintiffs,<br><br>v.<br><br>CITY OF VALLEJO, JARRETT TONN, ANDREW BIDOU and DOE VALLEJO POLICE OFFICERS 1-25;<br><br>　　Defendants. | CASE NO.: 2:18-cv-01246-WBS-AC<br><br>**DECLARATION OF STANLEY GOFF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>DATE: MAY 18, 2020<br>TIME: 1:30 P.M.<br><br>HON. WILLIAM B. SHUBB |

I, Stanley Goff, do hereby declare:

1. I am an attorney at law duly licensed to practice before all Court of the State of California and the United States District Court for the Eastern District of California. I am counsel of record for Plaintiff in the instant action. As such, I have personal knowledge of the facts set forth herein, and if called upon to testify, I could and would competently do so.

2. Attached as **Exhibit 1** is a true and correct copy of the deposition transcripts of Defendant Jarrett Tonn. This exhibit will also be produced on a thumb drive and delivered to the Court.

1

3. Attached as **Exhibit 2** is a true and correct copy of Defendant Jarrett Tonn's body camera footage. This exhibit will be produced on a thumb drive and delivered to the Court.

4. Attached as **Exhibit 3** is a true and correct copy of Plaintiff Robert Strong's cell phone camera footage. This exhibit will be produced on a thumb drive and delivered to the Court.

5. Attached as **Exhibit 4** is a true and correct copy of Defendant Jarrett Tonn's Responses to Plaintiff's Request for Admissions.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: March 31, 2020

