1  **RANDY J. RISNER**
Interim City Attorney, SBN 172552
2  **CITY OF VALLEJO**, City Hall
555 Santa Clara Street, 3rd Floor
3  Vallejo, CA 94590
Tel:   (707) 648-4545
4  Fax:   (707) 648-4687

5

6  **P O R T E R  |  S C O T T**
JOHN R. WHITEFLEET, SBN 213301
7  KAVAN J. JEPPSON, SBN 327547
PORTER | SCOTT
8  350 University Ave., Suite 200
Sacramento, CA
9  Tel: (916) 929-1481
Fax: (916) 927-3706
10  Email: jwhitfleet@porterscott.com

11

12  Attorneys for Defendants: CITY OF VALLEJO, ANDREW BIDOU, JARRETT TONN

13

14

15  UNITED STATES DISTRICT COURT

16  EASTERN DISTRICT

17  ROBERT STRONG,                     Case No.: 2:18-CV-01246-WBS-AC

18          Plaintiff,
                                        **INDEX OF EXHIBITS IN SUPPORT OF**
19  v.                                  **DEFENDANTS CITY OF VALLEJO AND**
                                        **JARRETT TONNS' OPPOSITION TO**
20  CITY OF VALLEJO, JARRETT TONN;     **PLAINTIFF'S MOTION FOR PARTIAL**
ANDREW BIDOU, and DOE VALLEJO         **SUMMARY JUDGMENT**
21  POLICE OFFICER,

22          Defendants.                 Date: June 1, 2020
                                        Time: 1:30 p.m.
23                                      Courtroom: 5, 14th Floor

24

25  ///

26  ///

27  ///

28

{02210577.DOCX}                      1

INDEX OF EXHIBITS

Defendants CITY OF VALLEJO AND JARRETT TONN hereby submits the following Index of Exhibits in support of its Opposition to Plaintiff's Motion for Partial Summary Judgment.[1]:

| EXHIBIT A | Excerpt of Robert Strong's Deposition Testimony, dated August 9, 2019. |
| EXHIBIT B | Excerpt of Jarrett Tonn's Deposition Testimony, dated August 9, 2019. |
| EXHIBIT C | Excerpt of Don Cameron's Deposition Testimony, dated January 30, 2020. |
| EXHIBIT D | Excerpt of Roger Clark's Deposition Testimony, dated January 22, 2020. |

Dated:  May 18, 2020

Respectfully submitted,

PORTER SCOTT
A PROFESSIONAL CORPORATION


By /s/ John R. Whitefleet
    John R. Whitefleet
    Attorney for Defendants CITY OF VALLEJO,
    ANDREW BIDOU, JARRETT TONN

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

[1] Defendants also rely on exhibits presented in Defendants' Index of Exhibits in Support of Motion for Summary Judgment, see Document No. 14-4.

{02210577.DOCX}

2

INDEX OF EXHIBITS

# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF CALIFORNIA

3                 SACRAMENTO DIVISION

4                      --oOo--

5   ROBERT STRONG,                    )
                                      )
6          Plaintiff,                 )
                                      )
7          VS.                        ) No. 2:18-CV-01246-
                                      )       WBS-AC
8   CITY OF VALLEJO, JARRETT TONN,    )
    ANDREW BIDOU and DOE VALLEJO      )
9   POLICE OFFICERS 1-25,             )
                                      )
10         Defendants.                )
                                      )
11  _____    )

12

13                     --oOo--

14  VIDEOTAPED DEPOSITION OF ROBERT EVERETT STRONG

15                     --oOo--

16

17

18                 Vallejo, California
                 Friday, August 9, 2019
19                   10:47 a.m.

20                     --oOo--

21

22             DOUCETTE & ASSOCIATES
                 1219 Marin Street
23           Vallejo, California 94590
                 (707) 554-9970
24

25  REPORTED BY:  REBECCA K. DOWELL, CSR, RPR
              CSR License Number 8043

                                                1

| 1 | Q. | Okay.  Are you at all hard of hearing? | |
|---|---|---|---|
| 2 | A. | No. | |
| 3 | Q. | Are you right- or left-handed? | |
| 4 | A. | Right. | |
| 5 | Q. | Okay.  And currently do you have a driver's | 10:55:58 |
| 6 | | license? | |
| 7 | A. | Yes. | |
| 8 | Q. | Is it currently valid? | |
| 9 | A. | Yes. | |
| 10 | Q. | Okay.  Do you know if it was valid at the | 10:56:06 |
| 11 | | time of the incident that we're here to speak about, | |
| 12 | | which is April 19, 2017? | |
| 13 | A. | It was not. | |
| 14 | Q. | It was -- | |
| 15 | A. | I believe it was not. | 10:56:20 |
| 16 | Q. | Okay.  Was it expired or was it suspended or | |
| 17 | | something for another reason? | |
| 18 | A. | Suspended. | |
| 19 | Q. | Okay.  And for what reason was it suspended? | |
| 20 | A. | Traffic tickets from years ago. | 10:56:32 |
| 21 | Q. | Okay.  So just unpaid traffic tickets? | |
| 22 | A. | Yes. | |
| 23 | Q. | Do you know approximately how long preceding | |
| 24 | | the incident it was suspended for? | |
| 25 | A. | I do not. | 10:56:48 |