/s/ Stanley Goff

Attorney for Plaintiff

**Exhibit 1** deposition transcripts of Defendant Jarrett Tonn.

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF CALIFORNIA
 3                     SACRAMENTO DIVISION
 4                          --oOo--
 5   ROBERT STRONG,                      )
                                         )
 6            Plaintiff,                 )
                                         )
 7            VS.                        ) No. 2:18-CV-01246-
                                         )     WBS-AC
 8   CITY OF VALLEJO, JARRETT TONN,      )
     ANDREW BIDOU and DOE VALLEJO        )
 9   POLICE OFFICERS 1-25,               )
                                         )
10            Defendants.                )
                                         )
11                                       )
12
13                          --oOo--
14               DEPOSITION OF JARRETT TONN
15                          --oOo--
16
17
18                    Vallejo, California
                    Friday, August 9, 2019
19                        2:42 p.m.
                            --oOo--
20
21
22                  DOUCETTE & ASSOCIATES
                       1219 Marin Street
23                 Vallejo, California 94590
                       (707) 554-9970
24
25   REPORTED BY: REBECCA K. DOWELL, CSR, RPR
              CSR License Number 8043
```

Page 10

1  bunch of people showing up, and it becomes very unsafe.
2       So for my safety I don't want people calling
3  people, and especially nowadays you have people live
4  streaming, all sorts of stuff, but at the end of the day
5  I don't want anything done that's going to draw more
6  people to this location, especially when I'm by myself
7  and I don't even know who this person is.
8       So I instructed him not to use his cell phone.
9  Q.  Okay. And did the plaintiff tell you that he
10 was simply trying to record you on his phone versus that
11 he was talking on the phone?
12 A.  He did not.
13 Q.  Did you tell the plaintiff that you were
14 recording him?
15 A.  I did.
16 Q.  And -- strike that.
17      Is there a law that a person is not allowed to
18 record an officer while they're performing their duties?
19      MR. SMYTH: Calls for expert opinion.
20      MR. GOFF: If you know.
21      THE WITNESS: I don't believe there's a law
22 stating they cannot.
23 BY MR. GOFF:
24 Q.  Okay. And at the time that you were interacting
25 with the plaintiff on the day of this incident you were,

Page 11

1  in fact, performing your duties as a public servant; is
2  that correct?
3  A.  I was.
4  Q.  Did you ever issue a command to the plaintiff to
5  put his phone away before you tried to take it from him?
6  A.  I might take issue with the exact wording. I
7  told him to put his phone down or stop using it. I don't
8  remember my exact words, but it was made clear to him to
9  put the phone down and stop using it.
10 Q.  Okay. But you never said, "Put your phone away
11 or else I'm going to take it from you"?
12 A.  I don't believe I said those exact words.
13 Q.  And you didn't have a warrant to seize his
14 phone; is that correct?
15 A.  I did not.
16 Q.  And you never gave the plaintiff commands to
17 step out of the car on his own; is that correct?
18 A.  I did not.
19 Q.  You did subsequently grab the plaintiff by his
20 arm and took him out of his car to the ground; is that
21 correct?
22      MR. SMYTH: Objection; vague as to subsequent.
23 BY MR. GOFF:
24 Q.  On the day of the incident -- on the day of the
25 incident you wound up taking the plaintiff -- or grabbing

Page 12

1  the plaintiff by the arm and taking him out of his car;
2  is that correct?
3  A.  That is correct. There are events that led up
4  to that, so I don't want it to seem out of place, but
5  that in and of itself is correct.
6  Q.  Okay. All right. Let's go through some of the
7  events that led up to that.
8  A.  Sure.
9  Q.  Can you expound to me what were the events that
10 led up to that?
11      MR. SMYTH: Calls for narration.
12      THE WITNESS: You want me to narrate, or do you
13 want a question?
14 BY MR. GOFF:
15 Q.  You can give a brief narrative.
16 A.  I asked him several times to stop using his
17 phone, he would not. I told him I was going to then take
18 his phone so he could not keeping using it.
19      I was afraid he was either in the middle of a
20 call or already called, so I tried to grab his phone to
21 stop it, stop whatever phone call was possibly in
22 progress.
23      When I went to take his cell phone he then
24 started to pull away and started to kind of twist his
25 body away.

Page 13

1       At that point, being that he was physically
2  resisting, not knowing anything about him or what might
3  be in the car, I did remove him from the vehicle by
4  grabbing him and pulling him out of the vehicle down to
5  the ground.
6  Q.  Okay. Now, let me ask you this: Prior to you
7  grabbing the plaintiff by his arm and taking him out of
8  the car did you say, "You're under arrest, I'm placing
9  you under arrest"?