13

DOUCETTE & ASSOCIATES

```
1    Q.      Was it --

2    A.      Are you saying before the incident how long

3    was it suspended?

4    Q.      Yes.

5    A.      Oh.  Okay.  I would say most likely two        10:56:55

6    months.

7    Q.      Two months?

8    A.      Yeah.

9    Q.      Okay.  And on the day of the incident you

10   were driving a vehicle?                                10:57:05

11   A.      No.

12   Q.      Okay.  You -- there was a vehicle that you

13   were sitting in on the day of the incident, correct?

14   A.      Correct.

15   Q.      Okay.  And were you -- was that vehicle one    10:57:20

16   that was lent to you?

17   A.      Lent to me?

18   Q.      Lended to you?

19   A.      There was no vehicle lended to me.  It was my

20   vehicle.                                               10:57:35

21   Q.      Oh, it was your vehicle?

22   A.      Yeah, it was my vehicle.

23   Q.      Okay.  And --

24   A.      I have a cosigner, but there was no vehicle

25   lent to me.                                            10:57:45
```

DOUCETTE & ASSOCIATES

1    Q.        So when you arrived to your vehicle then what
2    did you do?
3    A.        Sat down with one foot out and one foot in
4    the car.
5    Q.        Okay.  And then as you were sitting there          11:29:12
6    were you -- you were still trying to make the phone
7    call?
8    A.        He pulled up in front of my car at that time.
9    Q.        So approximately how long before he pulled up
10   were you sitting in the car?                                11:29:28
11   A.        Twenty, 30 seconds.
12   Q.        Okay.  So you were in the car, you sat down,
13   he -- within the next 20, 30 seconds he actually
14   pulled up?
15   A.        Yep.  I'm on my phone, I look up, and I see       11:29:44
16   lights in front of me.
17   Q.        Okay.  And did you happen to see him at all
18   before that moment?
19   A.        Yes.
20   Q.        Okay.  And where or when did you see him          11:29:55
21   beforehand?
22   A.        When I was walking he was coming on the
23   opposite way, so I'm like this, and he's like this
24   (indicating).
25   Q.        So while you were walking he was driving by,      11:30:10

DOUCETTE & ASSOCIATES

1   Q.     And what -- did Officer Tonn say anything

2   about that at that time?

3   A.     He said, "I'm going to take this phone," and

4   he reached for it.  And I said, "Hey, hey, hey, hey,"

5   like don't do that, and that's when he grabbed me by   12:00:11

6   my hair and pulled me down.

7   Q.     Okay.  So after he grabbed you can you

8   describe for me what you initially felt or how

9   that -- what was going through in your mind?

10   A.     I was scared.  I was scared.  I didn't know   12:00:35

11   what he was gonna do.  When he reached for my phone I

12   just moved my hand like, hey, like don't do that,

13   you're all in my personal -- you're in my bubble.

14         And he said, "I'm gonna take this phone."

15   And then he grabbed me by my dreads, I used to have   12:00:51

16   dreadlocks, and he threw me on the ground and put me

17   in a choke hold.

18   Q.     Okay.  And when you say, "a choke hold," can

19   you describe -- well, let's first go back.

20         So he grabbed you by the dreadlocks and   12:01:08

21   pulled you, correct?

22   A.     Correct.

23   Q.     And you then -- did he throw you on the

24   ground, or did he --

25   A.     Yeah.   12:01:18

DOUCETTE & ASSOCIATES

```
 1    Q.        -- pull you?

 2    A.        He grabbed me with a good amount of force and

 3    threw me on the ground with a good amount of force.

 4    Q.        Okay.  So you landed on the pavement?

 5    A.        Correct.  Stomach -- belly down.                    12:01:28

 6    Q.        And at that time were you trying to get out

 7    of his holding of you, like wrestle your way loose,

 8    or what was going on?

 9    A.        No, I wasn't.

10    Q.        Okay.  So then what were you doing at that       12:01:45

11    time?

12    A.        Letting him do his thing.  I had the camera,

13    as soon as he reached for it all I did was move, he

14    grabbed me, I went straight to the ground, no

15    resisting, no pulling back, I just let him do his        12:01:57

16    thing.

17    Q.        All right.  And so on the -- so you had a

18    camera in your hand -- or the phone in your hand,

19    what happened with the phone as he's pulling you out?

20    A.        I'm still holding the phone while I'm on the     12:02:09

21    ground, so he has one hand behind my back, right, and

22    I'm still -- I'm like this (indicating), you know,

23    holding it like this try to -- I can't see if I'm

24    actually recording him or not.

25              And then he takes my phone and just kind of      12:02:22
```

1    tosses it out of my hand, like he tosses it on the

2    ground.

3           And then he pulls me up by my dreadlocks,

4    handcuffed my other hand, pulls me up by my

5    dreadlocks and starts pulling my hair back like that          12:02:35

6    (indicating).

7    Q.      Did -- when he's pulling your hand -- I

8    guess -- so you have the phone in your right hand,

9    right?

10   A.      Yes, I do.                                             12:02:47

11   Q.      And he has your left hand?

12   A.      Yes.

13   Q.      Does he need to kind of move it into place

14   behind your back?

15   A.      He does.  I -- when he first grabbed my left          12:02:54

16   hand when I'm recording you can see it on the

17   footage, it goes straight back like that

18   (indicating), and then he throws me on the ground.

19   Q.      Oh.  So -- yeah.  So he had your hand behind

20   your back --                                                  12:03:08

21   A.      M-hm.

22   Q.      -- before you actually were out of the

23   vehicle, correct?