10 A.  I did not.
11 Q.  And prior to you grabbing the plaintiff and
12 taking him out of his car did he ever swing at you?
13 A.  He did not.
14 Q.  And prior to you grabbing the plaintiff and
15 taking him out of his car, did he ever lunge at you in
16 any kind of way?
17 A.  He did not.
18 Q.  And prior to you grabbing the plaintiff and
19 taking him out of his car, did he threaten you?
20      MR. SMYTH: That's vague.
21 BY MR. GOFF:
22 Q.  Did he threaten to hit you?
23 A.  He did not give me any verbal threats.
24 Q.  Okay. Now, once you took the plaintiff out of
25 his car he was placed in a choke hold; is that correct?

Page 18

1  A.    I'm done.
2  Q.    So in your police report it states that, "I did
3  not conduct a carotid." When you say that, what are you
4  referring to?
5  A.    Again, it's really hard to describe without
6  demonstrating, but in essence, you know, your arm can be
7  in front like this (indicating) where it's over someone's
8  front neck area, not necessarily like -- I'm not talking
9  sort of right on the Adam's Apple, the neck area.
10 Q.    Right.
11 A.    When I say I did not apply, so I could have
12 applied the carotid if necessary, but I did not conduct a
13 carotid, meaning I did not at any point tighten up on
14 that and I didn't apply any pressure to his carotid
15 arteries with my bicep or my forearm.
16 Q.    During the time that you had your arm around the
17 plaintiff's neck, at any time did it appear that he could
18 not breathe or that he was having problems breathing --
19 A.    No.
20 Q.    -- based on your observation?
21 A.    No. In fact, the opposite. He was talking
22 during that time. The carotid would have made someone
23 pass out in several seconds, and he was talking clearly.
24 Q.    And I'm glad you said that. So if someone was
25 placed in a carotid hold would it have caused them to

Page 19

1  become light-headed?
2  A.    If someone was placed --
3         MR. SMYTH: That's vagus, and may call for
4  speculation.
5         But, go ahead, just generally.
6         THE WITNESS: If a proper carotid was applied
7  the person would pass out within a matter of seconds.
8  BY MR. GOFF:
9  Q.    Okay. Forty-five seconds? Thirty seconds?
10 A.    It could be as quick as five or six seconds.
11 Depends how much pressure you're applying and how
12 properly, just depends.
13 Q.    Okay. So let me ask you this: Prior to --
14 strike that.
15        When you had your arm around the plaintiff's
16 neck, and it wasn't a carotid hold, but when you had your
17 arm around his neck you guys were on the ground; is that
18 correct?
19 A.    That's correct.
20 Q.    And how did you guys wind up on the ground? Did
21 the plaintiff wrestle you to the ground or was he taken
22 to the ground?
23 A.    He was taken to the ground.
24 Q.    And prior to the plaintiff being taken to the
25 ground and you placing your arm around his neck, he did

Page 20

1  not swing at you; is that correct?
2  A.    Correct.
3  Q.    Okay. And prior to you placing the plaintiff --
4  prior to placing your arm around the plaintiff's neck
5  while he was on the ground he did not lunge at you; is
6  that correct?
7  A.    That's correct.
8  Q.    Okay. And prior to you placing the plaintiff --
9  or placing your arm around his neck when you guys were on
10 ground he did not verbally threaten you; is that correct?
11 A.    Correct.
12 Q.    And same question: He didn't kick at you; is
13 that correct?
14 A.    Correct.
15 Q.    Okay. Let me ask you this: Once you took the
16 plaintiff to the ground and you had your arm around his
17 neck, then did you place him under arrest then?
18        MR. SMYTH: Vague.
19        MR. GOFF: If he remembers.
20 BY MR. GOFF:
21 Q.    Did you say, "You're under arrest"?
22 A.    Did I -- are you asking me if I said, "You are
23 under arrest"?
24 Q.    Well, yes.
25 A.    Did I --

Page 21

1  Q.    First question: Did you say, "You're under
2  arrest"?
3  A.    I did not.
4  Q.    Okay. Was he placed under arrest?
5  A.    My understanding of a lawful arrest, at that
6  point, yes, he would be arrested.
7  Q.    Okay. And what were the grounds for lawfully
8  arresting him at that time, once you guys were on the
9  ground?
10 A.    Yes. I would say the grounds for arrest in my
11 mind occurred when he pulled the cell phone away from me
12 and tried to turn away from me. I felt that to be a
13 violation of the Penal Code Section 148(a), resisting or
14 obstructing an investigation of a police officer.
15 Q.    Okay. So he conducted or engaged in the 148
16 offense before you even put your hands on him; is that
17 correct?
18 A.    That's correct.
19 Q.    And this was because when you grabbed his phone
20 he tried to not let you grab his phone?
21 A.    Correct. And I could even clarify, actually,
22 the initial part of the 148 violation was the continuous
23 use of his phone after me telling him not to, but the --
24 you were kind of splitting up.
25        The resisting portion definitely happened on

Page 26

1  zero discipline in this department.