24   A.      Yeah.  You could see he grabbed this hand,

25   and he goes just like this, just like that                    12:03:14

```
 1          He said, "April 2nd," and told me that I'm
 2   being recorded on his body camera.
 3          I said, "Okay.  I'm going to record too," and
 4   that's when I go like that (indicating).  But no, he
 5   didn't say anything like that.                                  12:39:14
 6          At the end when everything was done, yes, he
 7   was like:  You need to listen.
 8          I was like:  Dude, I'm telling you to
 9   listen while I'm on the ground, so you need to listen
10   too.                                                            12:39:25
11          That's -- he wants me to listen, but he won't
12   listen to me.
13   Q.      So during the traffic stop, just kind of
14   going back --
15   A.      Yeah.                                                   12:39:35
16   Q.      -- what -- what were you trying to tell him
17   that he wouldn't listen to?
18   A.      That I just got off work, and that I didn't
19   do anything wrong, I literally just got off the
20   school bus, walking to my car, that's what I was        12:39:49
21   trying to tell him.  And I had witnesses tell him the
22   same thing, and he -- the officer saying, "I don't
23   care, get back.  I don't care, get back."
24   Q.      He was saying, "I don't care, get back," to
25   who?                                                            12:40:06
```

1   Q.      And did you at any point come to understand

2   that the car registration was expired at the time?

3   A.      Um, no, because the tags said April 2017, and

4   from my understanding they don't have -- they don't

5   have certain dates, like oh, it ends April 2nd, I          12:45:38

6   didn't know that.  So from my understanding from the

7   tags, they ended the end of April 2017.

8   Q.      Is that still your understanding?

9   A.      Well, from now, no, because he said they have

10  certain dates they end, so -- I didn't know that at       12:45:52

11  the time.

12  Q.      So because you didn't know at the time of the

13  traffic stop was there a reason you believe he

14  shouldn't have been pulling you over then?

15  A.      Yeah.  I believe he --                             12:46:10

16  Q.      Sorry, ignore that, that's --

17          MR. GOFF:  Objection; calls for a legal

18  conclusion.  He's not a lawyer.

19          THE WITNESS:  Could you repeat the question?

20          MR. SMYTH:  Sure.  I'll -- we'll try and do       12:46:25

21  that question, then we'll go on a quick break.

22          THE WITNESS:  Okay.

23  BY MR. SMYTH:

24  Q.      Is there an understanding you have that

25  because you didn't know at the time of the                12:46:40

1   April 19th, 2017, traffic stop that he should not

2   have pulled you over?

3          MR. GOFF:  Same objection.

4          You can answer.

5          THE WITNESS:  I believe he shouldn't have          12:46:57

6   pulled me over.

7   BY MR. SMYTH:

8   Q.     Even though the registration was expired?

9   A.     Yes.  I was not driving the vehicle, I

10  wasn't.  He shouldn't have pulled me over regardless.   12:47:07

11         MR. SMYTH:  Okay.  Let's go on a break.

12         THE VIDEOGRAPHER:  Okay.  This is going to

13  conclude media number one of the August 9th, 2019,

14  deposition of Robert Strong.

15         Off the record at 12:47.                          12:47:21

16         (Recess taken from 12:47 p.m. to 1:00 p.m.)

17         THE VIDEOGRAPHER:  This begins media number

18  two of the August 9th, 2019, deposition of Robert

19  Strong.

20         On the record at 1:00 o'clock, approximately.    01:00:45

21  BY MR. SMYTH:

22  Q.     Okay.  So we were still kind of talking about

23  the time inside the -- inside the holding cell with

24  Officer Tonn and the conversations that you were

25  having at that time, but before we get back into the   01:01:06

DOUCETTE & ASSOCIATES

1    arrest and now he was going to pull you out of the

2    car?

3    A.        No, he didn't.

4    Q.        Did you ever threaten Officer Tonn during the

5    incident at that moment in time?                              01:53:34

6    A.        No, I didn't.

7    Q.        Did you ever swing at Officer Tonn?

8    A.        No, I didn't.

9    Q.        Did you ever kick at Officer Tonn?

10    A.        No, I didn't.                                        01:53:41

11    Q.        Were you ever on the phone -- once Officer

12    Tonn approached you and you were sitting in the car

13    were you ever talking to someone on the phone?

14    A.        I wasn't talking to anyone.  I was dialing on

15    the dial pad.                                                 01:53:52

16    Q.        So you weren't talking to anybody on the

17    phone?

18    A.        No.

19    Q.        And you told Officer Tonn that you were

20    recording him, or you were going to record him; is         01:53:58

21    that correct?

22    A.        Yes.

23    Q.        And this was after Officer Tonn said he was

24    going to record you?

25    A.        Yes.                                                01:54:04

120

DOUCETTE & ASSOCIATES

1  A.      Say that one more time.

2  Q.      Excuse me.  Even after Officer Tonn released

3  some of the force from the hold that he had around

4  your neck, his arm remained around your neck; is that

5  correct?                                              01:55:14

6  A.      Correct.

7  Q.      When Officer Tonn had you on the ground with

8  his arm around your neck -- strike that.

9          When you were on the ground and Officer Tonn

10 had his arm around your neck, is that the time that   01:55:24

11 Officer Tonn told you to put your hands behind your

12 back?

13 A.      Yes.

14 Q.      Were you physically able to put your hands

15 behind your back while you were being choked --       01:55:33

16 A.      No.

17 Q.      -- by Officer Tonn?

18 A.      No.

19 Q.      Were you trying to comply with his orders

20 while he had his arm choking you around your neck?    01:55:41

21 A.      Yes.

22 Q.      But you were physically unable to do so at

23 the time because his arm was choking you around your

24 neck; is that correct?