2      MR. GOFF: Okay. I figured that. I always
3  gotta ask that.
4  BY MR. GOFF:
5  Q.   Did you ever place your knee in the plaintiff's
6  head or on the plaintiff's head while he was on the
7  ground?
8  A.   No. It might have been over or near it. I
9  don't believe I like -- I was squatting over him trying
10 to handcuff him at some point.
11 Q.   Okay. Based on your -- strike that.
12     Prior to pulling the plaintiff out of the car
13 did he pose an immediate threat to you?
14     MR. SMYTH: Vague, calls for a legal conclusion.
15     MR. GOFF: You can answer.
16     THE WITNESS: Repeat that again, I'm sorry,
17 before when?
18 BY MR. GOFF:
19 Q.   Sure. Prior to you pulling the plaintiff out of
20 the car, grabbing his arm, pulling him out of the car,
21 did he pose an immediate threat to you?
22 A.   I mean he -- that's a very hard question to
23 answer because -- I mean if you ask me was there a
24 visible threat that I saw --
25 Q.   Yes.

Page 27

1  A.   -- I could say no, but I think it's the unknown
2  threat of I have a guy in a car that I don't know what
3  they might have, and now they're not listening, they're
4  not obeying what I'm saying, and now they're pulling away
5  so -- I mean I think there's always a threat when there's
6  an unknown and unsecured person who I have no clue -- you
7  know, I always tell people when they say they're scared
8  of the police I go: You know who I am because I'm
9  wearing a badge and a name tag. I have no clue who you
10 are.
11 Q.   Right. Right.
12 A.   So, you know, there's always a threat. You
13 know, did I see any weapons, no, if that helps.
14 Q.   Yeah. It does help because that's my question.
15 Like at that moment in time did it appear -- did you feel
16 threatened that he was going to immediately try to harm
17 you, engage and try to harm you?
18 A.   I --
19     MR. SMYTH: Overbroad.
20 BY MR. GOFF:
21 Q.   Like was he reaching for a weapon? Was he
22 reaching for a stick? Was --
23 A.   So when he turned away I did become very
24 concerned because he pulled his phone away and started
25 turning away, and I'm always concerned when people are

Page 28

1  knot listening to the police and being uncooperative.
2      A high percentage of the time, in my experience
3  and in all the training that I've done, it means there's
4  a high likelihood that there's some other crime that I
5  don't know of, probably bigger than the one I'm currently
6  investigating, in this case a registration because if it
7  was merely a registration, and in other traffic stops
8  where that -- it is what it appears on its face, people
9  are compliant.
10     So when people are not compliant, and I kind of
11 say like partial compliance is noncompliance. If you're
12 only halfway listening to what I'm saying, you're not
13 listening to what I'm saying, and there's a reason you're
14 doing that.
15     And we deal with so many people with guns, and,
16 you know, I was already in that neighborhood because so
17 many stolen cars, and we've had people with guns in that
18 neighborhood, specifically in that block radius, so when
19 people start not complying, not listening, and then
20 pulling away I am fearful, yeah. Are they going to hide
21 a weapon or are they going to access a weapon, are they
22 gonna grab the car and put it in drive?
23     So yes, I am fearful about that type of
24 behavior, and I was specifically fearful about what he
25 might try to do next in that case, not knowing who he

Page 29

1  was.
2  Q.   Okay. But he didn't threaten you?
3  A.   He made no verbal threats.
4  Q.   Okay. And he didn't swing at you?
5  A.   He did not.
6  Q.   And he did not have a weapon in the car?
7  A.   He did not.
8      I should clarify that. I don't know if they
9  found any small knives or un -- or minor weapons. There
10 was no firearms or anything like that.
11 Q.   Well, you didn't find weapons in the car?
12 A.   I don't believe I was the person to even search
13 that car at that point. I did not find any weapons.
14 Q.   All right. Let me ask you this: Regarding the
15 use of force, when is it -- based on the policies of the
16 Vallejo Police Department, when is it appropriate to use
17 force?
18     MR. SMYTH: It's vague, overbroad, and the
19 policy document may speak for itself, so if it's written,
20 then refer to that.
21     But to the ability you can summarize or --
22     THE WITNESS: Sure.
23     MR. GOFF: Just a summary, yeah.
24     THE WITNESS: So I am authorized by law and by
25 policy to use physical force as necessary and reasonable

Page 30

1  to effect an arrest.
2       Specifically I'm authorized by both of those
3  things to use greater amount of force than is being used
4  against me if there is someone resisting, meaning if
5  someone is just pulling away I could potentially Tase
6  them or use a baton. I don't have to equal the amount of
7  force to overcome, and I'm allowed to use a greater force
8  to overcome that resistance as is reasonable and as is
9  necessary.
10      So that's my understanding.