25 A.      Correct.                                       01:55:50

```
 1   STATE OF CALIFORNIA      )
                              ) ss:
 2   COUNTY OF SOLANO         )

 3

 4          I, REBECCA K. DOWELL, a duly licensed

 5   Certified Shorthand Reporter, State of California,

 6   hereby certify that the witness in the foregoing

 7   deposition, named

 8                  ROBERT EVERETT STRONG,

 9   was duly sworn to testify to the truth, the whole

10   truth and nothing but the truth in the within-

11   entitled cause; that said deposition was taken at the

12   time and place therein named; that the testimony of

13   said witness was reported by me, and was thereafter

14   transcribed under my direction by computer-aided

15   transcription; that the foregoing is a full,

16   complete, and true record of said testimony.

17          I further certify that I am not related to

18   any party or counsel or attorney for any of the

19   parties to said deposition, nor in any way interested

20   in the outcome of the cause named in said caption.

21          I have hereunto set my hand this 20th day of

22   August, 2019.

23

24          _____

25          REBECCA K. DOWELL, RPR
            CSR License No. 8043
```

128

DOUCETTE & ASSOCIATES

# EXHIBIT B

1                    UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        SACRAMENTO DIVISION

4                            --oOo--

5   ROBERT STRONG,                    )
                                      )
6           Plaintiff,                )
                                      )
7       vs.                           ) No. 2:18-CV-01246-
                                      )        WBS-AC
8   CITY OF VALLEJO, JARRETT TONN,    )
    ANDREW BIDOU and DOE VALLEJO      )
9   POLICE OFFICERS 1-25,             )
                                      )
10          Defendants.               )
                                      )
11  _____ )

12

13                            --oOo--

14               DEPOSITION OF JARRETT TONN

15                            --oOo--

16

17

18                    Vallejo, California
                    Friday, August 9, 2019
19                        2:42 p.m.

20                            --oOo--

21

22               DOUCETTE & ASSOCIATES
                     1219 Marin Street
23            Vallejo, California 94590
                    (707) 554-9970

24

25   REPORTED BY:  REBECCA K. DOWELL, CSR, RPR
                  CSR License Number 8043

                                                        1

1   A.        Yes.

2   Q.        And how are you familiar with the date?

3   A.        Because it's tied to that incident.

4   Q.        How did you become involved with the plaintiff

5   on April 19th, 2017?

6   A.        I initiated a traffic stop on his vehicle.

7   Q.        And what was the purpose for initiating the

8   traffic stop, if you recall?

9   A.        The vehicle had an expired registration.

10  Q.        Did you ever -- strike that.

11            You never observed the plaintiff operating his

12  vehicle at the time that you detained him for

13  unregistered tags; is that correct?

14  A.        I'll maybe take issue with the word "operating."

15  Did I see the car moving --

16  Q.        Sure.

17  A.        -- no.  I believe the Vehicle Code standard he

18  was operating the motor vehicle; it was running, and he

19  was in the driver's seat.

20            It was not driving, if that's what you're asking

21  me.

22  Q.        Sure.  So your observation was the car was on,

23  or it was running?

24  A.        It appeared to be running, and when I approached

25  it closer I believe it was running, but not driving.  It

1   was on the side of the road, if that's what you're asking

2   me.

3   Q.      And the plaintiff was eventually arrested, he

4   was eventually arrested that day; is that correct?

5   A.      That's correct.

6   Q.      Okay.  Was one of the reasons that he was

7   arrested because he had expired registration tags?

8   A.      No.  That is an infraction, that is not

9   arrestable, it's only citable.

10          He was arrested for 148(a) of the Penal Cole,

11   which was resisting or obstructing.

12   Q.      Okay.  Now, was he -- based on your observation

13   was the plaintiff obstructing, or was he resisting?

14   A.      One led to another.  He was obstructing and

15   resisting.

16   Q.      So let's talk about the obstructing.  How was he

17   objecting that day?

18   A.      During my initial approach or contact with him

19   during the traffic stop he kept trying to use his cell

20   phone to make a phone call, and I believe made a comment

21   about making a phone call.

22          And I said, you know, "Please don't make a phone

23   call."  And the reason I instructed him not to make a

24   phone call, I have gone on numerous traffic stops where

25   people will call relatives, friends, and then you get a

9

```
1    bunch of people showing up, and it becomes very unsafe.

2         So for my safety I don't want people calling

3    people, and especially nowadays you have people live

4    streaming, all sorts of stuff, but at the end of the day

5    I don't want anything done that's going to draw more

6    people to this location, especially when I'm by myself

7    and I don't even know who this person is.

8         So I instructed him not to use his cell phone.

9    Q.        Okay.  And did the plaintiff tell you that he

10   was simply trying to record you on his phone versus that

11   he was talking on the phone?

12   A.        He did not.

13   Q.        Did you tell the plaintiff that you were

14   recording him?

15   A.        I did.

16   Q.        And -- strike that.

17        Is there a law that a person is not allowed to

18   record an officer while they're performing their duties?

19        MR. SMYTH:  Calls for expert opinion.

20        MR. GOFF:  If you know.

21        THE WITNESS:  I don't believe there's a law

22   stating they cannot.

23   BY MR. GOFF:

24   Q.        Okay.  And at the time that you were interacting

25   with the plaintiff on the day of this incident you were,
```

10

1    in fact, performing your duties as a public servant; is

2    that correct?

3    A.      I was.

4    Q.      Did you ever issue a command to the plaintiff to

5    put his phone away before you tried to take it from him?

6    A.      I might take issue with the exact wording.  I

7    told him to put his phone down or stop using it.  I don't

8    remember my exact words, but it was made clear to him to

9    put the phone down and stop using it.

10   Q.      Okay.  But you never said, "Put your phone away

11   or else I'm going to take it from you"?

12   A.      I don't believe I said those exact words.

13   Q.      And you didn't have a warrant to seize his

14   phone; is that correct?