11 BY MR. GOFF:
12 Q.   All right. And if the person is not -- if the
13 person is not resisting then it wouldn't be necessary to
14 use force; is that correct?
15      MR. SMYTH: Overbroad, vague, calls for a legal
16 conclusion, and resisting being a term of art as a legal
17 conclusion.
18      MR. GOFF: You can answer if you can.
19      THE WITNESS: You're always using against some
20 force, whether you're picking up someone's arm to
21 handcuff him. Again, the amount of force you use is
22 dependent on the person you're dealing with.
23      MR. GOFF: Right.
24      No further questions. I'm good.
25           --oOo--

Page 31

1       (The deposition concluded at 3:18 p.m.)
2           --oOo--
3
4
5       _____
            JARRETT TONN
6
7           --oOo--

Page 32

1  STATE OF CALIFORNIA   )
                          ) ss:
2  COUNTY OF SOLANO      )
3
4       I, REBECCA K. DOWELL, a duly licensed Certified
5  Shorthand Reporter, State of California, hereby certify
6  that the witness in the foregoing deposition, named
7            JARRETT TONN,
8  was duly sworn to testify to the truth, the whole truth
9  and nothing but the truth in the within-entitled cause;
10 that said deposition was taken at the time and place
11 therein named; that the testimony of said witness was
12 reported by me, and was thereafter transcribed under my
13 direction by computer-aided transcription; that the
14 foregoing is a full, complete, and true record of said
15 testimony.
16      I further certify that I am not related to any
17 party or counsel or attorney for any of the parties to
18 said deposition, nor in any way interested in the outcome
19 of the cause named in said caption.
20      I have hereunto set my hand this 20th day of
21 August, 2019.
22
23
24      _____
        REBECCA K. DOWELL, RPR
25      CSR License No. 8043

**Exhibit 2** Defendant Jarrett Tonn's body camera

**Exhibit 3** Plaintiff Robert Strong's cell phone camera footage.

**Exhibit 4** Defendant Jarrett Tonn's Responses to Plaintiff's Request for Admissions.

CLAUDIA M. QUINTANA
City Attorney, SBN 178613
**BY: TIMOTHY R. SMYTH**
Deputy City Attorney, SBN 258661
**CITY OF VALLEJO**, City Hall
555 Santa Clara Street, P.O. Box 3068
Vallejo, CA 94590
Tel:   (707) 648-4545
Fax:   (707) 648-4687
Email: timothy.smyth@cityofvallejo.net

Attorneys for Defendants CITY OF VALLEJO, JARRETT TONN, and ANDREW BIDOU

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| ROBERT STRONG, | Case No: 2:18-cv-01246-WBS-AC |
| Plaintiff, | |
| vs. | **DEFENDANTS CITY OF VALLEJO AND JARRETT TONN'S RESPONSE TO REQUESTS FOR ADMISSION, SET ONE** |
| CITY OF VALLEJO, JARRETT TONN, ANDREW BIDOU and DOE VALLEJO POLICE OFFICERS 1-25; | |
| Defendants. | |

**REQUESTING PARTY:**   Plaintiff ROBERT STRONG
**RESPONDING PARTY:**   Defendants JARRETT TONN, CITY OF VALLEJO
**SET NO.:**   ONE

## REQUEST FOR ADMISSION NO. 1:

Admit that the Plaintiff did not break any laws in your presence on the date of the incident.

//

//

---

Case No. 2:18-cv-01246-WBS-AC       RESPONSE TO REQUESTS FOR ADMISSION, SET ONE

- 1 -

**RESPONSE TO REQUEST NO. 9:**

Responding party objects to this request as it is vague, ambiguous, and overbroad. Further, this request calls for a legal conclusion and is an incomplete hypothetical. As phrased, responding party cannot admit or deny this request.

**REQUEST FOR ADMISSION NO. 10:**

Admit that you placed the Plaintiff in a carotid hold (choke-hold) on the date of the incident.

**RESPONSE TO REQUEST NO. 10:**

Responding party objects to this request as it is vague, ambiguous, and overbroad. Without waiving the foregoing objection, Responding Party responds as follows: Admit that responding party placed Plaintiff in a carotid hold to detain Plaintiff as he resisted Officer Tonn, but did not apply pressure to "choke" Plaintiff in the hold.

**REQUEST FOR ADMISSION NO. 11:**

Admit that you were wearing a body camera on the date of the incident.

**RESPONSE TO REQUEST NO. 11:**

Admit.

**REQUEST FOR ADMISSION NO. 12:**

Admit that your body camera was activated on the date of the incident.

**RESPONSE TO REQUEST NO. 12:**

Admit.

**REQUEST FOR ADMISSION NO. 13:**

Admit that you have been accused of using excessive force as a Vallejo Police Officer within the last 10 years.

**RESPONSE TO REQUEST NO. 13:**

Responding party objects to this request as it is vague, ambiguous, and overbroad. Furthermore, this request seeks private information protected from disclosure pursuant to the official information privilege (*see Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1033 (9th Cir.

**REQUEST FOR ADMISSION NO. 18:**

Admit that the Plaintiff suffered cut on his lip after being taken to ground by you on the date of incident.

**RESPONSE TO REQUEST NO. 18:**

Responding party objects to this request as vague, ambiguous, and overbroad. Responding Party lacks sufficient information to admit or deny this request.

DATED: June 11, 2019

Respectfully submitted,

TIMOTHY R. SMYTH
Deputy City Attorney
Attorneys for City Defendants