15   A.      I did not.

16   Q.      And you never gave the plaintiff commands to

17   step out of the car on his own; is that correct?

18   A.      I did not.

19   Q.      You did subsequently grab the plaintiff by his

20   arm and took him out of his car to the ground; is that

21   correct?

22          MR. SMYTH:  Objection; vague as to subsequent.

23   BY MR. GOFF:

24   Q.      On the day of the incident -- on the day of the

25   incident you wound up taking the plaintiff -- or grabbing

1   the plaintiff by the arm and taking him out of his car;

2   is that correct?

3   A.      That is correct.  There are events that led up

4   to that, so I don't want it to seem out of place, but

5   that in and of itself is correct.

6   Q.      Okay.  All right.  Let's go through some of the

7   events that led up to that.

8   A.      Sure.

9   Q.      Can you expound to me what were the events that

10  led up to that?

11          MR. SMYTH:  Calls for narration.

12          THE WITNESS:  You want me to narrate, or do you

13  want a question?

14  BY MR. GOFF:

15  Q.      You can give a brief narrative.

16  A.      I asked him several times to stop using his

17  phone, he would not.  I told him I was going to then take

18  his phone so he could not keeping using it.

19          I was afraid he was either in the middle of a

20  call or already called, so I tried to grab his phone to

21  stop it, stop whatever phone call was possibly in

22  progress.

23          When I went to take his cell phone he then

24  started to pull away and started to kind of twist his

25  body away.

1             (Response to Requests for Admission, Set One,
2             was marked as Plaintiff's Exhibit No. 5 for
3             identification.)
4    BY MR. GOFF:
5    Q.       And I would like to direct your attention to
6    request for admission number ten, and let me know when
7    you finish reading that particular request.
8    A.       Go ahead.
9    Q.       Okay.  So request for admission number ten
10   states:
11            Admit that you placed the plaintiff in
12            a carotid hold, in parentheses choke hold,
13            on the date of the incident.
14            And the response was:
15            Admit, admit that responding party placed
16            Plaintiff in a carotid hold to detain
17            Plaintiff as he resisted Officer Tonn.
18            Now, this response to my -- to the plaintiff's
19   the request for admissions states that you admit to
20   placing the plaintiff in a carotid hold; is that correct?
21            MR. SMYTH:  This is -- just vague, may be
22   overstating what -- the understanding of what carotid and
23   choke hold mean in connectin to each other, but if you
24   can explain.
25            THE WITNESS:  Yeah, I would be happy to.

                                                              15

1          So I was kind of going to say the same thing.

2          I don't really know what a -- I don't know what

3    -- a carotid hold without applying pressure, if that

4    makes sense.

5          MR. GOFF:  Sure.

6          THE WITNESS:  I don't see as there's a carotid

7    hold that you don't apply pressure.

8          MR. GOFF:  Right.

9          THE WITNESS:  I mean because, in essence,

10   putting your arm around someone's neck or that area I

11   mean is not a carotid -- the hold and the pressure are

12   all one thing, there's not a -- now, you can get set --

13   defensive tactic speaking, you can get set up in a

14   position where you could do a carotid move if necessary,

15   but at least in my thinking I equate the -- I don't -- we

16   don't -- I don't know what a choke hold is, but a carotid

17   I can speak to.

18         The carotid hold is the pressure.  I don't think

19   you can separate the two, if that makes sense.

20   BY MR. GOFF:

21   Q.        Sure.  So --

22   A.        My arm was around the front of his neck, if

23   that's what you're asking.  I can say that, yes.

24   Q.        Okay.  All right.

25         MR. SMYTH:  And just to clarify the record,

1    these are -- this is my words that I was trying to

2    explain what I understood when the maneuver to place a

3    person into a carotid maneuver, or whatever it is, as to

4    say, but as I tried to explain in that second portion of

5    the admission that there was no pressure applied, so --

6         THE WITNESS:  Yeah.  I think that's -- I think

7    my -- you can be in a position where you could apply a

8    carotid if necessary.

9         MR. GOFF:  Sure.

10        THE WITNESS:  But I think the hold and the

11   pressure are all one thing.  I see that as one thing.

12        MR. GOFF:  Okay.  So -- okay.  So let's go to

13   Exhibit Number 6.

14        (Investigation Narrative Report was marked as

15        Plaintiff's Exhibit No. 6 for identification.)

16   BY MR. GOFF:

17   Q.      And this would be the third to the last

18   paragraph says -- last paragraph is a small paragraph,

19   the one right above that -- no, the one above that.

20   A.      Which page?

21   Q.      I'm sorry, the first page, very first page, so

22   the third to the last paragraph, if you could read that,

23   then let me know when you're done.

24        Oh, excuse me, the second to last paragraph.

25   Let me know when you're done.  Sorry.

1    A.       I'm done.

2    Q.       So in your police report it states that, "I did

3    not conduct a carotid."  When you say that, what are you

4    referring to?

5    A.       Again, it's really hard to describe without

6    demonstrating, but in essence, you know, your arm can be

7    in front like this (indicating) where it's over someone's

8    front neck area, not necessarily like -- I'm not talking

9    sort of right on the Adam's Apple, the neck area.

10   Q.       Right.

11   A.       When I say I did not apply, so I could have

12   applied the carotid if necessary, but I did not conduct a

13   carotid, meaning I did not at any point tighten up on

14   that and I didn't apply any pressure to his carotid

15   arteries with my bicep or my forearm.

16   Q.       During the time that you had your arm around the

17   plaintiff's neck, at any time did it appear that he could

18   not breathe or that he was having problems breathing --

19   A.       No.

20   Q.       -- based on your observation?

21   A.       No.  In fact, the opposite.  He was talking

22   during that time.  The carotid would have made someone

23   pass out in several seconds, and he was talking clearly.

24   Q.       And I'm glad you said that.  So if someone was

25   placed in a carotid hold would it have caused them to

18

```
 1   become light-headed?

 2   A.        If someone was placed --

 3             MR. SMYTH:  That's vagus, and may call for

 4   speculation.

 5             But, go ahead, just generally.

 6             THE WITNESS:  If a proper carotid was applied

 7   the person would pass out within a matter of seconds.

 8   BY MR. GOFF:

 9   Q.        Okay.  Forty-five seconds?  Thirty seconds?

10   A.        It could be as quick as five or six seconds.

11   Depends how much pressure you're applying and how

12   properly, just depends.

13   Q.        Okay.  So let me ask you this:  Prior to --

14   strike that.

15             When you had your arm around the plaintiff's

16   neck, and it wasn't a carotid hold, but when you had your

17   arm around his neck you guys were on the ground; is that

18   correct?

19   A.        That's correct.

20   Q.        And how did you guys wind up on the ground?  Did

21   the plaintiff wrestle you to the ground or was he taken

22   to the ground?

23   A.        He was taken to the ground.

24   Q.        And prior to the plaintiff being taken to the

25   ground and you placing your arm around his neck, he did
```

19

```
1   A.        -- I could say no, but I think it's the unknown

2   threat of I have a guy in a car that I don't know what

3   they might have, and now they're not listening, they're

4   not obeying what I'm saying, and now they're pulling away

5   so -- I mean I think there's always a threat when there's

6   an unknown and unsecured person who I have no clue -- you

7   know, I always tell people when they say they're scared

8   of the police I go:  You know who I am because I'm

9   wearing a badge and a name tag.  I have no clue who you

10  are.

11  Q.        Right.   Right.

12  A.        So, you know, there's always a threat.  You

13  know, did I see any weapons, no, if that helps.

14  Q.        Yeah.  It does help because that's my question.

15  Like at that moment in time did it appear -- did you feel

16  threatened that he was going to immediately try to harm

17  you, engage and try to harm you?

18  A.        I --

19            MR. SMYTH:  Overbroad.

20  BY MR. GOFF:

21  Q.        Like was he reaching for a weapon?  Was he

22  reaching for a stick?  Was --

23  A.        So when he turned away I did become very

24  concerned because he pulled his phone away and started

25  turning away, and I'm always concerned when people are
```

27

DOUCETTE & ASSOCIATES

1   knot listening to the police and being uncooperative.

2          A high percentage of the time, in my experience

3   and in all the training that I've done, it means there's

4   a high likelihood that there's some other crime that I

5   don't know of, probably bigger than the one I'm currently

6   investigating, in this case a registration because if it

7   was merely a registration, and in other traffic stops

8   where that -- it is what it appears on its face, people

9   are compliant.

10          So when people are not compliant, and I kind of

11  say like partial compliance is noncompliance.  If you're

12  only halfway listening to what I'm saying, you're not

13  listening to what I'm saying, and there's a reason you're

14  doing that.

15          And we deal with so many people with guns, and,

16  you know, I was already in that neighborhood because so

17  many stolen cars, and we've had people with guns in that

18  neighborhood, specifically in that block radius, so when

19  people start not complying, not listening, and then

20  pulling away I am fearful, yeah.  Are they going to hide

21  a weapon or are they going to access a weapon, are they

22  gonna grab the car and put it in drive?

23          So yes, I am fearful about that type of

24  behavior, and I was specifically fearful about what he

25  might try to do next in that case, not knowing who he

28

```
 1   STATE OF CALIFORNIA    )
                            ) ss:
 2   COUNTY OF SOLANO       )

 3

 4        I, REBECCA K. DOWELL, a duly licensed Certified

 5   Shorthand Reporter, State of California, hereby certify

 6   that the witness in the foregoing deposition, named

 7             JARRETT TONN,

 8   was duly sworn to testify to the truth, the whole truth

 9   and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   reported by me, and was thereafter transcribed under my

13   direction by computer-aided transcription; that the

14   foregoing is a full, complete, and true record of said

15   testimony.

16        I further certify that I am not related to any

17   party or counsel or attorney for any of the parties to

18   said deposition, nor in any way interested in the outcome

19   of the cause named in said caption.

20        I have hereunto set my hand this 20th day of

21   August, 2019.

22

23

24        _____
          REBECCA K. DOWELL, RPR
25        CSR License No. 8043
```

# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


ROBERT STRONG,

                    Plaintiff,

vs.                                        No.
                                           2:18-CV-01246-WBS-AC
CITY OF VALLEJO, OFFICER TONN
and DOES VALLEJO POLICE OFFICERS
1-25,

                    Defendants.

_____/




DEPOSITION OF DON CAMERON


Taken before LISA LOUNDAGIN

Certified Shorthand Reporter

State of California

CSR 9213

Thursday, January 30, 2020

800-331-9029                        emerickfinch@emerickfinch.com

Page 19

1    to do so; is that correct?

2        A    Correct.

3        Q    Okay.  So you just read the policy from Vallejo,

4    Subsection D.  Does state that if someone is placed in a

5    carotid hold, whether they lose consciousness or not, the

6    police officer is required to get medical attention for

7    that person; is that correct?

8        A    Correct.

9        Q    Okay.  Based on your observation of the video

10   footage and the deposition transcripts, isn't it true that

11   Officer Tonn did not get medical attention for the

12   plaintiff after the plaintiff -- after the hold was placed

13   on the plaintiff?

14       A    Correct, but he didn't place him in a carotid

15   hold.

16       Q    Okay.  Isn't it true that after the -- after

17   Officer Tonn finished putting -- having his arm around the

18   plaintiff's neck, that Officer Tonn never got medical

19   attention or assistance for the plaintiff to be evaluated?

20       A    Correct.

21       Q    All right.

22            MR. SMYTH:  It may call for speculation.  I

23   don't know if you know.

24            MR. GOFF:  Just based on his observation.

25       Q    Now, I understand and I seen in your opinion

800-331-9029                                    emerickfinch@emerickfinch.com

Page 20

1    that it said something to the effect that if a carotid

2    hold was applied, that the person would lose oxygen within

3    a very brief amount of time, like 20, 30 seconds or

4    something.

5        A    They usually go out in, like, three to eight

6    seconds.

7        Q    Three to eight seconds, okay.  And is that why

8    you base your opinion that Officer Tonn did not place the

9    plaintiff in a hold because the plaintiff never lost

10   consciousness?

11       A    Well, he never lost consciousness, but he talked

12   the entire time.  I don't know if you've ever had a

13   carotid placed around you --

14       Q    Thank God, no.

15       A    -- but you can't talk.

16       Q    Okay.

17       A    I mean, you can't yell, "Get off me.  Get off

18   me."  You just go (makes sound) like that, and it's over.

19       Q    It's over, okay.  Is it possible that the

20   plaintiff -- Officer Tonn was simply -- did not place --

21   strike that.

22            Is it possible that whatever carotid hold that

23   plaintiff -- that Officer Tonn was trying to place on the

24   plaintiff, that Officer Tonn just didn't do it correctly?

25   Is that possible?

Page 21

1          MR. SMYTH:  I'm going to -- assumes facts in the

2     form of the question and lacks foundation.

3          MR. GOFF:  Q.  Well, you said that he was able

4     to talk, the plaintiff.  He was able to say, "Get off me."

5          A    Yeah, several times.

6          Q    I heard that.  So is -- so is it that Officer

7     Tonn did not place him in a carotid hold, or he just did

8     not place him in -- he didn't do it properly?  That's my

9     question.

10         A    (Witness shrugs.)

11         Q    You don't know?

12         A    I wouldn't know.  I mean, I know that he said he

13    had his arm around the neck.  I believe he also said he

14    was not placing him in a carotid.  He was gonna have his

15    control, and it is a control move.

16         Q    Okay.  And based on Learning Domain 20, an

17    officer is allowed to place their arm around someone's

18    neck to control them?

19         A    Oh, yeah.

20         Q    And you may use a carotid hold if necessary?

21         A    Correct.

22         Q    And a carotid hold would only be necessary if

23    the person, the subject, was offering some level of

24    resistance, correct?

25         A    Right, that would be justification for using the

Emerick and Finch, Certified Shorthand Reporters
Don Cameron

800-331-9029                                      emerickfinch@emerickfinch.com

Page 37

CERTIFICATE OF REPORTER

1

2

3        I, LISA LOUNDAGIN, hereby certify that the

4   witness in the foregoing deposition was by me duly sworn

5   to tell the truth, the whole truth, and nothing but the

6   truth in the within-entitled cause;

7

8        That said deposition was taken in shorthand by

9   me, a Certified Shorthand Reporter of the State of

10  California, and was thereafter transcribed into

11  typewriting, and that the foregoing transcript constitutes

12  a full, true, and correct record of said deposition and of

13  the proceedings which took place;

14

15       That I am a disinterested person to the said

16  action.

17

18       IN WITNESS WHEREOF, I have hereunto set my hand

19  this _____ day of _____, 2020.

20

21

22                            _____

23                            LISA LOUNDAGIN

24                            CSR No. 9213

25

800-331-9029                    emerickfinch@emerickfinch.com

Page 38

1                              ---oOo---

2                                        Date_____

3

4    Check One

5    _____        Signature waived on the

6                      record.

7

8    _____        I certify that the witness

9                      was given the statutory

10                     allowable time within which

11                     to read and sign the

12                     deposition, and the witness

13                     failed to appear for such

14                     reading and signing.

15

16   _____        I certify that the witness

17                     has read and signed the

18                     deposition and has made any

19                     changes indicated therein.

20

21   By_____

22         EMERICK & FINCH

23

24

25                              ---oOo---

Emerick and Finch, Certified Shorthand Reporters
Don Cameron

800-331-9029                                    emerickfinch@emerickfinch.com

Page 39

1          I, DON CAMERON, make the following changes to my

2   deposition taken in the matter of ROBERT STRONG vs. CITY

3   OF VALLEJO, OFFICER TONN and DOES VALLEJO POLICE OFFICERS

4   1-25 taken on January 30, 2020:

5   DATE:_____      _____

6                                              DON CAMERON

7   Page        Line        Change

8   _____       _____       _____

9   _____       _____       _____

10  _____       _____       _____

11  _____       _____       _____

12  _____       _____       _____

13  _____       _____       _____

14  _____       _____       _____

15  _____       _____       _____

16  _____       _____       _____

17  _____       _____       _____

18  _____       _____       _____

19  _____       _____       _____

20  _____       _____       _____

21  _____       _____       _____

22  _____       _____       _____

23  _____       _____       _____

24  _____       _____       _____

25  _____       _____       _____

Emerick and Finch, Certified Shorthand Reporters
Don Cameron

800-331-9029                          emerickfinch@emerickfinch.com

Page 40

EMERICK & FINCH
Certified Shorthand Reporters
18 Crow Canyon Court, Suite 125
San Ramon, California 94583
Telephone (925) 831-9029

Job No._____

_____, 2020

DON CAMERON
c/o TIMOTHY R. SMYTH, Esq.
City Attorney's Office
555 Santa Clara Street
Vallejo, California 94590

Re:  ROBERT STRONG vs. CITY OF VALLEJO, OFFICER TONN and
DOES VALLEJO POLICE OFFICERS 1-25

Dear DON CAMERON:

        Your deposition in the above matter is now
available at this office.  You may wish to discuss with
your attorney whether he or she requires that it be read,
corrected, if necessary, and signed before it is filed
with the court, if so ordered.

        Since the original deposition may not be released
from our custody, if you wish to sign it, please appear at
this office, 18 Crow Canyon Court, Suite 125, San Ramon,
California, within the next 30 days on any weekday between
the hours of 9:00 a.m. and 4:00 p.m.  It is necessary that
you bring this letter with you.

        In the alternative, you may wish to read your
attorney's copy of the deposition and notify this office
by letter of any changes you desire to be made.

                        Very truly yours,
                        EMERICK & FINCH


                        _____
                        LISA LOUNDAGIN, CSR No. 9213

cc:  All Counsel

# EXHIBIT D

1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                   SACRAMENTO DIVISION

4                       --oOo--

5   ROBERT STRONG,                    )
                                      )
6           Plaintiff,                )
                                      )
7           VS.                       ) No. 2:18-CV-01246-
                                      )        WBS-AC
8   CITY OF VALLEJO, JARRETT TONN,    )
    ANDREW BIDOU and DOE VALLEJO      )
9   POLICE OFFICERS 1-25,             )
                                      )
10          Defendants.               )
                                      )
11  _____  )

12

13                       --oOo--

14          DEPOSITION OF ROGER ALMA CLARK

15                       --oOo--

16

17

18                  Vallejo, California
               Wednesday, January 22, 2020
19                     10:16 a.m.

20                       --oOo--

21

22               DOUCETTE & ASSOCIATES
                    1219 Marin Street
23             Vallejo, California 94590
                    (707) 554-9970

24

25  REPORTED BY:  REBECCA K. DOWELL, CSR, RPR
                 CSR License Number 8043

                                                         1

1   report?

2   A.      Okay.  I was not using it interchangeably, and

3   first and foremost I didn't care one way or the other

4   because it was a significant application of force on

5   Strong's neck.

6       However, if the carotid was applied correctly

7   Strong would be able to breathe.  He would -- and the

8   grip, I'll use that, the grip of Tonn's cradling of his

9   neck with his forearm and bicep against Strong's neck is

10  a typical carotid grip.  Whether or not it was, in fact,

11  a carotid, it was very, very poorly done, so I didn't

12  care one way or the other.

13  Q.      So, in essence, you don't have an opinion as to

14  whether or not the carotid was actually effected properly

15  in this matter?

16  A.      Oh, I think it was not properly done.  For the

17  first reason, it should never have been done; and

18  secondly, because you can hear him choking and gasping,

19  that's -- that doesn't happen when you're applying it

20  properly.

21      So it's -- that should never -- have never been

22  inflicted on Mr. Strong, it's life threatening.

23  Q.      So going to your Force Used Against Mr. Strong,

24  you also note that Officer Tonn was mounted on

25  Mr. Strong's back, correct?

26

DOUCETTE & ASSOCIATES

```
 1    typically go unconscious?

 2    A.        Seconds.  It's very fast.   I could demonstrate

 3    it if you want.

 4              MR. SMYTH:  Stanley, you want to --

 5              MR. GOFF:  No thank you.

 6              MR. SMYTH:  Just kidding.

 7    BY MR. SMYTH:

 8    Q.        All right.  So had Tonn applied the carotid

 9    correctly, and not to say that I think he did, but if he

10    had applied it correctly did he -- Mr. Strong would

11    likely have been unconscious within seconds?

12    A.        If the technique had been applied correctly he

13    would have been unconscious within seconds, and he would

14    not be able to speak, et cetera, because he'd be

15    unconscious, and then there would be a recovery.  Typical

16    recovery is like a petit mal seizure, when you come out

17    of it.

18    Q.        So in your training with the carotid is it a

19    complicated move?

20    A.        It's not complicated.  It's pretty

21    straightforward.  And, by the way, you breathe freely

22    during the process, so the subject's not even aware of

23    what's happening because they breathe, it's comfortable,

24    all of a sudden they're unconscious.

25    Q.        What is the -- now, you have kind of an
```

46

1   STATE OF CALIFORNIA     )
                            ) ss:
2   COUNTY OF SOLANO        )

3

4        I, REBECCA K. DOWELL, a duly licensed Certified

5   Shorthand Reporter, State of California, hereby certify

6   that the witness in the foregoing deposition, named

7                      ROGER ALMA CLARK,

8   was duly sworn to testify to the truth, the whole truth

9   and nothing but the truth in the within-

10  entitled cause; that said deposition was taken at the

11  time and place therein named; that the testimony of said

12  witness was reported by me, and was thereafter

13  transcribed under my direction by computer-aided

14  transcription; that the foregoing is a full, complete,

15  and true record of said testimony.

16       I further certify that I am not related to any

17  party or counsel or attorney for any of the parties to

18  said deposition, nor in any way interested in the outcome

19  of the cause named in said caption.

20       I have hereunto set my hand this 30th day of

21  January, 2020.

22

23  _____

24  REBECCA K. DOWELL, RPR
    CSR License No. 8043

25

56

DOUCETTE & ASSOCIATES