1              UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF CALIFORNIA
3                  SACRAMENTO DIVISION
4                      --oOo--
5    ROBERT STRONG,                    )
                                       )
6          Plaintiff,                  )
                                       )
7          VS.                         ) No. 2:18-CV-01246-
                                       )        WBS-AC
8    CITY OF VALLEJO, JARRETT TONN,    )
     ANDREW BIDOU and DOE VALLEJO      )
9    POLICE OFFICERS 1-25,             )
                                       )
10         Defendants.                 )
                                       )
11                                     )
12
13                      --oOo--
14      VIDEOTAPED DEPOSITION OF ROBERT EVERETT STRONG
15                      --oOo--
16
17
18                  Vallejo, California
                 Friday, August 9, 2019
19                    10:47 a.m.
20                      --oOo--
21
22              DOUCETTE & ASSOCIATES
                  1219 Marin Street
23             Vallejo, California 94590
                  (707) 554-9970
24
25   REPORTED BY: REBECCA K. DOWELL, CSR, RPR
             CSR License Number 8043

Page 2

INDEX

                                          PAGE
APPEARANCES                                 3

PROCEEDINGS                                 4

EXAMINATION BY:
    MR. SMYTH                               5
    MR. GOFF                              119

EXHIBITS FOR DEFENDANTS:
No. 1 -  Notice of Taking Deposition       23
No. 2 -  Color print of image from Google Maps   34
No. 3 -  Plaintiff's Response to Defendant's     69
         Request for Production of Documents
No. 4 -  Photocopy of Notice to Appear dated     91
         5/29/17

REPORTER'S CERTIFICATE                    128

--oOo--

Page 3

1    BE IT REMEMBERED that, pursuant to Notice of
2  Taking Deposition, and on Friday, August 9, 2019,
3  commencing at 10:47 a.m. thereof, at office of
4  Vallejo City Attorney, 555 Santa Clara Street, Third
5  Floor, Vallejo, California, before me, REBECCA K.
6  DOWELL, CSR No. 8043, a duly licensed Certified
7  Shorthand Reporter in the State of California, there
8  personally appeared
9        ROBERT EVERETT STRONG,
10 a witness called under the appropriate and applicable
11 provisions of the Codes of the State of California,
12 who, being first duly sworn, was thereupon examined
13 and testified as hereinafter set forth.
14              --oOo--
15        A P P E A R A N C E S
16              --oOo--
17    STANLEY C. GOFF, JR., Attorney at Law, 15
18 Broadman Place, San Francisco, California 94103,
19 appeared as counsel on behalf of Plaintiff.
20    TIMOTHY R. SMYTH, Attorney at Law, of CITY OF
21 VALLEJO, 555 Santa Clara Street, Third Floor, Post
22 Office Box 3068, Vallejo, California 94590, appeared
23 as counsel on behalf of Defendants City of Vallejo,
24 Jarrett Tonn, and Andrew Bidou.
25    STUART PETTIGREW, of Stuart Pettigrew Video

Page 4

1  Services, 4521 Adeline Street, Emeryville, California
2  94608, was present to videotape the proceedings.
3      Also present was Shelby Rae.
4              --oOo--
5        PROCEEDINGS
6      THE VIDEOGRAPHER:  Good morning.  This is the
7  videotaped deposition of Robert Strong taken on
8  behalf of the defendant, and is being taken by
9  Timothy R. Smyth, Deputy City Attorney, for the City
10 of Vallejo, California.
11     It's in the matter of Robert Strong versus
12 the City of Vallejo and others.  This case is venued
13 in the United States District Court for the Eastern
14 District of California, Sacramento Division.  The
15 case number is 2:18-CV-01246-WBS-AC.
16     This deposition is being held at the office
17 of the City Attorney in Vallejo, California, on
18 August 9th, 2019.
19     The video operator is Stu Pettigrew of Stuart
20 Pettigrew Video, located in Vallejo -- pardon me,
21 located in Emeryville, California, phone number there
22 is (510) 469-7440.
23     The court reporter is Becky Dowell of
24 Doucette & Associates Court Reporters, and they are
25 located in Vallejo, California.

Page 5

1      We're going on the record at approximately
2  10:47 a.m.
3      Will counsel please state their appearances
4  for the record.
5      MR. SMYTH:  For the City and Defendants,
6  Timothy Smyth.
7      MR. GOFF:  Stanley Goff, attorney for the
8  plaintiff.
9      THE VIDEOGRAPHER:  Thank you.
10     Would the court reporter please swear in the
11 witness.
12     (Thereupon ROBERT EVERETT STRONG was duly and
13     regularly sworn by the court reporter.)
14     THE WITNESS:  Yes.
15        EXAMINATION
16 BY MR. SMYTH:
17 Q.    Good morning.  My name is Timothy Smyth, I
18 introduced myself off the record a little earlier.
19     If you can please, for the record, state your
20 full name and spell it.
21 A.    My name is Robert Everett Strong.  First name
22 R-o-b-e-r-t, last name Strong, S-t-r-o-n-g, middle
23 name Everett, E-v-e-r-e-t-t.
24 Q.    Great.  And what is your date of birth?
25 A.    03/10/1994.

Page 6

1  Q.      Thank you.
2         So before we really get into the substance of
3  the deposition there are admonitions, which are
4  basically the rules of the deposition, that I'd like
5  to go through, but first off, have you ever had your
6  deposition taken before?
7  A.      No.
8  Q.      Okay.  Very good.  Have you ever testified in
9  court before?
10  A.      No.
11  Q.      Okay.  So a new experience for you today?
12  A.      Yes.  Yes, it is.
13  Q.      Okay.  So first and foremost you understand
14  you just took an oath and were sworn in for this
15  deposition today.  You understand that that oath is
16  the same oath to be truthful as if you were in a
17  court of law, even though we're in a conference room?
18  A.      I do.
19  Q.      Okay.  Great.
20         You're doing good so far.  Audible answers
21  are necessary for the court reporter.  Everything is
22  being taken down into a transcript, written down
23  words, so --
24  A.      Okay.
25  Q.      Please do your best to continue giving

Page 7

1  audible answers --
2  A.      Okay.
3  Q.      -- yes, no, I don't know.  Nods of the head,
4  those types of things, uh-huhs, huh-uhs, will
5  never --
6  A.      Right.
7  Q.      -- they won't transcribe well.
8  A.      I get you.
9  Q.      One other thing, and as part of our normal
10  conversation people tend to start answering before
11  they hear the conclusion of a question, it just tends
12  to happen in casual conversation.  For someone like
13  yourself who hasn't been in this kind of setting
14  before it might be difficult to wait until the
15  conclusion of my questions.  If we talk over each
16  other it's going to make for a really poor record, so
17  for that reason I ask do your best to wait till I'm
18  done with my questions before you answer, and I'm
19  going to do my best to wait until you finish your
20  answers before I start with my next question.
21  A.      Sounds good.
22  Q.      Okay.  Perfect.  And not to be rude or
23  anything, if myself or Stanley try to stop you from
24  talking it's not to be rude --
25  A.      Okay.

Page 8

1  Q.      -- it's really because the transcript is
2  going to reflect poorly.
3  A.      Okay.
4  Q.      So I apologize in advance for that.
5  A.      Okay.
6  Q.      I'm going to do my best to offer clear
7  questions to you, present clear questions, things
8  that you understand I'm asking for.
9  A.      M-hm.
10  Q.      It doesn't always come out that way, you
11  know, whatever is, you know, wheels are spinning in
12  my head --
13  A.      Right.
14  Q.      -- don't always translate properly --
15  A.      Okay.
16  Q.      -- in audible form.  So please listen to my
17  questions, wait till the answers -- or wait till my
18  question is completed.
19  A.      Okay.
20  Q.      If you don't understand my questions please
21  feel free to ask me to rephrase.
22  A.      Okay.
23  Q.      That will be totally fine.  I'm going to do
24  my best to make it clear to you what I'm asking.
25  A.      Okay.

Page 9

1  Q.      If you do provide answers I'm just going to
2  assume you understand what I'm asking; is that fair?
3  A.      Yeah, that's fair.
4  Q.      Okay.  And it also gives your attorney time
5  to answer questions -- or to object if you wait till
6  the question is completed, you know, give it a moment
7  to reflect, and then provide your answers.
8  A.      Okay.
9  Q.      So I'm entitled to your best testimony, your
10  best estimates today about things.  I'm not entitled
11  to guesses necessarily.  Do you know the difference
12  between a guess and an estimate?
13  A.      A guess and an estimate?  I'm guessing it's
14  just like guessing you're not sure and you're just
15  making a guess; estimate you're kinda sure, but not
16  really so sure.
17  Q.      That's a pretty good idea of it.  I'll give
18  you an example that we typically use in explaining
19  it.
20         For instance, if I was to ask you the length
21  of the table in front of you right now, you haven't
22  done any measurements, it would be an estimate based
23  upon your ability to perceive it, you look at it and
24  you have your own common experiences, you might be
25  able to give me it's -- you don't know the exact

Page 10

1   number of inches or whatever --
2   A.      Right.
3   Q.      -- but you could give me an estimate for the
4   length.
5   A.      Right.
6   Q.      If I were to ask you the length of my dinner
7   table at my house, you haven't been to my house, as
8   far as I know, and so you would have no idea.
9   A.      Right.
10  Q.      So that's -- do you understand the
11  difference?
12  A.      I get what you're saying, yeah.
13  Q.      Okay.  So you're entitled to breaks.
14  A.      Okay.
15  Q.      I'm going to try and take breaks about an
16  hour -- every hour or so, but if at any time you need
17  a break, please feel free to ask and I'll do my best
18  to accommodate you.
19  A.      M-hm.
20  Q.      The only thing I ask is that you try not to
21  take a break in the middle of a question.
22  A.      Okay.
23  Q.      So we'll try to get an answer, and then we
24  can take a break.
25  A.      Okay.

Page 11

1   Q.      So -- yeah.  Your attorney is here, he's
2   going to be making objections through the deposition.
3   An objection to a question doesn't necessarily mean
4   do not answer, it's just to preserve rights on
5   objections for the record, if we were to take this to
6   trial or otherwise.
7           So unless he instructs you not to answer,
8   then I'm entitled to an answer to my questions; do
9   you understand
10  A.      I understand.
11  Q.      Okay.  Great.
12          So I think that's pretty much it, and so
13  let's go ahead and start with the substance.
14          Are you -- have you taken any drugs or
15  alcohol that would impact your ability to testify
16  today?
17  A.      No.
18  Q.      Okay.  Is there any reason why you don't
19  believe your testimony should be heard today?
20  A.      No.
21  Q.      Okay.  Did you prepare for your deposition?
22  A.      Yes.
23  Q.      And what did you do to prepare for your
24  deposition?
25  A.      I went over the e-mails he sent me.

Page 12

1   Q.      Your counsel?
2   A.      My attorney, yes.
3   Q.      Okay.  And so I'm not entitled to the
4   substance between communications between yourself and
5   your attorney, so did you speak to anyone other than
6   your attorney regarding your deposition today?
7   A.      No.
8   Q.      Okay.  Did you review any documents in
9   preparation for your deposition today, aside from
10  e-mails from your attorney that I'm not entitled
11  to --
12  A.      No.
13  Q.      -- know about?
14          Okay.  And you stated your date of birth is
15  3/10/94?
16  A.      Correct.
17  Q.      Okay.  And do you go by any other names,
18  aliases, that kind of thing?
19  A.      Rob, Robert.  That's it.
20  Q.      Okay.  Just iterations of your first name?
21  A.      Yeah.  Correct.
22  Q.      Have you ever had a felony conviction?
23  A.      No.
24  Q.      Okay.  Do you wear any glasses or contacts?
25  A.      No.

Page 13

1   Q.      Okay.  Are you at all hard of hearing?
2   A.      No.
3   Q.      Are you right- or left-handed?
4   A.      Right.
5   Q.      Okay.  And currently do you have a driver's
6   license?
7   A.      Yes.
8   Q.      Is it currently valid?
9   A.      Yes.
10  Q.      Okay.  Do you know if it was valid at the
11  time of the incident that we're here to speak about,
12  which is April 19, 2017?
13  A.      It was not.
14  Q.      It was --
15  A.      I believe it was not.
16  Q.      Okay.  Was it expired or was it suspended or
17  something for another reason?
18  A.      Suspended.
19  Q.      Okay.  And for what reason was it suspended?
20  A.      Traffic tickets from years ago.
21  Q.      Okay.  So just unpaid traffic tickets?
22  A.      Yes.
23  Q.      Do you know approximately how long preceding
24  the incident it was suspended for?
25  A.      I do not.

Page 14

```
 1   Q.      Was it --
 2   A.      Are you saying before the incident how long
 3   was it suspended?
 4   Q.      Yes.
 5   A.      Oh.  Okay.  I would say most likely two
 6   months.
 7   Q.      Two months?
 8   A.      Yeah.
 9   Q.      Okay.  And on the day of the incident you
10   were driving a vehicle?
11   A.      No.
12   Q.      Okay.  You -- there was a vehicle that you
13   were sitting in on the day of the incident, correct?
14   A.      Correct.
15   Q.      Okay.  And were you -- was that vehicle one
16   that was lent to you?
17   A.      Lent to me?
18   Q.      Lended to you?
19   A.      There was no vehicle lended to me.  It was my
20   vehicle.
21   Q.      Oh, it was your vehicle?
22   A.      Yeah, it was my vehicle.
23   Q.      Okay.  And --
24   A.      I have a cosigner, but there was no vehicle
25   lent to me.
```

Page 15

```
 1   Q.      Okay.  So let me just clarify for the -- so
 2   that was your vehicle that you were sitting in?
 3   A.      Correct.
 4   Q.      Okay.  And who was the cosigner?
 5   A.      My grandfather.
 6   Q.      And who is that?
 7   A.      Claudy Kelly.
 8   Q.      Okay.  Okay.  So that was your vehicle at the
 9   time of the incident cosigned with your grandfather?
10   A.      Correct.
11   Q.      Okay.  And just as a matter of background,
12   what is your current address?
13   A.      133 Leonard Street, Vallejo, California
14   94589.
15   Q.      Is that the location of your residence at the
16   time of the incident?
17   A.      Yes.
18   Q.      And how long, approximately, have you lived
19   there for?
20   A.      Oh, years, ten plus.  Ten years plus.
21   Q.      So since childhood?
22   A.      Since childhood, yeah.  Grew up in the house.
23   Q.      All right.  And you're relatively young so --
24   A.      Yeah.
25   Q.      It's pretty standard questions, but are you
```

Page 16

```
 1   married?
 2   A.      No.
 3   Q.      Okay.  And are you currently engaged?
 4   A.      No.
 5   Q.      Are you seeing anybody?
 6   A.      Yeah.  Her (indicating).  That's my
 7   girlfriend.
 8   Q.      And she's in the room with us today?
 9   A.      M-hm.
10   Q.      Can you -- was she your girlfriend at the
11   time of the incident?
12   A.      Yes.
13   Q.      Okay.  Do you mind telling me her name?
14   A.      Shelby Rae.
15   Q.      Okay.  Can you spell her last name?
16   A.      R-a-e.
17   Q.      And -- okay.  And you have no children?
18   A.      No.
19   Q.      Okay.  And just in terms of your -- well,
20   actually, who do you currently live with?
21   A.      My grandfather and my grandma.
22   Q.      And anyone else who lives in the house?
23   A.      Shelby.
24   Q.      And how long has she lived with you?
25   A.      About a year.  A year.
```

Page 17

```
 1   Q.      Okay.  And what is -- so let's go into your
 2   education.
 3   A.      M-hm.
 4   Q.      What is your highest level of education?
 5   A.      High school.
 6   Q.      Did you graduate?
 7   A.      Yes.
 8   Q.      Have you had any post-high-school education
 9   or training?
10   A.      No.
11   Q.      No vocational training or otherwise, that
12   kind of thing?
13   A.      No.
14   Q.      Okay.  In terms of your work history, are you
15   currently employed?
16   A.      Yes.
17   Q.      And where are you employed?
18   A.      It's Michelin Tires in San Francisco.
19   Q.      Okay.  And how long have you worked there
20   for?
21   A.      Three months.
22   Q.      Okay.  Did you have a job before that?
23   A.      Yes, I did.
24   Q.      And where did you work before Michelin?
25   A.      Michelin.  I was working at Silverado Resort
```

Page 18

1   and Spa in Napa, California.
2   Q.      Okay.  And just going back to the Michelin,
3   where you currently work, what is your job duties or
4   description?
5   A.      I demount tires on city buses and I put them
6   back on the bus.
7   Q.      Okay.  And what was your job title at
8   Silverado Resort?
9   A.      Banquet setup.
10  Q.      So you would do the setup for banquets?
11  A.      Yeah.  Yeah.
12  Q.      And how long were you with Silverado?
13  A.      I was with them for a good year.
14  Q.      Okay.  And so that takes us about a year
15  and three months-ish, and what -- did you have a job
16  before that?
17  A.      Yes.  I was an electrician.
18  Q.      Okay.  And was that like in an apprenticeship
19  program?
20  A.      Yes, it was, uh-huh.
21  Q.      And how long were you in that for?
22  A.      Eight months.  Less than a year.
23  Q.      Was that through a particular company?
24  A.      Tradesmen International.
25  Q.      Okay.  And prior to that, I think we're

Page 19

1   getting close to around the date of the incident --
2   A.      That was -- yeah.  The job before that was
3   MBIS.  I was a behavioral associate.
4   Q.      And what is a behavioral associate?
5   A.      I worked with special need kids.  Like I
6   would go to their -- go to classes with them, help
7   them read books, sometimes I would feed 'em, help 'em
8   feed them.  That's about it.  Go on walks, take 'em
9   to the park, just do fun stuff with 'em.
10  Q.      And how long were you doing that for before
11  becoming an apprentice with International
12  Tradesmen?
13  A.      A little over a year.  A year.
14  Q.      Did you have -- prior to the incident how
15  long were you working for MBIS?
16  A.      Before the incident how long was I working
17  for MBIS?
18  Q.      Yeah.  From the point of the incident back,
19  approximately how long was that?
20  A.      Six, seven months.
21  Q.      So after the incident you were working for
22  MBIS about six to -- or five to six months?
23  A.      You said what?  Can you repeat it, please?
24  Q.      So following the incident you worked -- you
25  continued working for MBIS for about five to six

Page 20

1   months, something in there?
2   A.      Yes.  Yes.  Yeah.
3   Q.      Okay.  Did you have a job before MBIS?
4   A.      Um, yes, I did.
5   Q.      What was --
6   A.      I was working two jobs at the same time as
7   MBIS.
8   Q.      Okay.
9   A.      At T-Mobile.
10  Q.      Okay.  And just to kind of complete the
11  picture here, when did you graduate high school?
12  A.      Oh, 20 -- 2013.  2013, yeah.  A long time
13  ago, for me.
14  Q.      I was 2000, so, you know, not nearly as long.
15          Well, so you were working at T-Mobile and
16  whatnot?
17  A.      Yeah.
18  Q.      Just generally, do you have any training or
19  experience in the field of police practices?
20  A.      No, I don't.
21  Q.      How about in the medical field?
22  A.      Medical field, yes.  I went to school for
23  CNA, so I mean I kinda know a little bit, but not too
24  much.
25  Q.      When you say CNA, what is that?

Page 21

1   A.      Certified nursing assistant.
2   Q.      Okay.  And when did you do training with --
3   as a certified nursing assistant?
4   A.      I was fresh out of high school, so this was
5   at least 2014.
6   Q.      Do you know how long the CNA program
7   typically goes?
8   A.      The one I went to, the classes were a month
9   for the whole thing.
10  Q.      Okay.  So you -- did you gain some sort of
11  certification or anything through that?
12  A.      Yes, I did.  I don't remember the name of it.
13  I believe it was from Red Cross, but I cannot
14  remember the name of it.
15  Q.      Okay.  Do you have any or hold any other
16  certifications?
17  A.      No.
18  Q.      Okay.  And presumably to obtain your driver's
19  license you went through a driver's training course
20  and received some sort of training.
21  A.      I didn't go through a driver's training
22  course, I just went to the courthouse and they gave
23  me a program called the amnesty fee, so I just did
24  that.  And I paid them a couple hundred bucks, and I
25  got my license back, and I'm making payments on 'em.

Page 22

1   Q.      Oh.  I'm just talking about even before --
2   like before you were issued any driver's license at
3   all.
4   A.      Oh.  Okay.
5   Q.      Like way back.
6   A.      Oh.  Way back, way back.
7   Q.      Yeah.
8   A.      Yeah, I did.  I went through classes.  Oh,
9   what was the name of the class?  I can't remember the
10  name of the driving school, it was a while ago, but
11  yeah, I did go through driving classes.
12  Q.      And do you remember how long the driver's
13  classes or courses lasted for?
14  A.      I do not.  It was years ago.
15  Q.      And since that original classes to obtain
16  your driver's license have you ever been sent back or
17  you had to go through another training program to
18  obtain your driver's license?
19  A.      No.  I didn't, no.
20          MR. SMYTH:  Okay.  Well, let's just, as a
21  matter of course here, mark the first exhibit in
22  order.
23          (Notice of Taking Deposition was marked as
24          Defendants' Exhibit No. 1 for
25          identification.)

Page 23

1   BY MR. SMYTH:
2   Q.      So what I marked as Exhibit 1 is the notice
3   of taking your deposition today.
4   A.      Okay.
5   Q.      Have you seen this document?
6           THE WITNESS:  This is the one you e-mailed
7   me, right?
8           MR. GOFF:  Hmm?
9           THE WITNESS:  Is this the one you e-mailed
10  me?
11          MR. GOFF:  No.
12          THE WITNESS:  No, I haven't seen this
13  document.
14  BY MR. SMYTH:
15  Q.      Okay.  So if you can take a look at the
16  second page of this, there is a list of document
17  requests that we made for this deposition, and in the
18  course of this litigation I'm sure you've gone
19  through and found records and provided to Counsel as
20  Counsel has provided records to us, however, what I
21  would like for you to do is take a look at the
22  requests here on this page and consider them and let
23  me know if there's anything you currently believe you
24  possess which you have not provided as part of the
25  course of this litigation.

Page 24

1   A.      I see.  Okay.
2           I think the year is wrong on --
3   Q.      Which one?
4   A.      On the second one.  It says --
5   Q.      Oh.
6   A.      -- April 2019.
7   Q.      That might have been an auto-correct.  You
8   can ignore the subject incident date because we know
9   it's 2017.
10  A.      Right.
11  Q.      But other than the incorrect date of the
12  subject incident, is there any records that you
13  noticed when reviewing the requests one through five
14  that you believe you have which you haven't provided
15  to Counsel for production?
16          THE WITNESS:  I gave you all --
17          MR. GOFF:  (Nods head.)
18          THE WITNESS:  Yeah, I did all this.
19          MR. SMYTH:  Okay.
20          THE WITNESS:  Yeah, I gave him everything.
21          MR. SMYTH:  Okay.
22          THE WITNESS:  Hospital stuff, all that.
23          MR. SMYTH:  Very good.  Put that off to the
24  side.
25          THE WITNESS:  Okay.

Page 25

1   BY MR. SMYTH:
2   Q.      So as you correctly pointed out, it wasn't
3   2019, the date of the incident, did you understand it
4   to have been on April 19th, 2017?
5   A.      Yes.
6   Q.      Okay.  And just kind of getting an idea of
7   what was going on that day, can you tell me what --
8   give me your best estimate or whatever about when you
9   understand the incident took place.
10  A.      When I understand the incident took place?
11  Q.      Yeah.  The time of day, approximately.
12  A.      Oh, like the time it took place?
13  Q.      Yeah.
14  A.      2:15.
15  Q.      And so that morning do you recall what you
16  were doing?  Did you go any places, see anybody, talk
17  to anyone?
18  A.      No, I didn't.
19  Q.      So on that morning -- well, let's just kind
20  of walk through the day.  Do you remember
21  approximately what time you woke up that day?
22  A.      Um, 6:30.
23  Q.      Okay.
24  A.      6:30, because I have to be at his house at
25  7:00, so I woke up at 6:30 so I was on the bus.  I

Page 26

1    have to pick him up.  Yeah.
2    Q.      So you say that on the day of the incident
3    you wake up around 6:30; is that kind of a typical
4    when you were working for the --
5    A.      MBIS.
6    Q.      -- MBIS?
7    A.      Correct.
8    Q.      Okay.  And so you said that you have to pick
9    up him, and that would be I guess a client of some
10   kind?
11   A.      Correct.
12   Q.      Okay.  And kind of walk me through the
13   morning, what your typical process or procedure would
14   be to get yourself up and out of the house.
15   A.      Um, I would just get ready, go to his house,
16   wait for the school bus, and get on it with him.
17   Q.      Okay.
18   A.      That's really it.
19   Q.      So in your -- was there anything unique in
20   that morning to that particular day?
21   A.      No.
22   Q.      So it was like a typical morning?
23   A.      Typical morning, normal morning.
24   Q.      Okay.  And you -- what time would you have to
25   be to his house?

Page 27

1    A.      I would have to be there before 7:00.
2    Q.      And this was while you were living at the
3    same address --
4    A.      Yep.
5    Q.      -- 133 Leonard?
6    A.      Correct.
7    Q.      And where is the house?  What is the property
8    address, if you remember?
9    A.      My address?
10   Q.      No.  You said you have to go to his house.
11   A.      Yep.  It's on Springs Road off of Lassen
12   Street in Vallejo, California.
13   Q.      So you -- so you'd wake up at 6:30, get
14   yourself ready, head to his house, get there before
15   7:00 a.m. you said?
16   A.      Correct.
17   Q.      And you would -- what would you do -- you
18   know, you don't have to identify the client by name,
19   he's a minor, correct?
20   A.      No, he was an adult, but he was -- he
21   couldn't talk --
22   Q.      Oh.  Okay.
23   A.      -- or he couldn't do anything for him
24   himself.
25   Q.      Okay.

Page 28

1    A.      And I have to have two people with him at all
2    times.
3    Q.      Okay.  And so the client needed your
4    assistance?
5    A.      Correct.
6    Q.      And what was his -- what reason did you have
7    to get to 7:00 -- to his house by 7:00 a.m.?  What
8    was he typically needed to go?
9    A.      To school.
10   Q.      Okay.  To school.  And which school is that?
11   A.      It's closed down now.  Um, I can't remember
12   the name of it, but it's closed down.
13   Q.      Was it kind of a special school?
14   A.      Yes, it was.
15   Q.      Was that school in Vallejo?
16   A.      Yes, it was.
17   Q.      And how would -- so you would help get him to
18   school?
19   A.      Yes.  I would go with him on the bus.
20   Q.      So you would ride alongside him, escort him
21   to get to school?
22   A.      Yes.
23   Q.      And once he was at school would you stay
24   there with him or --
25   A.      Yes.

Page 29

1    Q.      Okay.  Try to wait till I'll done with my
2    question because it's -- it does two things; it's
3    going to make for a unclear record, and it hurts her
4    fingers.
5    A.      Okay.
6    Q.      So let's try to -- where was I?
7            So you would actually stay at the school with
8    him?
9    A.      Yes, I would.
10   Q.      Okay.  And while you were at school what
11   would you -- what would your duties entail while
12   trying to assist your client?
13   A.      I would do puzzles with him, build blocks,
14   we'd have a snack.  He was a walker, so we would
15   always go on walks every day.  That's pretty much it.
16   Q.      Okay.  And that was a -- did he have a
17   particular condition or something?
18   A.      He does.  I -- I don't know -- it's like a
19   big word.  I don't know off the top of my head.
20   Q.      Okay.  Do you know just generally what the
21   condition would entail, what symptoms or behavioral
22   changes?
23   A.      Like his symptoms of what he would do?
24   Q.      Yeah.
25   A.      Hit himself, throw tantrums, run away from

Page 30

1   me --
2   Q.      Yeah.
3   A.      -- and my other coworker, that's pretty much
4   it.
5   Q.      So it was kind of a handful?
6   A.      Yeah.
7   Q.      So you would essentially spend an entire few
8   hours, or how long did the school program go until,
9   or how many hours?
10  A.      School got out at 1:45.
11  Q.      And what time did the school actually start?
12  A.      7:00.  No, sorry.  8:00.  Sorry.  8:00.
13  Q.      So from 8:00 a.m. to 1:45 p.m. you would be
14  with the client at all times or --
15  A.      M-hm.
16  Q.      Okay.  And did you have a -- you said you had
17  like a partner or something?
18  A.      Yes, I did.
19  Q.      Who was your partner?
20  A.      Rachel.
21  Q.      Did Rachel have a last name?
22  A.      I don't know her last name.  It's like Herber
23  -- I don't know.  It's really hard to pronounce.
24  Q.      Well, that's okay.  Do you know what Rachel's
25  doing now?

Page 31

1   A.      I do not.
2   Q.      Did you stay out of touch, lose touch with
3   her?
4   A.      Yeah.
5   Q.      Okay.  So it would be true then that you
6   weren't consuming drugs or alcohol on the day prior
7   to the incident with the officer?
8   A.      Hm-m.
9   Q.      Okay.  Standard questions.
10  A.      No.  That's all right.
11  Q.      And did your work with MBIS, was that -- did
12  that require the certification with the nursing
13  school?
14  A.      No, it didn't.
15  Q.      Okay.  Did it require any sort of
16  certifications or training?
17  A.      No, it didn't.
18  Q.      Okay.  So on the particular day with the
19  client at school did -- was there anything unique or
20  unusual that happened on that day?
21  A.      No.
22  Q.      So at approximately 1:45 that day is the
23  conclusion of school you said?
24  A.      M-hm.
25  Q.      And so you would escort then the client home?

Page 32

1   A.      I would escort the client onto the bus, and
2   then the bus would drop off kids, and then they would
3   drop us off.
4   Q.      So you would actually sit on the bus again
5   with the client?
6   A.      M-hm.
7        MR. GOFF:  Say yes.
8        THE WITNESS:  Yes.  Sorry.  Yeah, you told me
9   about that.
10       MR. SMYTH:  Good catch.
11  BY MR. SMYTH:
12  Q.      Okay.  So on this day on the ride home was
13  there anything unique that stood out to you?
14  A.      No.
15  Q.      All right.  So you -- when would you
16  typically get home with the client?
17  A.      Around 2:10, 2:15, around that time.
18  Q.      Okay.  And so you would actually get off the
19  bus with the client and then escort him to his house?
20  A.      Yep.
21  Q.      Okay.  And then on the day of the incident
22  what happened next after you dropped off the client?
23  A.      I took out my phone, and I was going to call
24  another job because I had got a job offer that day.
25  Q.      Okay.  And what was that with?

Page 33

1   A.      I don't remember the name of the company, but
2   it was the same kind of work I was doing, behavioral
3   social work, just for a different company.
4   Q.      Okay.  And so you were on the phone with a
5   different company; do you remember the name of it?
6   A.      I don't remember the name of it.  I didn't
7   even get a chance to talk to them.
8   Q.      And why was that?
9   A.      Because of what happened with the incident
10  with the officer.
11  Q.      Okay.  So you were parked in your vehicle
12  that day?
13  A.      Um, are you talking before I took my client
14  home?
15  Q.      Well, so let me just -- it was kind of a
16  foundational question, but -- so you dropped off your
17  client, correct?
18  A.      Correct.
19  Q.      And then you from -- approximately how far
20  was your vehicle parked from the house, like the
21  front of the house to the car?
22  A.      It was literally down the street, like five
23  seconds away from walking there.
24  Q.      So like five seconds from walking?
25  A.      Yeah.  Five, ten seconds from walking.  It

Page 34

1  was down the street.
2  Q.      Was it kind of parked right in front of the
3  property?
4  A.      No.  I didn't like to park in front of their
5  house because they have shuttle buses that come to
6  pick up the kids and the wheelchairs, so I didn't
7  like parking in front of their house.
8         MR. SMYTH:  Okay. So the -- I printed out
9  these beautiful Google Maps of the kind of area.
10        THE WITNESS:  Oh.
11        MR. SMYTH:  So let me just mark these -- mark
12  this next in order so we can kind of navigate.
13        (Color print of image from Google Maps was
14         marked as Defendants' Exhibit No. 2 for
15         identification.)
16  BY MR. SMYTH:
17  Q.      So I -- hopefully this covers kind of the
18  area that you were parked.
19  A.      Yeah.
20  Q.      Do you see the cross streets?
21  A.      This must be -- this is the street.  I'm
22  trying to figure out the angle.
23        (Reporter interrupts for clarification of
24         the record.)
25        THE WITNESS:  I'm just trying to figure out

Page 35

1  exactly where it was at.  So it was on Lassen Street,
2  right here (indicating).
3         MR. SMYTH:  Yes.
4         THE WITNESS:  So this must be Springs Road,
5  this long street must be Springs Road.  This looks
6  like the freeway along this way.  Okay.
7         So, yeah.  So we came from off the freeway
8  this way, and went left up here, so his house is
9  around this area, and I parked here
10  (indicating).
11  BY MR. SMYTH:
12  Q.      Okay.  So your car was parked on the corner
13  of Lassen and Glenwood --
14  A.      Uh-huh.
15  Q.      -- correct?
16  A.      Yep.
17  Q.      Do you want to just take my pen and kind of
18  mark where your car was parked?
19  A.      Yes.  (Marking exhibit.)
20  Q.      Okay.  You drew a circle kind of in that
21  spot, correct?
22  A.      Yes.
23  Q.      All right.  I'll tell you what to mark so
24  that way we have a clear idea on the record --
25  A.      Okay.

Page 36

1  Q.      -- of everything, if we're marking anything.
2         So do you want to put an X on the property
3  that you escorted your client to --
4  A.      Okay.
5  Q.      -- where you understand it to be,
6  approximately?
7  A.      Yeah.  I'm not going to know if it's for sure
8  because it's the roof, I can't tell --
9  Q.      Sure.
10  A.      -- but I'm going to do my best.
11  Q.      Yes.  That's more than acceptable.
12  A.      (Marking exhibit.)
13  Q.      Is my pen running out of ink?  That's not
14  good.
15         So you crossed a house that looks to be in
16  kind of the middle of the block --
17  A.      M-hm.
18  Q.      -- of Lassen Street between Glenwood and
19  Springs Drive?
20  A.      Yes.
21  Q.      Okay.  And when you said that the bus would
22  drop off the client, they would actually drop him
23  off --
24  A.      They would literally --
25  Q.      -- right in front of his house?

Page 37

1  A.      -- pull up in front of the driveway and drop
2  him off.
3  Q.      Okay.  And so at that point you would get off
4  and then have -- escort the client to the door of the
5  house?
6  A.      No.  I would just take him off the bus, and
7  one of his caretakers would come out, open the gate,
8  and let him in.
9  Q.      So you kind of do an exchange --
10  A.      Yeah.
11  Q.      -- you hand him off?
12  A.      Yeah.
13  Q.      Okay.  And you were able to hand him off
14  without incident that day?
15  A.      Correct.
16  Q.      Okay.  So after you handed him off did you
17  have any conversations with the caretaker?
18  A.      No, I didn't.
19  Q.      So you then at that point proceeded to walk
20  to your vehicle, which is parked on Glenwood?
21  A.      Correct.
22  Q.      Okay.  So you walked, and then as you were
23  walking that's when you were on the phone?
24  A.      Correct.
25  Q.      Okay.  So you walked from the X to the

Page 38

1  circle, and how -- were you on the phone the entire
2  time?
3  A.    Yes.
4  Q.    Okay.  And when you arrived to your vehicle
5  were you still on the phone?
6  A.    Yes.
7  Q.    Okay.  And what was -- and you were actually
8  speaking to persons on the other side during that
9  time?
10  A.    No.  I was on my phone regular, and I had the
11  card in my hand for the phone number.
12  Q.    Okay.  So you were trying to make the call?
13  A.    Yeah.
14  Q.    You were punching in --
15  A.    Correct.
16  Q.    -- as you were walking?
17  A.    Correct.
18  Q.    So when you actually arrived at your car had
19  you actually been able to dial the number yet?
20  A.    No.
21  Q.    So the entire walk you were punching in, but
22  you didn't actually get a call --
23  A.    Correct.
24  Q.    -- going?
25  A.    Correct.

Page 39

1  Q.    So when you arrived to your vehicle then what
2  did you do?
3  A.    Sat down with one foot out and one foot in
4  the car.
5  Q.    Okay.  And then as you were sitting there
6  were you -- you were still trying to make the phone
7  call?
8  A.    He pulled up in front of my car at that time.
9  Q.    So approximately how long before he pulled up
10  were you sitting in the car?
11  A.    Twenty, 30 seconds.
12  Q.    Okay.  So you were in the car, you sat down,
13  he -- within the next 20, 30 seconds he actually
14  pulled up?
15  A.    Yep.  I'm on my phone, I look up, and I see
16  lights in front of me.
17  Q.    Okay.  And did you happen to see him at all
18  before that moment?
19  A.    Yes.
20  Q.    Okay.  And where or when did you see him
21  beforehand?
22  A.    When I was walking he was coming on the
23  opposite way, so I'm like this, and he's like this
24  (indicating).
25  Q.    So while you were walking he was driving by,

Page 40

1  and you were not in the car yet?
2  A.    Correct.
3  Q.    And he was driving, so if you're walking I
4  guess, if this map is directionally correct, you were
5  walking north on Lassen, which is up?
6  A.    Up.  Yep.  Yep.  And he was coming down.
7  Q.    He was going south --
8  A.    Yeah.
9  Q.    -- or down on Lassen Street?
10  MR. GOFF:  It might be more clear to say the
11  plaintiff was walking towards Lassen and Glenwood.
12  MR. SMYTH:  Sure.
13  BY MR. SMYTH:
14  Q.    So he's walking towards Lassen and Glenwood,
15  and then the car of Tonn, Officer Tonn, you
16  understand that that was the officer involved in this?
17  A.    I do.
18  Q.    He was driving towards the intersection of
19  Spring -- is that Spring?
20  A.    Springs Road --
21  Q.    Springs Road.
22  A.    -- is this long road.
23  Q.    Okay.
24  A.    So he was already on Lassen --
25  Q.    Okay.

Page 41

1  A.    -- at the time.
2  Q.    So you saw that exchange.  He drove by and
3  you were walking, correct?
4  A.    I'm looking at him as how me and you are
5  looking at right now.
6  Q.    And then at the time you got into your
7  vehicle had you seen him any point between that?
8  A.    When I just got into my vehicle?
9  Q.    Yeah.  So you said that he pulled up
10  approximately 20 to 30 seconds --
11  A.    Correct.
12  Q.    -- after you sat down.
13  Between the time that you first saw him
14  driving by to the point when you saw him in the car
15  with the lights going --
16  A.    Okay.  No, I did not -- I did not see him.  I
17  didn't see him do any U turns or anything.
18  Q.    Okay.
19  A.    I was concentrated on what was going on my
20  phone.
21  Q.    Okay.  So -- and then where was he -- his car
22  positioned in relation to yours?
23  A.    So I'm here (indicating), and he's in front
24  of me, so our cars are nose to nose.
25  Q.    Okay.  So he pulled kind of on the -- he

Page 42

1  turned onto Glenwood, pulled up right on the same
2  side of the sidewalk that your car was parked facing
3  the opposite direction?
4  A.    Correct.
5  Q.    Nose to nose?
6  A.    Nose to nose.
7  Q.    And then what happened next?
8  A.    He got out the car, approached me, and he --
9  he told me that -- asked me what I was doing here,
10  and I told him that I had just got off work, and he
11  told me that I was being recorded on his body camera.
12  Q.    Okay.  So there was -- so there was nothing
13  stated before he told you you were on body camera?
14  A.    All he said -- all he asked me was what I was
15  doing in the neighborhood.  That's the only thing he
16  said.
17  Q.    And so -- yeah.  So there's a -- so have you
18  seen the body camera footage?
19  A.    His body camera footage?
20  Q.    Yeah.
21  A.    No.
22  Q.    Have you seen any body camera footage in this
23  case?
24  A.    No.
25  Q.    So you haven't seen -- and just to be clear,

Page 43

1  there's body camera footage of you at the -- during
2  the interchange, the interaction, as well as at the
3  police station; you haven't seen either of those?
4  A.    Footage?
5  Q.    Yeah, the footage.
6  A.    No.
7  Q.    Okay.  So the -- before Officer Tonn -- he
8  ultimately removed you from the vehicle, correct?
9  A.    Correct.
10  Q.    Approximately how long, if you can estimate,
11  before he pulled you -- or started removing you from
12  the vehicle to the point where you -- where he
13  actually exited the vehicle?
14  A.    Where he exited his vehicle?
15  Q.    Yeah.  So the time that he exited his vehicle
16  to the point where he actually physically removed
17  you, or began removing you, that time, approximately
18  how long transpired between those two instances?
19  A.    It all happened so fast.  It happened
20  literally within 45 seconds to a minute, everything.
21  Q.    Okay.  You mean -- when you say,
22  "everything," is that also -- did that include time
23  you were on the ground with Tonn --
24  A.    No.
25  Q.    -- or just from him removing you from the

Page 44

1  car?
2  A.    No, just removing me from the car.
3  Q.    Okay.
4  A.    And him coming up to me.
5  Q.    So just to kind of get a sense of the time
6  through the entire, you know, exchange, so after that
7  minute, after he removed you from the vehicle,
8  approximately how long were you on the ground before
9  you were placed into cuffs?
10  A.    Most -- another minute.
11  Q.    Okay.  So you were actually in cuffs after
12  about a minute.  Do you know then -- so they -- after
13  the -- after you were in cuffs you were escorted to a
14  vehicle, correct?
15  A.    Correct.
16  Q.    So after they escorted you into a vehicle how
17  long were you in a vehicle before someone drove you
18  anywhere?
19  A.    About three minutes.  And then Tonn --
20  Officer Tonn said, "Get him outa here."
21  Q.    Okay.  And so then do you know who escorted
22  you at that time, who was in the car driving you?
23  A.    I don't know his name.
24  Q.    Did you have any conversations with that
25  officer?

Page 45

1  A.    I did.
2  Q.    And what was the substance of that
3  conversation?
4  A.    Um, he told me, um, that -- he basically was
5  trying to tell me that I was acting up and, um, that
6  I was basically acting a fool or something.  And, um,
7  I was like:  You guys are mistreating me, and I'm
8  going to press charges.  And he said, "Good luck with
9  that."
10  Q.    Okay.  And then -- so that was the entire
11  conversation?  There was no other kind of back and
12  forth in the car at that time?
13  A.    No.
14  Q.    Okay.  And then you arrived to the Vallejo
15  police station?
16  A.    Correct.
17  Q.    And how long were you, approximately, at the
18  Vallejo police station?
19  A.    Two hours.  About two hours.
20  Q.    And while you were at the police station did
21  you communicate with any officers?
22  A.    Officer Tonn came to see me about a hour
23  later.
24  Q.    Okay.  Did you speak with any other officers
25  from that point forward, other than Officer Tonn?

Page 46

1   A.      No, I didn't.
2   Q.      And after being -- so how long were you at
3   the police station?  You said two hours?
4   A.      Yes.  Correct.
5   Q.      And then what happened at the end of those
6   two hours?  How did you -- where did you -- you were
7   released?
8   A.      I was released, yes.
9   Q.      And then where did you go after that?
10  A.      Um, I didn't have anything on me, no car, no
11  phone, so I walked to a car -- used car salesman
12  place where they sells cars, and I was just calling
13  my friends for a ride.
14  Q.      So you used the establishment's phone?
15  A.      Correct.
16  Q.      Okay.  And then you got a ride?
17  A.      M-hm.
18  Q.      And where did they take you?
19  A.      They took me home.
20  Q.      And who was it that gave you a ride?
21  A.      My friend Ramonte.
22  Q.      Can you spell that?
23  A.      R-a-m-o-n-t-e.
24  Q.      Does he have -- is it a he or a she?
25  A.      He.

Page 47

1   Q.      Does Ramonte have a last name?
2   A.      Williamson.
3   Q.      Okay.  So after you went home what did you
4   do?  Did you speak to anyone?
5   A.      Um, no.  My family told -- asked me where's
6   my car, and I told 'em that it got towed.
7   Q.      And did you tell them -- did you talk about
8   why it was towed?
9   A.      I didn't know -- I didn't have a straight
10  answer for 'em.  I told 'em I don't know why it was
11  towed.
12  Q.      So after -- after that did you speak to them
13  on, you know, at all about your exchange with Officer
14  Tonn?
15  A.      Other than my mom about the vehicle, no.
16  Q.      Did you go anywhere else that day, or did you
17  just stay home?
18  A.      No.  I just stayed home.
19          Oh.  Correction.  Apologize.  Hospital.  I
20  went to the hospital.
21  Q.      I thought maybe that I forgot the dates or
22  something.
23          Okay.  So you did -- you went to the hospital
24  that day?
25  A.      Yes, I did.

Page 48

1   Q.      Okay.  And how did you get to the hospital?
2   A.      My grandpa drove me.
3   Q.      Did you at that time talk about, you know,
4   any of the -- why you had to go to the hospital?
5   A.      Um, yeah, I did.  I just told him that I got
6   basically in my, how I feel, I got harassed.  That
7   was about it.
8   Q.      Okay.  And -- all right.  Let's kind of -- do
9   you remember what time you went to the hospital?
10  A.      Um, it took me about an hour, an hour and a
11  half to get home, so I want to say close to 4:00.
12  Q.      And how long were you at the hospital for?
13  A.      Um, under an hour.
14  Q.      Okay.  So just kind of -- that's a long time
15  line.
16  A.      I know, right?
17          MR. SMYTH:  So how are you all doing?
18          THE WITNESS:  I could use a bathroom break
19  whenever you guys --
20          MR. SMYTH:  Yeah.  Might as well just take a
21  quick break.
22          THE VIDEOGRAPHER:  The time is 11:42.  Off
23  the record.
24          (Recess taken from 11:42 a.m. to 11:52 a.m.)
25          THE VIDEOGRAPHER:  The time is approximately

Page 49

1   11:52.  On the record.
2           MR. SMYTH:  Okay.  So back on the record.
3   BY MR. SMYTH:
4   Q.      We took a break, the court reporter isn't
5   swearing you back in, but you understand you're still
6   under the same oath, correct?
7   A.      I do understand.
8   Q.      Okay.  So we were talking kind of about the
9   sequence of the events leading up to the arrest on
10  the -- on 19th of April 2017, so we were talking kind
11  of of the times and how they broke down as far as you
12  could recall, and you had stated that -- so Officer
13  Tonn left his vehicle, exited his vehicle, within
14  approximately -- was it 45 seconds to a minute from
15  that point between your exchange, that's when he had
16  removed you from the vehicle, correct?
17  A.      Correct.
18  Q.      Okay.  And at that point in that, you know,
19  45 seconds to a minute had you tried to make any
20  phone calls?
21  A.      Yes, I did.
22  Q.      Okay.  And how -- who did you try to call?
23  A.      The job offer that I -- that they offered to
24  me with the card.
25  Q.      Okay.  And did you -- did -- was that while

Page 50

1  Officer Tonn was with you?
2  A.      When he was with me I still had my phone in
3  my hand, like I was on the dial pad about to hit
4  call.
5  Q.      So he approached, and you had the phone out,
6  and did you tell him you were trying to make a phone
7  call?
8  A.      Yes, I did.
9  Q.      Okay.  And what did he -- how did he respond
10  to that?
11  A.      He did not respond to it.
12  Q.      So he didn't say anything?
13  A.      Towards my phone call, no.
14  Q.      He didn't say no, he didn't say yes, it's
15  okay --
16  A.      No.
17  Q.      -- put down the phone, anything?
18  A.      No.
19  Q.      So then did you make the call?
20  A.      No, I didn't.
21  Q.      So if he didn't respond why did you not make
22  the call?
23  A.      Because he was there trying to talk to me, so
24  I just hung it up, locked my phone.
25  Q.      Okay.  So -- and that was -- let's just go

Page 51

1  back even further.  What was the first thing that
2  you -- who spoke first, you or Tonn?
3  A.      Tonn.
4  Q.      And what did he say?
5  A.      "What are you doing in this neighborhood."
6  He said, "This is like a crime neighborhood."
7  Q.      So were those all the words that he spoke
8  before you spoke?
9  A.      Correct.
10  Q.      So he says, "What are you doing in this
11  neighborhood.  This is a high crime neighborhood," or
12  something to this effect?
13  A.      He said, "What are you doing in this
14  neighborhood."
15      I respond, "I just got off of work."
16      And he responds that this is a crime
17  neighborhood or a crime area.
18  Q.      Okay.  And then how did you respond to that?
19  A.      Um, I didn't.  He brought up about my tags
20  being expired on my car, and this was in April, he
21  said they expired April 2nd.
22  Q.      Okay.  And how did you respond to that?
23  A.      I told him that they are not expired.  I told
24  him that we're still in April, they expire at the end
25  of the month, when it gets to May, and he told me

Page 52

1  that it expires April 2nd, and I was not aware that
2  tags had an exact date.
3  Q.      Yeah.
4  A.      So -- yeah.
5  Q.      So in your exchange, so it was -- he told you
6  that the tags are expired, you said that -- and how
7  did you respond?  What did you say?  That no, they
8  are not expired, they're in April?
9  A.      I told him no, they don't expire till the end
10  of April.
11  Q.      Do you remember the exact words, or is that
12  just the gist of what it was?
13  A.      That's the gist of what it was.  That's what
14  I said.  I'm like:  No, they don't expire until the
15  end April, and he said, "No, they expired April 2nd."
16  Q.      Okay.  And then -- then what -- did you --
17  what did you say at that point?
18  A.      At that point he told me he was recording on
19  his body camera, and I told him that I'm recording on
20  my phone.
21  Q.      So in the moment that -- did you ask him
22  anything about why you were being -- why he was
23  pulling you over?
24  A.      No, I didn't.
25  Q.      So you -- so after he told you about the

Page 53

1  April 2nd expiration he started recording you?
2  A.      On his body camera.
3  Q.      And he said something to that effect?
4  A.      Yeah.  He said, "I'm recording on my body
5  camera."
6      And I said, "Okay, I'm going to record you on
7  my phone," and I slid up, and I hit the camera, and I
8  hit record.
9  Q.      Okay.  And when you were -- so at no point
10  did you tell him -- or -- well, strike that.
11      Did he ask you for a license or registration?
12  A.      No, he didn't.
13  Q.      Did you tell him that he was wrong, that the
14  expiration wasn't until the end of the month?
15  A.      Yeah, I did.
16  Q.      And was his only response that, no, they are
17  expired?
18  A.      April 2nd.
19  Q.      And there was no other conversation at all
20  before he turned on his body camera?
21  A.      No.
22  Q.      And you stated earlier you haven't seen his
23  body camera footage?
24  A.      Footage, I have not.
25  Q.      Okay.  So then after he turned on his body

14 (Pages 50 to 53)

Page 54

1  camera you turned on your cell phone; is that
2  correct?
3  A.     M-hm.
4  Q.     And what did you do with your cell phone?
5  A.     I slid up, and I hit camera on the bottom
6  left, and I hit record.
7  Q.     Okay.  And then what were you -- how were you
8  recording?
9  A.     The camera was faced my way, so you're
10 holding it like this taking a selfie like that
11 (indicating), so it was faced towards me, and I
12 didn't want to flip and I go like that (indicating),
13 so I went like this to get his face (indicating).
14 Q.     So you were sitting in the car.  You did
15 still have kind of a leg out and a leg in or --
16 A.     Yeah.  So I'm like this (indicating), and I'm
17 like listening to him getting his -- getting his
18 face.
19 Q.     So you brought your hand towards the center
20 of the car?
21 A.     Yep.
22 Q.     And with Tonn outside the car you can see him
23 in the background of the phone, as well as yourself,
24 kind of in a selfie mode?
25 A.     Correct.

Page 55

1  Q.     And what -- did Officer Tonn say anything
2  about that at that time?
3  A.     He said, "I'm going to take this phone," and
4  he reached for it.  And I said, "Hey, hey, hey, hey,"
5  like don't do that, and that's when he grabbed me by
6  my hair and pulled me down.
7  Q.     Okay.  So after he grabbed you can you
8  describe for me what you initially felt or how
9  that -- what was going through in your mind?
10 A.     I was scared.  I was scared.  I didn't know
11 what he was gonna do.  When he reached for my phone I
12 just moved my hand like, hey, like don't do that,
13 you're all in my personal -- you're in my bubble.
14        And he said, "I'm gonna take this phone."
15 And then he grabbed me by my dreads, I used to have
16 dreadlocks, and he threw me on the ground and put me
17 in a choke hold.
18 Q.     Okay.  And when you say, "a choke hold," can
19 you describe -- well, let's first go back.
20        So he grabbed you by the dreadlocks and
21 pulled you, correct?
22 A.     Correct.
23 Q.     And you then -- did he throw you on the
24 ground, or did he --
25 A.     Yeah.

Page 56

1  Q.     -- pull you?
2  A.     He grabbed me with a good amount of force and
3  threw me on the ground with a good amount of force.
4  Q.     Okay.  So you landed on the pavement?
5  A.     Correct.  Stomach -- belly down.
6  Q.     And at that time were you trying to get out
7  of his holding of you, like wrestle your way loose,
8  or what was going on?
9  A.     No, I wasn't.
10 Q.     Okay.  So then what were you doing at that
11 time?
12 A.     Letting him do his thing.  I had the camera,
13 as soon as he reached for it all I did was move, he
14 grabbed me, I went straight to the ground, no
15 resisting, no pulling back, I just let him do his
16 thing.
17 Q.     All right.  And so on the -- so you had a
18 camera in your hand -- or the phone in your hand,
19 what happened with the phone as he's pulling you out?
20 A.     I'm still holding the phone while I'm on the
21 ground, so he has one hand behind my back, right, and
22 I'm still -- I'm like this (indicating), you know,
23 holding it like this try to -- I can't see if I'm
24 actually recording him or not.
25        And then he takes my phone and just kind of

Page 57

1  tosses it out of my hand, like he tosses it on the
2  ground.
3        And then he pulls me up by my dreadlocks,
4  handcuffed my other hand, pulls me up by my
5  dreadlocks and starts pulling my hair back like that
6  (indicating).
7  Q.     Did -- when he's pulling your hand -- I
8  guess -- so you have the phone in your right hand,
9  right?
10 A.     Yes, I do.
11 Q.     And he has your left hand?
12 A.     Yes.
13 Q.     Does he need to kind of move it into place
14 behind your back?
15 A.     He does.  I -- when he first grabbed my left
16 hand when I'm recording you can see it on the
17 footage, it goes straight back like that
18 (indicating), and then he throws me on the ground.
19 Q.     Oh.  So -- yeah.  So he had your hand behind
20 your back --
21 A.     M-hm.
22 Q.     -- before you actually were out of the
23 vehicle, correct?
24 A.     Yeah.  You could see he grabbed this hand,
25 and he goes just like this, just like that

Page 58

1    (indicating).
2    Q.      Okay.  So when you're on the ground he had
3    his arm around your neck?
4    A.      M-hm.  Yes.
5    Q.      Okay.  And did you say anything to him in
6    that --
7    A.      I was trying, but he was choking me, I
8    couldn't breathe to the point where, you know, where
9    you see little dots, clear little dots.
10   Q.      So you were seeing -- at some point you were
11   light-headed?
12   A.      Yes.
13   Q.      So you weren't able to talk at all while he
14   had his arm around your neck?
15   A.      When he let go then I was able -- I told him
16   to stop, I just got off work.  I told him to let
17   me go.
18   Q.      Okay.  Did -- and you've obviously seen your
19   own footage, correct?
20   A.      Yeah.  Yeah.
21   Q.      Okay.  So while on the ground did you -- were
22   you yelling at him?  Were you -- how were you --
23   A.      At first when he put me in the choke hold you
24   can hear me in my video like (making sound), like
25   that.  And then when he lets go I'm yelling:  Stop,

Page 59

1    let me go.  I just got off work.  I didn't do
2    anything.  I had worked.
3    Q.      And so how long, approximately, did he have
4    you in a -- just the hold?
5    A.      The choke hold?  I would say a good minute or
6    a minute or over, a minute and 30 seconds, a minute.
7    Q.      During that time approximately how long did
8    he have it where he was applying pressure?
9    A.      When he was applying pressure to the choke
10   hold?
11   Q.      Yeah.
12   A.      Like how long was it?
13   Q.      Yeah.
14   A.      Is that what you said?
15         It lasted a good 45 seconds to a minute for
16   the actual pressure, you know.
17   Q.      To the point -- you know, so at the end of
18   that 45 seconds to a minute of him holding your
19   neck --
20   A.      Uh-huh.
21   Q.      -- that's when you started seeing the dots,
22   or --
23   A.      No.  No.  I started seeing -- so when he
24   started choking me, he was choking me for a good 45
25   seconds to a minute, and I'm gasping for air (makes

Page 60

1    sound), and then -- then I started seeing the dots,
2    and he lets me go, and I told him:  Let me go, I
3    didn't do nothing wrong, I just got off of work.
4    Q.      And was it during that 45 seconds that he was
5    holding you that he slapped your phone away, or was
6    that after?
7    A.      No, that was after.  I was able to talk when
8    he did that, and I told him:  You just broke my
9    phone.  You can hear it in my video.
10   Q.      Okay.  So you're on the ground, choke hold
11   applied, approximately 45 minutes (sic), you're
12   seeing dots, you can't talk for those 45 seconds-ish,
13   then he un --
14   A.      He lets go.
15   Q.      Relieves the pressure, I guess?
16   A.      Yeah.  Then he -- before, actually when he's
17   handcuffing me he puts his knee on top of my head, so
18   my lip is face down to the concrete.
19         So while he's putting my second handcuff he
20   does that; puts his knee to top of my head, scraped
21   my lip onto the concrete.
22   Q.      Okay.  And so between -- so basically after
23   the -- he was cuffing you, that was after he knocked
24   the phone out of your hand, he pulled the other hand
25   back --

Page 61

1    A.      M-hm.
2    Q.      -- that was holding the phone, correct?
3    A.      Correct.
4    Q.      So he put that behind you while you were on
5    the ground?
6    A.      Correct.
7    Q.      Put you in the cuffs while you were still on
8    the ground, and he had his knee on the back of your
9    head?
10   A.      Correct.
11   Q.      And then how long was -- from the point where
12   after you were able to breathe for air to the point
13   where he was able to get you into cuffs,
14   approximately how long was that for?
15   A.      Like and get me stood up?
16   Q.      Well, just from the point where you were in
17   cuffs.
18   A.      Like how long did it take for him to get me
19   in cuffs and fully just have me laying down on the
20   ground?
21   Q.      Yeah.
22   A.      It took about two minutes.
23   Q.      So you were on the ground for about two
24   minutes?
25   A.      Yeah.  Two to three minutes I was.

Page 62

1  Q.      And then during that two to three minutes,
2  just trying to make it completely clear here, so 45
3  seconds to about a minute you were being in a choke
4  hold with pressure?
5  A.      M-hm.
6  Q.      At the conclusion of that he -- was the first
7  thing he did is he slapped the phone away?
8  A.      The first thing he did when I was on the
9  ground?
10 Q.      Yes.
11 A.      No.  When I was on the ground I already had
12 one cuff on my hand on my back, so I'm recording on
13 the ground.
14         And then, yes, he takes my hand and he just
15 tosses my phone, and I say, "You just broke my
16 phone."
17         And then he does take my other hand and put
18 it behind my back and put his knees on my head while
19 he's doing that, and I'm face down onto the concrete,
20 and my lip is scraped.
21 Q.      Okay.  So -- all right.  So then he lifts you
22 up --
23 A.      Yes.
24 Q.      -- correct?
25 A.      By my dreadlocks, not by my arms while I'm

Page 63

1  cuffed, strictly by my hair.
2  Q.      Okay.  So he picks you up by the hair?
3  A.      M-hm.
4  Q.      Okay.  Then at that time had other officers
5  arrived?
6  A.      Yes.  There was a total of three officers.
7  Q.      Three other officers or --
8  A.      Well, three in total.  One including Tonn,
9  and then two other officers.
10 Q.      Okay.  And then did you get any of the other
11 officers' names?
12 A.      I don't remember their names.  I do have them
13 in my e-mail, but I don't remember their names off
14 the top of my head.  I strictly remember Tonn.
15 Q.      But none of the officers actually used force
16 to --
17 A.      No.  No.  It was mainly him.  You know, they
18 were there as backup.
19 Q.      Okay.  Did you notice Tonn through -- at any
20 point during your interaction with him at the car or
21 during the detention portion where he's radioing for
22 backup?
23         MR. GOFF:  Objection; compound.
24         THE WITNESS:  No.
25 //                          //

Page 64

1  BY MR. SMYTH:
2  Q.      You didn't notice him talking to anyone else
3  like over the radio at any point?
4  A.      No.
5  Q.      Were you -- okay.
6         So after you were detained you were walked to
7  the -- to a police cruiser, correct?
8  A.      Correct.
9  Q.      Okay.  And then someone placed you into a
10 police cruiser?
11 A.      They threw me into the police cruiser, and I
12 hit my head on the window, and then they put me in
13 about -- not too long after Tonn said, "Get him outa
14 here."
15 Q.      Which -- so you were thrown into the car, and
16 you hit your head on which window?
17 A.      On the back window.  The driver's side, and
18 then the back one from that.
19 Q.      Like the rear windshield?
20 A.      Yeah.  The left one on the back.
21 Q.      Okay.  And so your car was towed; is that
22 correct?
23 A.      Correct.
24 Q.      Okay.
25 A.      Yeah.

Page 65

1  Q.      And what -- what happened with the car?
2  A.      Um, it was sold at a tow yard.  I couldn't
3  get it back out, it was too much money.  It was on a
4  30-day hold.
5  Q.      Did they tell you how much it would cost to
6  get it back?
7  A.      Over five grand.
8  Q.      Did they say why it costed -- was it --
9  A.      Because it was on the 30-day hold, and they
10 added like over a hundred dollars every day, so it
11 just added up, totaling five grand.
12 Q.      Did they say anything about having tickets or
13 anything like that causing the money portion to be
14 higher?
15 A.      No.  My -- because they told my grandpa
16 because it's under his name, so the only thing that
17 he told me was they sent him a letter saying that
18 they sold the vehicle.
19 Q.      And you -- how long did you own that car?
20 A.      I owned that car for a good year.  I was
21 making payments on the car.
22 Q.      And who were you making payments with?
23 A.      Toyota.
24 Q.      What kind of car was it?
25 A.      It was a 2010 Kia Optima.

Page 66

1  Q.     So after the car was sold did Toyota have any
2  communications with you about it?
3  A.     Um, it's in my grandpa's collections, the
4  amount owed on the car.
5  Q.     Do you know how much that was?
6  A.     Um, I don't know the exact amount, but he did
7  tell me it was over 5,000.
8  Q.     That was all in your --
9  A.     Oh.  Sorry.  5,000 for the total -- the
10 amount of the total of the car was 10,000.  I thought
11 you were talking about the tow yard.
12 Q.     And that was the original purchase price?
13 A.     Correct.
14 Q.     And do you know how much was remaining on the
15 car?
16 A.     I do not.  I do not.  I had it about a year,
17 so it must be at least eight, eight grand on it.
18 Q.     Okay.  And your phone, I believe you said,
19 how -- what happened with your phone?
20 A.     So my phone, when he threw it on the ground,
21 he left it on the ground for a while, and when I left
22 they threw it in the trunk.  I didn't know they threw
23 it in the trunk.  I only knew because when they let
24 me out I asked for my phone, and they said they
25 didn't have my phone, the office at the police

Page 67

1  station.  And he checked to see if they put it on
2  like a hold or something, and he said no.  And then
3  he e-mailed Officer Tonn, and he said that he put it
4  in the trunk of my car, and it's at the tow yard.  So
5  I went to go over -- it took me about a day to get my
6  phone back.
7  Q.     So you got your phone from the trunk of the
8  car?
9  A.     Yeah, at the tow yard.
10 Q.     Okay.  And was it -- I think you said during
11 the video that it was broken.  Was it broken?
12 A.     It was cracked.
13 Q.     A cracked screen?
14 A.     Cracked screen, yes, correct.
15 Q.     Okay.  And as part of this litigation are you
16 claiming the cost of the cracked screen on your
17 phone?
18 A.     Yes.
19 Q.     Do you know how much -- did you have it
20 repaired?
21 A.     No, I did not.
22 Q.     So do you still own the phone?
23 A.     No, I don't.  The phone's -- I don't have
24 that phone anymore, it's gone.  I have a new phone.
25 Q.     When did you get a new phone?

Page 68

1  A.     This phone, I got this phone last year, the
2  phone I have now.
3  Q.     So you didn't actually pay to have your old
4  phone screen --
5  A.     No, I didn't.
6  Q.     -- repaired?
7  A.     Back then it was a iPhone 7, so it was kind
8  of expensive when the new iPhones came out, and I
9  didn't have the money.
10 Q.     So you had the phone I guess after the
11 incident for about a year?
12 A.     No, not even a year.  About -- I would say
13 less than three months, then I got another phone, and
14 then I got the iPhone 8, and I didn't want to pay on
15 that anymore, so I downgraded to another phone, to
16 this one that I have now.
17 Q.     Okay.  So basically within three months of
18 the incident you switched phones?
19 A.     Yes.
20 Q.     Then you changed down to an -- so you went to
21 an iPhone 8, then you went back down to -- for more
22 affordability?
23 A.     Yeah.  I got a iPhone 6 now.
24 Q.     Probably -- I mean these things are so darn
25 smart, this thing is so outdated, but it's still

Page 69

1  smarter than me.
2         Okay.  So I understand you said you went to
3  the doctor, correct?
4  A.     Correct.
5  Q.     All right.  So what did you -- did you
6  have -- receive a diagnosis or anything of that
7  nature?
8  A.     The doctor said I had whiplash on the -- in
9  my neck, and I had bruises on my arms and bruises on
10 my wrists from the cuffs, with the thing on my lip,
11 the scrape.
12 Q.     So you're -- since we're talking about it, so
13 you've had medical records that were produced in this
14 litigation; is that correct?
15 A.     Correct.
16 Q.     Did you personally go and acquire those
17 medical records?
18 A.     Yeah.  I went to Kaiser to go get 'em.
19        MR. SMYTH:  So I'm going to -- we'll just
20 mark next in order, this is the responses to the
21 City's requests for production of documents.
22        (Response to Defendant's Request for
23        Production of Documents was marked as
24        Defendants' Exhibit No. 3 for
25        identification.)

Page 70

1   BY MR. SMYTH:
2   Q.     Do you -- first off, do you recognize this
3   document at all?
4   A.     I do not.
5   Q.     Okay.  So if you can go to the page -- I
6   think it's page five of this.  One, two, three, four,
7   five.
8          So at the back end of this is what appears to
9   be Kaiser Permanente medical records.
10  A.     M-hm.
11  Q.     Do you see that?
12  A.     Yes, I do.
13  Q.     If you look through page six, this is -- it
14  looks like it's Bates labeled, so 000006 through
15  000027, so these are -- take a look at these, and
16  tell me do these look familiar to you at all?
17  A.     Are you looking at this bottom right here
18  when you say 000?
19  Q.     Yeah.
20  A.     Where's the 27?
21  Q.     Like the last page in this stack of stuff.
22  A.     Oh.  Okay.  I see what you're saying.  Okay.
23         So you just want me to read over it and make
24  sure it's correct?
25  Q.     So my first question was even more basic than

Page 71

1   that, it was do these look familiar to you.
2   A.     Okay.
3   Q.     Do you recognize these?
4   A.     Yes, I recognize this.  Let me just -- you
5   said 27, correct?
6   Q.     Yeah.  So I was asking you to look at this
7   first page through page 27.
8   A.     Ah.
9   Q.     They're identified --
10  A.     I see.  Okay.
11         Yeah, this all looks good.
12  Q.     Okay.  So just going back to my question,
13  you -- do you have an understanding of what these
14  documents are?
15  A.     Yes, I do.
16  Q.     And what is that?
17  A.     From Kaiser, this is my -- my history, my --
18  what is it called?
19  Q.     Your visit summary, something like that?
20  A.     Yeah.  History from when I go to Kaiser.
21  Q.     And this -- is this for what you understand
22  to be the date April 19th, 2017, the day after your
23  incident with Officer Tonn?
24  A.     Yep.  Yes, sir.
25  Q.     Okay.  And do you understand these to be the

Page 72

1   only medical records that reflect any sort of
2   injuries you claim in this action pertaining to your
3   incident with Officer Tonn?
4   A.     Yes.
5   Q.     And so just describe for me then, it says you
6   had a visit with a Dr. Morris Li; is that correct?
7   A.     Yes.
8          Are you on page four?
9   Q.     I'm just flipping through, actually.
10  A.     Okay.
11  Q.     My understanding is Morris Li was the doctor
12  that you saw that day; does that sound correct?
13  A.     Yes.
14  Q.     Have you seen Dr. Morris Li at any time
15  either before or after?
16  A.     No, I have not.
17  Q.     Did you go through the -- was it an emergency
18  room visit, or was it kind of a urgent care visit?
19  A.     I went to the emergency room.
20  Q.     Okay.  And was there any sort of
21  out-of-pocket cost for this visit that you're aware
22  of?
23  A.     Not that I'm aware of, no.
24  Q.     Have you paid anything personally for medical
25  care in regard to this incident?

Page 73

1   A.     I have not.
2   Q.     Do you know, did anyone else pay for any
3   visits of -- for your medical care in relation to
4   this incident?
5   A.     No.
6   Q.     Did you have insurance at the time of the
7   incident?
8   A.     Yes.
9   Q.     Was it through Kaiser?
10  A.     It's through my mom's.  I have like three
11  coverages, so I'm not quite too sure.
12  Q.     I guess at the time of the incident you were
13  a dependent on her health plan?
14  A.     Yes.
15  Q.     Okay.  So your mother's health care was with
16  Kaiser?
17  A.     Yes.
18  Q.     And have you informed Kaiser of your action
19  here today?
20  A.     About the -- what we're doing right now, the
21  deposition?
22  Q.     Yes.
23  A.     No.
24  Q.     So the -- I'm just looking at page 000011
25  right now.

Page 74

1   A.      Okay.
2   Q.      So shows at the top here a time of 5:53 p.m.;
3   do you see that?
4   A.      Yes, I do.  Yep.
5   Q.      Does that sound about correct as the time of
6   your -- when Morris Li saw you on that day?
7   A.      Yeah, that sounds about right.
8   Q.      Okay.  There's a section that says, "Patient
9   presents with multiple complaints," and then under
10  that:  Neck, comma, right forearm and left wrist.
11  A.      M-hm.  Yes, sir.
12  Q.      Does that sound correct as to what your
13  complaints were when you visited Dr. Morris Li on
14  that day?
15  A.      It was both wrists, not left wrist, but yes,
16  it does.
17  Q.      Okay.  So it was both wrists?
18  A.      Yeah.  It was both wrists, from the cuffs.
19  Q.      Okay.  And of all the information that he
20  received about your -- the cause of the injuries came
21  from you telling him what happened; is that correct?
22  A.      Yes.  This is me telling him what happened.
23  Q.      Okay.  So his -- pretty much all of the cause
24  of the incident came from -- from you, that's all he
25  had to go off of; is that correct?

Page 75

1   A.      Repeat that one more time?
2   Q.      So all information about what caused your
3   injuries that you were complaining of on the day,
4   that was from his interviews or information from you?
5   A.      Yes.  I gave him this information.  The neck
6   and the forearm and the left wrist he -- I showed him
7   all of it, and he was -- she was touching my neck and
8   told me that I have whiplash.
9   Q.      Okay.  And in the course of her I guess
10  investigation of your injuries she was asking you
11  questions about your pain?
12  A.      M-hm.  Yes.
13  Q.      Is that correct?
14  A.      Yes.
15  Q.      So it would be true then her diagnosis of
16  your whiplash is based upon your telling her what
17  your pain levels were during her investigation?
18  A.      So you're saying that my pain levels were --
19  my pain -- she asked my pain level, and she adjusted
20  it off of whiplash, is that what you're saying?
21  Q.      Well, I'm asking you what -- well, how about
22  we do it this way:  What did she do in the course of
23  her visit with you to figure out what your problems
24  were?
25  A.      She -- I told her about my wrists, she took a

Page 76

1   look at my wrists, she saw the bruise on my arm, and
2   she was just kind of feeling around my neck, because
3   I could barely turn it, so she was just feeling
4   around it.
5       I guess she found something hard or whatever,
6   and she said, "Okay, yeah, I see you have whiplash."
7   She was like:  You're gonna feel some pain for a
8   couple days, but it should go away.
9   Q.      Okay.  And -- so she just kind of did a
10  feeling around your neck; is that right?
11  A.      I'm guessing she felt, you know, some -- a
12  little tense up, so I'm guessing that's what she got
13  her analysis from.
14  Q.      Yeah.  So whatever she felt was part of how
15  she came to her diagnoses?
16  A.      Correct.
17  Q.      And when she was doing that did she -- she
18  was turning your neck, and she was asking you
19  questions about your -- the pain levels in your neck;
20  is that --
21  A.      Correct.
22  Q.      Okay.
23  A.      Yes.  Correct.
24  Q.      So in regard to her treatment
25  recommendations, did she tell you how to treat the

Page 77

1   pain in your various injuries?
2   A.      Yes.  Just begular -- begular?  Just regular
3   Tylenol, Advil, ibuprofen.
4   Q.      There is a -- within this page there's also
5   current outpatient prescriptions.  I don't know what
6   this is.  Is this something related to your injuries,
7   the mupirocin, m-u-p-i-r-o-c-i-n?
8   A.      Oh, see, mupirocin.  Okay.  Yes, I do
9   remember.  She did give me a medication.  She did
10  give me a medication, correct.
11  Q.      Do you know what that was for?
12  A.      This was for, I believe, my bruises.
13      Apply the affected areas.  Yes, it was for my
14  bruises.
15  Q.      Okay.  And did she -- do you recall as you're
16  -- does this refresh your recollection about any sort
17  of treatment that she recommended for your bruising?
18  A.      No, not other than this, this mupirocin.
19  Q.      On the page 13 of this packet, 000013, this
20  is where -- does this look familiar to you?
21  A.      Yes.
22  Q.      And what do you understand this sheet to be?
23  A.      Um, just like how to take care of the neck
24  problem, what I should do for the pain to go away,
25  most likely.

Page 78

1   Q.      Okay.  Did -- I think you said that she said
2   that it would go away within, you know, a few days --
3   A.      Yes.
4   Q.      -- the pain in your neck?
5   A.      Yes.
6   Q.      Did it go away within a few days?
7   A.      Yes, as she said.
8   Q.      So as you're sitting here today your neck is
9   not still suffering from any sort of neck sprain?
10  A.      No, it's not.
11  Q.      And your bruises all recovered?
12  A.      Yes, bruises all recovered on my arm and my
13  wrist.
14  Q.      And how long did you have those bruising last
15  for?
16  A.      About a week.
17  Q.      And it's true that you're not claiming any
18  other form of injury as a result of the incident on
19  April of 2017 that we're here to talk about today?
20  A.      Correct.
21  Q.      Okay.  So at the -- when you were taken to
22  the police station you were in a holding cell for --
23  you said I think it was approximately two hours; is
24  that correct?
25  A.      M-hm.  Correct.

Page 79

1   Q.      Did you know that Officer Tonn was recording
2   you during those interactions?
3   A.      I did not.
4   Q.      Okay.  So at the outset he came and read
5   Miranda rights to you; is that correct?
6   A.      When I was in there.
7   Q.      Yes.
8   A.      Yes.
9   Q.      Do you remember how many times,
10  approximately, he came to talk to you?
11  A.      He came to talk to me one time.  At first I
12  didn't even know if it was him.  I was asking him are
13  you the officer that arrested me because I could not
14  remember.  And he was like:  Yes, I am.
15          And I basically asked him, I was like:  What
16  did I do?  Like:  Why did you do that?
17          And we were just talking, going back and
18  forth from there.
19  Q.      And what did he say?
20  A.      Um, he didn't really say anything because I
21  was crying a lot, and I was trying to call my
22  girlfriend, her (indicating), and the phone in there
23  wasn't working, and I was trying to call, and he -- I
24  asked him if I could just use his phone to call her
25  just to let her know I'm in jail and I won't be

Page 80

1   coming back the same day, and he let me use his
2   phone.
3           And I couldn't stop crying, so he -- I asked
4   him if he could just tell her that I'm in jail
5   because I couldn't talk, like I was just crying too
6   much, and, yeah, he told her, and that was pretty
7   much about it.
8   Q.      Did you discuss at all the -- how you felt
9   about being -- Officer Tonn approaching you?
10  A.      I told him that -- yeah.  I told him that
11  you're mistreating me, you did me wrong.  I felt that
12  I was racially profiled, I told him that.
13          And he said, "I don't want to be one of these
14  officers on YouTube, you know, doing something to
15  another person."  And he asked me what I was doing on
16  my phone in there.  I told him:  I recorded you.
17          And yeah, that's -- that's how that went in
18  there.
19  Q.      So you told him you were upset with him
20  pulling you over?
21  A.      Yeah.  Yeah.  And I told him that I didn't do
22  anything wrong, you had no reason to even come up to
23  me.
24          He was listening to me, but he -- then he let
25  me out saying that, "Oh, you seem like a good guy,

Page 81

1   you're working."  He was like:  If you would have
2   just told me that you were working I wouldn't even
3   have took you here.  When we were talking in the cell.
4   Q.      Is there -- at any point did you talk about
5   you having anger issues?
6   A.      Yes.  He -- because the officers -- the
7   officer that was driving me up there was saying that
8   I need to calm down, that I was angry.
9           I had a right to be angry for being
10  mistreated, and I told him that, yeah, I have anger
11  problems.  I had anger management in middle school,
12  but that was years ago, but that was just 'cause a
13  teacher, I got in trouble in class, and the teacher
14  wanted me to do anger management class with her, but
15  other than that, no.
16  Q.      Did you talk at all about your -- what Tonn
17  was perceiving as your inability to listen?
18  A.      What do you mean?  What do you mean
19  inability?
20  Q.      Well, I'm trying to think of the right way to
21  phrase it, but did Officer Tonn express to you issues
22  that he had with your listening to him during the
23  interaction?
24  A.      He did.  He said that he wanted me to just
25  listen and basically just be quiet, just listen, but

Page 82

1  I was -- I was telling him like: No, I didn't do
2  anything wrong, I have a right to talk, I have a
3  right to say how I feel. And I told him how I felt.
4  Q.     Did you think that you had a right to not
5  listen during the traffic stop?
6         MR. GOFF: Objection; calls for a legal
7  conclusion.
8         THE WITNESS: No, I didn't. I -- no.
9  BY MR. SMYTH:
10  Q.     I'm sorry, your answer is no?
11        THE WITNESS: Because you --
12        MR. GOFF: I objected. You can answer.
13        MR. SMYTH: You can answer, yeah.
14        THE WITNESS: Oh. Okay. I was listening at
15  the stop.
16  BY MR. SMYTH:
17  Q.     Okay. And at the stop -- so did he tell you
18  or convey to you that he did not believe you were
19  listening during the traffic stop?
20  A.     He didn't -- he didn't say that -- he didn't
21  say that, no.
22        It just all happened so fast. As soon as he
23  came up to me at the traffic stop, asked for my -- he
24  told me about my tags, and I said, "No, they don't
25  expire till the end of April."

Page 83

1         He said, "April 2nd," and told me that I'm
2  being recorded on his body camera.
3         I said, "Okay. I'm going to record too," and
4  that's when I go like that (indicating). But no, he
5  didn't say anything like that.
6         At the end when everything was done, yes, he
7  was like: You need to listen.
8         I was like: Dude, I'm telling you to
9  listen while I'm on the ground, so you need to listen
10  too.
11        That's -- he wants me to listen, but he won't
12  listen to me.
13  Q.     So during the traffic stop, just kind of
14  going back --
15  A.     Yeah.
16  Q.     -- what -- what were you trying to tell him
17  that he wouldn't listen to?
18  A.     That I just got off work, and that I didn't
19  do anything wrong, I literally just got off the
20  school bus, walking to my car, that's what I was
21  trying to tell him. And I had witnesses tell him the
22  same thing, and he -- the officer saying, "I don't
23  care, get back. I don't care, get back."
24  Q.     He was saying, "I don't care, get back," to
25  who?

Page 84

1  A.     The witnesses. They're recorded on the
2  video.
3  Q.     Did -- okay. So let me ask you about --
4  break that apart.
5         So there were -- so during the interaction
6  between you and Officer Tonn now there were other
7  people standing around?
8  A.     Oh yeah, there were other people standing
9  around.
10  Q.     And Officer Tonn was talking to them?
11  A.     No. Officer Tonn was dealing with me. The
12  other officers were telling them to get back.
13  Q.     Okay. So this was after you were already
14  detained --
15  A.     Yes.
16  Q.     -- you're talking about those witnesses?
17  A.     Yes. They're recording the whole thing of
18  what happened, the other witnesses. So they see me,
19  they see the officer come up to me and pull me out of
20  my car by my hair and throw me on the ground.
21  They're recording the whole thing.
22  Q.     Did anyone give you any camera footage?
23  A.     Yes.
24  Q.     And who else gave you camera footage?
25  A.     I don't know his name off the top of my head.

Page 85

1  I have his information, and I have the footage.
2  Q.     Is there a reason you haven't given that to
3  your attorney?
4  A.     I have.
5  Q.     The other -- so other body -- or other cell
6  phone footage you have provided in this litigation?
7  A.     Yes. All footage I have I have sent to my
8  lawyer.
9         MR. SMYTH: Just ask that you provide --
10        MR. GOFF: Sure.
11        MR. SMYTH: -- any other video.
12        MR. GOFF: Sure.
13  BY MR. SMYTH:
14  Q.     And do you -- do you know who this person is?
15  A.     Um, I don't know him, but I know him just
16  because he lived across the street from my client, so
17  he seen the whole thing happen. And I would just
18  walk by and wave at him just to be nice everyday I go
19  to work.
20  Q.     And how did it come to be that he sent you
21  body camera -- or I mean cell phone camera
22  footage?
23  A.     When he was recording, after I got released,
24  my mom took me to his house of where it happened, and
25  I asked for the footage.

Page 86

1  Q.      And you knew that he had it beforehand?
2  A.      Um, no, I did not.
3  Q.      So how did you find out that he had footage?
4  A.      Because I went back and I saw them while they
5  were yelling: Hey, he just got off work, he works
6  for special needs.
7          So I went back to go and talk to 'em.
8  Q.      Okay.  So -- but that is -- all that stuff is
9  after you were already in handcuffs, correct?
10 A.      Correct.
11 Q.      Did they have any of the footage -- did any
12 of the footage that they gave you, did that depict
13 anything before you were in handcuffs?
14 A.      Depict anything before I was in handcuffs?
15 Q.      Did they videotape anything of the
16 interaction between you and Tonn before you were
17 already in handcuffs?
18 A.      Oh.  No.
19 Q.      So the camera footage that they gave you was
20 all afterwards?
21 A.      The camera footage that they gave me was when
22 I was on the ground.
23 Q.      So you were on the ground by the time they
24 started the footage?
25 A.      Yes.

Page 87

1  Q.      So they don't see, you know, anything like
2  Tonn pulling up or whatever was occurring before you
3  and -- before Tonn actually removed you from the
4  vehicle?
5  A.      They see -- they see him pulling -- they were
6  all standing outside, I saw them.  I saw them
7  standing outside.  They were standing outside in
8  front of their house on their porch.
9  Q.      Well, I mean the footage.
10 A.      Oh.  The footage, no, they don't have that,
11 just me on the ground.  I have that footage, me
12 personally.
13 Q.      Okay.  So in the -- so we're kind of still
14 talking about -- so there was -- so Officer Tonn and
15 you were talking about listening when you were in the
16 holding cell --
17 A.      Okay.
18 Q.      -- so that's what we were -- how we kind of
19 got on this line of questioning.
20 A.      Yeah.
21 Q.      So I want to kind of just go back and try and
22 bring it together here.
23         So with regard to your -- his and your
24 discussion on who should be listening to who,
25 basically, during this, is there anything that he

Page 88

1  should have been listening to you, as far as you
2  understood it, before he removed you from the
3  vehicle?
4  A.      Could you repeat that question?
5  Q.      Sure.  Let me ask it this way:  Is there
6  anything you were trying to tell him that he wasn't
7  listening to while -- before you were removed from
8  the vehicle?
9  A.      Other than that I just got off work and that
10 I didn't do anything wrong, no.  That was what I was
11 trying to get past him, that I was getting fresh off
12 working, I'm literally walking to my car, and that's
13 it.  I just wanted him to know that, like I just got
14 off work, like there's no reason for you to come up
15 to me right now.
16 Q.      And so when -- and you communicated all that,
17 you were telling him during the traffic stop that he
18 didn't do anything wrong -- that you didn't do
19 anything wrong, and that he shouldn't be approaching
20 you?
21 A.      Yeah.
22 Q.      And how did he respond when you said, "You
23 shouldn't" -- he shouldn't be approaching you?
24 A.      He didn't -- he didn't respond.  He didn't
25 respond to that.

Page 89

1  Q.      And did you at any point come to understand
2  that the car registration was expired at the time?
3  A.      Um, no, because the tags said April 2017, and
4  from my understanding they don't have -- they don't
5  have certain dates, like oh, it ends April 2nd, I
6  didn't know that.  So from my understanding from the
7  tags, they ended the end of April 2017.
8  Q.      Is that still your understanding?
9  A.      Well, from now, no, because he said they have
10 certain dates they end, so -- I didn't know that at
11 the time.
12 Q.      So because you didn't know at the time of the
13 traffic stop was there a reason you believe he
14 shouldn't have been pulling you over then?
15 A.      Yeah.  I believe he --
16 Q.      Sorry, ignore that, that's --
17         MR. GOFF:  Objection; calls for a legal
18 conclusion.  He's not a lawyer.
19         THE WITNESS:  Could you repeat the question?
20         MR. SMYTH:  Sure.  I'll -- we'll try and do
21 that question, then we'll go on a quick break.
22         THE WITNESS:  Okay.
23 BY MR. SMYTH:
24 Q.      Is there an understanding you have that
25 because you didn't know at the time of the

Page 90

1  April 19th, 2017, traffic stop that he should not
2  have pulled you over?
3      MR. GOFF:  Same objection.
4      You can answer.
5      THE WITNESS:  I believe he shouldn't have
6  pulled me over.
7  BY MR. SMYTH:
8  Q.     Even though the registration was expired?
9  A.     Yes.  I was not driving the vehicle, I
10 wasn't.  He shouldn't have pulled me over regardless.
11     MR. SMYTH:  Okay.  Let's go on a break.
12     THE VIDEOGRAPHER:  Okay.  This is going to
13 conclude media number one of the August 9th, 2019,
14 deposition of Robert Strong.
15     Off the record at 12:47.
16     (Recess taken from 12:47 p.m. to 1:00 p.m.)
17     THE VIDEOGRAPHER:  This begins media number
18 two of the August 9th, 2019, deposition of Robert
19 Strong.
20     On the record at 1:00 o'clock, approximately.
21 BY MR. SMYTH:
22 Q.     Okay.  So we were still kind of talking about
23 the time inside the -- inside the holding cell with
24 Officer Tonn and the conversations that you were
25 having at that time, but before we get back into the

Page 91

1  conversation itself, I understand that you had --
2  you -- he what you called cited you out; does that
3  sound familiar?
4  A.     Cited me out?
5  Q.     Yeah.
6  A.     Like when he released me?
7  Q.     So he gave -- had you fill out a paper, a
8  document, to --
9  A.     He had me fill out a ticket.
10 Q.     Yeah.  So let me hand you this, tell me does
11 this look familiar to you?
12 A.     Yes.
13     MR. SMYTH:  Okay.  If you want to mark that
14 next document in order.
15     (Photocopy of Notice to Appear was marked
16     as Defendants' Exhibit No. 4 for
17     identification.)
18     MR. SMYTH:  Here you go.
19     MR. GOFF:  Thank you.
20 BY MR. SMYTH:
21 Q.     So do you understand this, what we just
22 marked as Exhibit 4, to be the ticket that you filled
23 out?
24 A.     Yes.
25 Q.     And that is your signature at the bottom; is

Page 92

1  that correct?
2  A.     Yes.
3  Q.     And after filling this out you were released
4  from the Vallejo Police Department?
5  A.     Yes, I was.
6  Q.     And the time on here at the top is 2:25, does
7  that look about correct?
8  A.     At the top?
9  Q.     There's a time -- there's a date of
10 violation, time, and day of the week, case number at
11 the very first row of the ticket.
12 A.     Okay.  I see here.  It's in military time?
13 Q.     Yeah.  Does that look familiar or sound
14 familiar to you?
15 A.     Yes.
16 Q.     So --
17 A.     Was this -- 2:00 o'clock?  What was 2:00
18 o'clock?
19 Q.     That is the time that this was filled out.
20 A.     So then that's inaccurate then.  That can't
21 be 2:00 o'clock when it happened at 2:15.
22 Q.     So it's your understanding that this
23 ticket may have been filled out prior to your
24 release?
25 A.     Yes.  And it's -- the time is wrong.

Page 93

1  Q.     Okay.
2  A.     Couldn't have been 2:00 o'clock when that
3  happened 2:15.
4  Q.     Does the -- so what time did you understand
5  you were released from custody with the VPD?
6  A.     At least around 4:00 o'clock.
7  Q.     Okay.  Does -- at the middle of the ticket it
8  notes the code sections of violations for the ticket;
9  do you see that?
10 A.     Correctable violation?
11 Q.     Well, yeah.  Under there there's rows related
12 to particular codes and descriptions of the offenses.
13 A.     I see.
14 Q.     Do you have any understanding of either of
15 those codes and what the offense was for?
16 A.     This one says suspended license, and I don't
17 know what the second one is, obstruct?  I don't know
18 what that is, 148, obstruct.
19 Q.     Do you remember discussing any of these codes
20 and charges with anybody after receiving the
21 citation?
22 A.     All I remember is just him having me say I'm
23 gonna give you a ticket and, you know, I want you to
24 sign it, and you're going to get let go.  That's all
25 I remember.

Page 94

1    Q.      Okay.
2    A.      And from my understanding, this ticket was
3    never turned in.
4    Q.      When you say "turned in," what does that mean?
5    A.      Before Stanley was my lawyer I had another
6    lawyer, and they said that this ticket was never
7    turned in, so they said it was like it never
8    happened.
9    Q.      Okay.
10   A.      That's what they said.
11   Q.      And who is this other lawyer that you had
12   before him?
13         THE WITNESS:  What was his name?
14         MR. GOFF:  Um --
15         THE WITNESS:  What was his name?
16         MR. GOFF:  James Cook from John Burris's
17   office.
18         THE WITNESS:  John Burris.  John Burris, that
19   was the name.
20   BY MR. SMYTH:
21   Q.      So you had -- so just kind of timing-wise,
22   after this citation and you were released,
23   approximately how long after that did you seek
24   counsel from the Burris law firm?
25   A.      Oh, immediately, the next day.

Page 95

1    Q.      And did anyone tell you you should go seek
2    out the Burris firm?
3    A.      Um, no.  I believe I found him on Google.  I
4    was just Googling attorneys, lawyers.
5    Q.      And you happened to come across the Burris
6    firm?
7    A.      Yeah.
8    Q.      So you -- did you enter into some agreement
9    with the Burris firm at some point, or did you just
10   have like a --
11   A.      Yeah, I signed -- he accepted my case, I
12   signed it and everything, but then he had turned it
13   over to him, I guess 'cause he had too much going on.
14   Q.      Okay.  So it was a referral situation
15   essentially?
16   A.      Basically, yeah.
17   Q.      Okay.  And so approximately how long after
18   you approached the Burris firm was the referral?
19   A.      The referral to who?
20   Q.      To Stan.
21   A.      Oh.  Man, like three months, like three
22   months, yeah, took 'em a while to tell me.
23   Q.      And since that approximate three months,
24   after that point forward, Stanley has been your
25   attorney --

Page 96

1    A.      Yes.
2    Q.      -- for all purposes in this case?
3    A.      That's correct.
4    Q.      Okay.  You can put that Exhibit 4 to the
5    side.  And just so you know, all of these with the
6    original yellow stickers on them are originals that
7    need to stay with the court reporter.
8    A.      Okay.
9    Q.      So if you start walking away with them we're
10   gonna try and getcha.
11         Okay.  So at some point during your exchange
12   with Officer Tonn did he tell you what, in his mind,
13   you were doing wrong in the interaction between him
14   and you at the -- during the traffic stop?
15   A.      No.
16   Q.      He didn't tell you why he felt that you were
17   being difficult or --
18   A.      At the traffic stop, correct?
19   Q.      While you were in the holding cell --
20   A.      Okay, not the traffic stop.
21   Q.      -- and you were talking with Officer Tonn did
22   he tell you what he felt you were doing wrong during
23   the traffic stop?
24   A.      Only thing he said was about my attitude.
25   Q.      Okay.  And what in particular did he say

Page 97

1    about your attitude?
2    A.      That he just didn't like it.  That's pretty
3    much it.  He just didn't like my attitude.  I felt
4    that I didn't have an attitude.
5    Q.      But it's true you did not feel that he had
6    the right to approach you at that time?
7    A.      Yes.  I felt that he did not have the right
8    to approach me.
9    Q.      And in your interactions with Officer Tonn
10   during the traffic stop portion did that frustration
11   or disdain or displeasure, did that come out?
12   A.      When he -- when he came up to me?  When he --
13   Q.      Yeah.  When you were first pulled over --
14   A.      M-hm.
15   Q.      -- was -- did your displeasure with being
16   pulled over, having an officer approach you, was that
17   reflected in your actions?
18   A.      I was -- yes.  I was confused.  I was
19   wondering why he was -- why he was even coming up to
20   me.
21   Q.      And --
22   A.      I was like:  What's up?  Like:  What can I do
23   for you?  Like:  Why are you here talking to me right
24   now?  I was confused.
25   Q.      And in your interactions with Officer Tonn in

Page 98

1  the holding cell, I think we went over this at some
2  degree, but he did tell you that he felt you weren't
3  listening; is that correct?
4  A.     Yes, sir.
5  Q.     And do you recall how you responded?
6  A.     I do not recall.  I felt that I was
7  listening.  I do not recall me saying anything back
8  to that, but I was listening to him and what he had
9  to say.
10  Q.     So did you say anything along the lines of --
11  well, did you disagree with him that you were not
12  listening, and did you tell him that you disagreed
13  that you were not listening during the traffic stop?
14  A.     No.
15        Did I tell him if I was not listening to him?
16  Is that what you asked?
17  Q.     Yeah.  Let me try that one again so we're all
18  on the -- while you were in the holding cell after
19  Tonn expressed to you that he felt you were not
20  listening --
21  A.     Uh-huh.
22  Q.     -- did you -- how did you respond?
23  A.     When he told me that I was not listening?
24  Q.     Yes.
25  A.     I told -- I didn't respond in any kind of

Page 99

1  way.  I was listening to what he had to say when I
2  was in the cell, and I was crying at the same time,
3  listening to what he had to say.
4  Q.     Before you started crying do you know how
5  long you were in the cell for?
6  A.     I started crying like within ten minutes I
7  was in the cell, so within ten minutes I wasn't
8  crying, and then I started crying, yeah.
9  Q.     So the first -- okay.  So in that ten
10  minutes -- let's just clarify even more.
11        You're ten minutes in the cell, was that
12  while Officer Tonn was there talking to you --
13  A.     No.
14  Q.     -- is that what you're referring to?
15  A.     No.  I was by myself trying to contact my
16  girlfriend, I'm frustrated, and I started crying
17  because the phone inside wasn't working, and I
18  couldn't contact anybody, I didn't have no phone, I'm
19  in jail, I was sitting there bawling, sitting on the
20  bench, like what is going on.
21  Q.     Did you at any point during that -- well,
22  before you began crying did you speak with Tonn in
23  the holding cell at all?
24  A.     Before I was crying?
25  Q.     Yeah.

Page 100

1  A.     No.  He came to the holding cell within like
2  -- within close to an hour of me being there, I feel
3  like, and that's when we started exchanging words,
4  talking and stuff about what happened, and that was
5  when I asked him -- first I asked him are you the one
6  that arrested me, because I couldn't remember.  I was
7  like:  Are you the one that arrested me and brought
8  me here?  He was like:  Yes.  That's when we started
9  talking about what happened.
10  Q.     Okay.  So in response to him telling you
11  that, in his belief, that you weren't listening, you
12  don't recall saying anything about that your
13  girlfriend says the same thing?
14  A.     What, that I have anger problems?
15  Q.     That you have problems listening.
16  A.     No.  She -- I remember -- she says a lot I
17  have anger problems, but that's about it.
18  Q.     She says you have anger problems --
19  A.     Yeah.
20  Q.     -- but not listening problems?
21  A.     No.  I listen fine.  I have anger problems.
22  I can get -- she said I got anger problems though.
23  I -- listening, no, I listen.
24  Q.     Well, tell me about your anger problems.
25        MR. GOFF:  Objection; calls for a

Page 101

1  conclusion -- a medical conclusion.
2        THE WITNESS:  I don't think I have anger
3  problems.
4  BY MR. SMYTH:
5  Q.     Well, what does -- what you just described as
6  anger problems, what do you mean?
7  A.     Like a little -- a couple arguments.  That's
8  when she says I have anger problems, but that's about
9  it.
10  Q.     So she never says that you have problems
11  listening?
12  A.     No.  No.  Not that I know of.
13  Q.     During your conversations in the holding cell
14  with Officer Tonn, did he tell you you were having
15  difficulty listening during that conversation?
16  A.     While we were in the holding cell?
17  Q.     Yeah.
18  A.     Not that I know of, no.  Not that I know of.
19  Q.     He didn't say anything like:  See, this is
20  what I'm talking about, you're not letting me finish
21  what I'm trying to say?
22  A.     Like I was talking over him?
23  Q.     Yes.
24  A.     Um, he probably did say that, but I don't
25  remember.  It was like we were just talking, I was

Page 102

1   crying.  I don't know what was going -- I don't know
2   what was happening.  I don't remember him saying
3   that, no.
4   Q.       Do you recall in the holding cell saying you
5   don't remember your conversations during the traffic
6   stop with Officer Tonn?
7   A.       No.  I don't recall that.
8   Q.       Okay.  Do you recall apologizing to Officer
9   Tonn --
10  A.       No.
11  Q.       -- at all in the holding cell?
12  A.       I do not.  I do not.
13          MR. SMYTH:  Okay.  Well, I -- let me take a
14  look at my notes.
15          Let's go off the record for a minute.
16          THE VIDEOGRAPHER:  Time is approximately
17  1:15.  Off the record.
18          (Pause in proceedings from 1:15 p.m. to
19          1:20 p.m.)
20          THE VIDEOGRAPHER:  The time is approximately
21  1:20.  On the record.
22          MR. SMYTH:  So off the record what we talked
23  about doing is playing some of the video that we had
24  of body camera inside the holding cell as well, but
25  first before I get to that I'm playing -- I'm going

Page 103

1   to play some audio, and I wanted you to confirm for
2   me that this is the video you took.  I think you
3   described it, but this is what was produced to us.
4          (Reporter interrupts for clarification of
5          the record.)
6          MR. SMYTH:  No, you don't need to transcribe
7   the audio from the phone camera footage.
8          (Video being played on cell phone.)
9   BY MR. SMYTH:
10  Q.       All right.  So we played the whole video.
11  That was the extent of what you understood you to
12  have taken during the traffic stop?
13  A.       Yes.
14  Q.       And that is the full version, there's no
15  breaks or anything like that; is that correct?
16  A.       No.  I originally had a hour -- I had an hour
17  and a half footage of what happened, that's a
18  cropped.  I cropped that video, I made it shorter.
19  Q.       So this is a shortened version of the
20  audio --
21  A.       Correct.
22  Q.       -- or video?
23  A.       Correct.
24  Q.       So what happened -- do you still have more
25  video?

Page 104

1   A.       Um, so the video I originally had was an hour
2   and a half, but I -- when I backed it up to my cloud
3   it didn't save because it was too large, so it didn't
4   save all of my video, which was a hour and a half.
5          So I only have that and another witness
6   footage, but on the video I originally had you can
7   hear -- you can hear everything, what's going on.
8          The whole thing lasted an hour and a half,
9   what was going on.  I had original footage of it, but
10  I lost it.  I had him telling the other officers what
11  actually happened; he was telling 'em that he pulled
12  me over, that he saw me driving and saw me park.
13          And then he said, "I think I was right this
14  whole time."  I had that.  I don't have that footage
15  anymore.  You can most likely check his camera or any
16  other officers that have the camera on their body,
17  but yeah, that did happen.
18  Q.       So let me just break that down a little bit.
19  So the rest of the footage that you currently no
20  longer have, but --
21  A.       M-hm.
22  Q.       -- which you understood it to have had on it
23  was audio of the officers after the fact?
24  A.       Yes.  He said, "So what do you want to do
25  with the car?  You want to tow it?"  I'm like: Yeah,

Page 105

1   let's tow it.
2          He's like:  So what happened?  Um, he was
3   like:  So come up to him, tell him that his plates
4   are expired, and that -- oh.  Sorry.  Told him that
5   his plates are expired, and I ran his plates when the
6   car was parked, they came back expired on the 2nd.
7          And -- and also that he told the other guys
8   that he was -- that he saw me drive and he saw me
9   park and I pulled him over, was like:  What's going
10  on?  Talked to him nicely, and he's being rude.
11          Just a whole bunch of other stuff I had, but
12  I had everything, but it got lost when I got a new
13  phone and I tried to transfer it.  But you can
14  probably hear it on his body camera or another
15  officer's, the two other officers' body camera
16  because they were all talking about what happened.
17  Q.       Okay.  So for -- well, if you can recover any
18  of that, then great, please produce.
19  A.       M-hm.
20  Q.       Otherwise, you know, if it's not in the cloud
21  and it's gone, then I guess it's gone.
22          Okay.  So but other than that, what you did
23  see here is what you do have currently, that's the
24  extent of it?
25  A.       Yeah.  I have that on my phone.

Page 106

1  Q.     And you don't have any other extended
2  versions, this is the extent of all the footage?
3  A.     Plus the witness video, yeah.
4  Q.     Yeah, the other video that you guys sent me
5  today, correct?
6  A.     Yeah.
7         MR. GOFF:  Yeah.
8  BY MR. SMYTH:
9  Q.     Okay.  Does -- after watching that video does
10 that refresh your recollection at all about the
11 events, how they transpired from earlier, your
12 testimony, anything -- does it change anything about
13 your testimony today?
14 A.     No.
15 Q.     Okay.  So I have footage here, this is after
16 you were in handcuffs.  So you were talking about if
17 we had body camera footage just now, afterwards.  So
18 this is Officer Tonn's, I'll represent to you, trying
19 to --
20        MR. GOFF:  Thanks.
21        MR. SMYTH:  So you can see --
22        (Video playing on computer.)
23        THE WITNESS:  Is the volume --
24        MR. SMYTH:  Yeah, I'm -- might come on in a
25 second because of the buffering.

Page 107

1         (Video playing on computer.)
2         THE WITNESS:  Can you pause this?  Did you
3  hear how he said, "I think I was right the whole
4  time," too?
5         Before this video he tells them what's going
6  on, so if you have this video before what happened
7  he -- I mean you have to if you have this, but you
8  can hear him telling 'em what happened.  He told them
9  that I saw him driving, I pulled him over, and I saw
10 him park.  You can hear it.
11        This happened after, I remember, this was
12 after.  So he has to have that footage of him saying
13 what happened because this -- I remember that part of
14 the video.  I'm the one that had it, I took it, I
15 remember that part.
16 BY MR. SMYTH:
17 Q.     So I'll just -- just to clarify, so at the
18 point prior to you being placed into the vehicle,
19 because that's where this one starts, you're talking
20 about Officer Tonn was talking to other officers
21 about the -- what happened, and in so saying what
22 happened that is where he -- what you captured, what
23 you were referring to you captured on your phone,
24 that was before you were placed into the car?
25 A.     It must have happened while I was in the car

Page 108

1  or something.  I wasn't there at the time it
2  happened, I know that for a fact.  I wasn't by them.
3  I was probably in the car, or I was on my way to the
4  Vallejo Police Department, but I remember -- I
5  remember because he said I think I was right the
6  whole time.
7         Before this video he tells -- I believe it's
8  him because he asked, "So what happened?"  You can
9  hear it, he tells him what happened.
10 A.     Well, that was --
11 A.     I run the plates, I pull him over, I seen him
12 driving, I saw him park.
13        How do you see me -- how do you pull me over,
14 first off, when we're nose to nose, and you see me
15 park?  I mean -- it just don't make sense to me
16 personally.
17 Q.     So -- well, let me ask this:  Were you --
18 this is your car, right?
19 A.     That's my car.
20 Q.     And it was parked at the -- at the client's
21 house?
22 A.     Down the street from his house.
23 Q.     And this is where you normally park when
24 you -- or in the morning you get there to pick him up
25 and escort him to the bus, correct?

Page 109

1  A.     Yes.
2  Q.     And so this morning, was that any different?
3  A.     No.  It was the same thing; just took him
4  there and walked to my car and I seen him going like
5  this (indicating), making eye contact like how we
6  make eye contact, and he just turned around.
7  Q.     So this car being -- it being parked in
8  another side of Vallejo, if you will, registered, you
9  know, for 133 Leonard, correct, and with expired
10 registration --
11 A.     M-hm.
12 Q.     -- is there a reason, knowing all that, that
13 you still believe he should not have attempted to
14 pull it over?
15 A.     Yeah.
16        MR. GOFF:  Objection; calls for a legal
17 conclusion.
18        THE WITNESS:  Shouldn't have pulled me over.
19 BY MR. SMYTH:
20 Q.     And is -- I guess if knowing that the car has
21 expired registration, and you being in the driver's
22 seat of it, what is it that you believe he should
23 have done differently?
24 A.     Well, for one, I didn't know that it was
25 expired.  He should have approached me differently,

Page 110

1   saying, "Hey, while you weren't here I had ran the
2   plates on this car, and they came up expired on
3   April 2nd, and if you don't know, they expire on
4   actual dates, just letting you know that they do."
5         It was like -- he didn't ask me -- he didn't
6   ask me for my license, registration, none of that, he
7   should have asked me for that; it was all in my
8   hands. Everything, I had my license in my hand, I
9   didn't have no wallet at the time, so license in my
10  hand, that card with the phone number was in my hand
11  also, everything was in my hands. When he came up to
12  me all he had to do was ask for it, probably would
13  have went differently.
14  Q.    If --
15  A.    I didn't go in my pockets or do no movements
16  or nothing like that to freak him out, go in the
17  glove department, you know, everything was in my
18  hand. All I did was move up like I'm anybody.
19  Q.    Okay. So this is -- so that was body camera
20  footage of Tonn's.
21  A.    M-hm.
22  Q.    And that was after, so once you were placed
23  into the vehicle and he had about a minute or two
24  after that, so that's what he -- his body camera had.
25        This is in the holding cell later.

Page 111

1         So just so you know, for the record, this is
2   titled video where it's suspect, underscore given,
3   underscore Miranda, underscore admonishment, and it's
4   about six minutes and 52 seconds long video.
5   A.    Okay.
6         (Video playing on computer.)
7         MR. SMYTH: I'm going to fast forward.
8         (Video playing on computer.)
9   BY MR. SMYTH:
10  Q.    So we've been listening to it --
11  A.    Yeah.
12  Q.    -- three minutes.
13        So I can -- first off, does that change your
14  opinions or testimony about what occurred during the
15  traffic stop any differently?
16  A.    No.
17  Q.    It does not?
18  A.    No.
19  Q.    Okay. So during this you said that you don't
20  even remember the first thing that he said to you --
21  A.    M-hm.
22  Q.    -- while you were in the holding cell here.
23  A.    M-hm.
24  Q.    Is that different today?
25  A.    Yes, it's different today. I mean at that

Page 112

1   point, yeah, I did say that because it was a lot
2   going on, and then once I actually got my phone back
3   the next day and I looked at the videos I'm like:
4   Oh, wow, this really did happen, this is exactly what
5   just happened, he really did this to me.
6         I'm looking at it with her shaking our heads,
7   like this really just happened. So, I mean --
8   Q.    Do you still believe you were racially
9   profiled?
10  A.    Yes, I do. Yes.
11  Q.    And why is that?
12  A.    I mean you can just see from the video, like
13  it was -- he had to have some intentions against me.
14  I mean who just comes up to somebody while they're
15  walking, you know, and just does that?
16        I didn't have -- he didn't have no --
17        (Reporter interrupts for clarification of
18        the record.)
19        THE WITNESS: -- probable cause to come, for
20  me he didn't have no probable cause. What did I do?
21  What did I honestly do for you to come up to me and
22  to do that?
23  BY MR. SMYTH:
24  Q.    Is --
25  A.    There's no probable cause. I mean you gonna

Page 113

1   run people's tags while they're not even at the car,
2   their parked car? The car don't look like it's
3   abandoned, it's a 2010 Kia, I mean -- car looks like
4   -- I mean, you're out running cars that's abandoned
5   and stuff and check 'em out, ain't nothing wrong with
6   that car.
7         It was still April; from my understanding at
8   that time they didn't expire on the 1st or 2nd or
9   14th, nothing like that. I thought it was just by
10  the month, you know, at the end of the month you
11  gotta update your tags.
12        I don't think people should go to jail for
13  expired tags.
14  Q.    So did you -- well, just kinda going off of
15  what you just said, so you think that he approached
16  you, he racially profiled you in that neighborhood as
17  you were walking to your car and had some animus
18  towards you before he even approached you?
19  A.    He had to.
20  Q.    And that's because he shouldn't have -- well,
21  tell me why -- why -- say again, what is -- why did
22  he have to?
23  A.    Have to?
24  Q.    Have to have racially profiled you or had
25  animus towards you.

Page 114

1   A.     Being a black male, I mean we don't get
2   treated the same as everybody else, you know, I mean
3   that's just the truth.  We don't get treated the
4   same, I mean, and being -- having dreadlocks at
5   that -- at that time too, I mean a person can look
6   intimidating, their facial features, maybe could look
7   like a drug dealer, maybe could, I don't know, could
8   be robbing stores, something, probably up to no good,
9   you know, your appearance.  Probably my appearance,
10  he probably didn't like it.  It was something.
11        I don't know -- I'm not going to say I know
12  what it is, but I'm going to say what I feel like it
13  is, and from how he was talking to me and how he
14  approached that's how he brought it off as, so I
15  mean --
16  Q.     And at the time he approached you you felt
17  you were being racially profiled, and based upon the
18  fact you weren't doing anything wrong --
19  A.     Yeah.
20  Q.     -- in your mind at the time?
21  A.     Yeah.  I mean I don't see how walking to your
22  car being on the phone is doing something wrong,
23  unless you do.
24  Q.     Do you remember during the interchange,
25  exchange here with Officer Tonn, talking about there

Page 115

1   was nothing that he could have done differently that
2   would have changed your belief that he shouldn't have
3   approached you?
4   A.     I don't remember that.  I remember him saying
5   something differently.  Can you play it back?  Can
6   you play it back?
7   Q.     I'm going to have to find that.
8   A.     I mean --
9   Q.     So I'm going to -- I think it was in a
10  different video entirely, and this one I'm playing --
11  this one, for the record, it's called conversation,
12  underscore, with, underscore, suspect.  The video
13  goes for 12 minutes and nine seconds, I'm going to
14  bounce around, and I'll try and find --
15  A.     Okay.
16        (Video playing on computer.)
17  MR. SMYTH:  Girlfriend, that was what --
18  THE WITNESS:  I don't remember that.
19  MR. SMYTH:  So anyway --
20        (Video playing on computer.)
21  MR. SMYTH:  So I almost forgot what I was
22  looking for here as part of the audio as we're
23  listening.  What did I say I was looking for?  Sorry.
24        (The record at Page 114, Page 24, through
25        Page 115, Line 3, was read by the reporter.)

Page 116

1        (Video playing on computer.)
2        MR. SMYTH:  It might be a different video,
3   this is why it's difficult.
4        (Video playing on computer.)
5        MR. SMYTH:  Here, let me see --
6        (Video playing on computer.)
7   BY MR. SMYTH:
8   Q.     So I went back to the suspect, underscore,
9   given, underscore, Miranda, underscore, admonishment
10  video, and I think around here is what I was looking
11  for, and we're at about the four-minute mark of the
12  video, we had stopped earlier around the three-minute
13  mark when we were listening earlier, so this might be
14  what I was referring to.
15        You know, after we do this one, if you want
16  to watch more videos, but I want to get us moving and
17  then --
18  A.     Oh yeah.
19  Q.     -- you know --
20  A.     That's all right.
21        (Video playing on computer.)
22        THE WITNESS:  Can we pause this?  So you
23  heard him say that I didn't drive up.
24  BY MR. SMYTH:
25  Q.     Which part?

Page 117

1   A.     That I didn't drive up.  He just said that I
2   didn't drive up.  If you go back a little bit --
3        (Video playing on computer.)
4        THE WITNESS:  He said, "When you drove up,"
5   correction, "When I drove up."
6        (Video playing on computer.)
7        MR. SMYTH:  Is that --
8        MR. GOFF:  That's it.
9   BY MR. SMYTH:
10  Q.     So in that you told Tonn that you knew what
11  was happening before it even started.
12  A.     Oh yeah.  When I saw him go like this
13  (indicating), when we made eye contact like this, I
14  already knew.  I knew he was gonna come up to me, I
15  knew it, I knew it.
16  Q.     And when you say you made eye contact with
17  him --
18  A.     Like this (indicating).  When he's driving by
19  he's looking out the window, I'm looking at him like
20  this (indicating), eye to eye, we make eye contact.
21  Q.     Was he -- he was wearing sunglasses, wasn't
22  he?
23  A.     I believe he was.  Jeans, blue jeans, a
24  police shirt, I believe he was wearing some
25  sunglasses.  I think he was.  I don't know.

Page 118

1    Q.    So you couldn't see his eyes?
2    A.    No.  I seen him.  He looked out the window.
3  He looked at me, he was looking like this
4  (indicating).  Just 'cause somebody's got glasses on
5  that doesn't mean you can't see.
6    Q.    Well, I mean you can't see his eyes.
7    A.    I can see him looking at me.
8    Q.    So you can see him turn his head?
9    A.    I see him look at me.
10   Q.    Like look over --
11   A.    I see him drive by and look at me.
12   Q.    Okay.
13   A.    That's what I seen.
14   Q.    And so when -- even at that point you knew in
15 your head that he was going to approach you?
16   A.    I said in my head:  I bet you he come up to
17 me.  That's what I said in my head:  I bet you he
18 come up to me, as I'm walking to my car.
19   Q.    And you're --
20   A.    And, sure enough, that's what he did.
21   Q.    Okay.  I mean there's much more.
22   A.    Oh yeah, I already -- way more.
23   Q.    There's -- I don't intend to go through all
24 of it.
25   A.    Okay.

Page 119

1    Q.    We do have lunch and another deposition this
2  afternoon.
3    A.    Okay.
4          MR. SMYTH:  But I think for now I appreciate
5  your time, thank you for coming in.
6          That will be it for me, unless Stanley --
7          MR. GOFF:  Yeah, I've got a couple questions.
8          MR. SMYTH:  -- has questions.
9          MR. GOFF:  Yeah.
10              EXAMINATION
11 BY MR. GOFF:
12   Q.    Let me ask you this:  Did Officer Tonn ever
13 tell you that he had a warrant to seize your phone?
14   A.    Are you asking me?
15   Q.    I'm talking to you.
16   A.    Oh.  No, he didn't.
17   Q.    Okay.  He just -- did he ever give you a
18 command that if you did not give you -- give him your
19 phone he was going to pull you out of the car and
20 place you under arrest?
21   A.    No, he didn't.
22   Q.    Did he ever give you any commands to step out
23 of the car or else you would be placed under arrest?
24   A.    No, he didn't.
25   Q.    Did he ever tell you that you were under

Page 120

1  arrest and now he was going to pull you out of the
2  car?
3    A.    No, he didn't.
4    Q.    Did you ever threaten Officer Tonn during the
5  incident at that moment in time?
6    A.    No, I didn't.
7    Q.    Did you ever swing at Officer Tonn?
8    A.    No, I didn't.
9    Q.    Did you ever kick at Officer Tonn?
10   A.    No, I didn't.
11   Q.    Were you ever on the phone -- once Officer
12 Tonn approached you and you were sitting in the car
13 were you ever talking to someone on the phone?
14   A.    I wasn't talking to anyone.  I was dialing on
15 the dial pad.
16   Q.    So you weren't talking to anybody on the
17 phone?
18   A.    No.
19   Q.    And you told Officer Tonn that you were
20 recording him, or you were going to record him; is
21 that correct?
22   A.    Yes.
23   Q.    And this was after Officer Tonn said he was
24 going to record you?
25   A.    Yes.

Page 121

1    Q.    Did Officer Tonn tell you that you were under
2  arrest for trying to record him?
3    A.    No.
4    Q.    Did Officer Tonn give you a command that you
5  could not record him?
6    A.    No.
7    Q.    For the 45 seconds that Officer Tonn had his
8  arm around your neck was it difficult for you to
9  breathe or -- were you able to breathe at all?
10   A.    No.  I was gasping for air.
11   Q.    And this lasted for about 45 seconds?
12   A.    Correct.
13   Q.    And you said that you started seeing spots
14 or --
15   A.    Yeah, little white dots.
16   Q.    Or, as Counsel has stated earlier for you,
17 that you were becoming light-headed?
18   A.    Correct.
19   Q.    And then this light-headedness continued to
20 go -- continued until Officer Tonn let go or released
21 some of the force around your neck?
22   A.    Correct.
23   Q.    But even after he released some the force
24 around your neck he still had his arm around your
25 neck?

Page 122

1    A.      Say that one more time.
2    Q.      Excuse me.  Even after Officer Tonn released
3    some of the force from the hold that he had around
4    your neck, his arm remained around your neck; is that
5    correct?
6    A.      Correct.
7    Q.      When Officer Tonn had you on the ground with
8    his arm around your neck -- strike that.
9            When you were on the ground and Officer Tonn
10   had his arm around your neck, is that the time that
11   Officer Tonn told you to put your hands behind your
12   back?
13   A.      Yes.
14   Q.      Were you physically able to put your hands
15   behind your back while you were being choked --
16   A.      No.
17   Q.      -- by Officer Tonn?
18   A.      No.
19   Q.      Were you trying to comply with his orders
20   while he had his arm choking you around your neck?
21   A.      Yes.
22   Q.      But you were physically unable to do so at
23   the time because his arm was choking you around your
24   neck; is that correct?
25   A.      Correct.

Page 123

1            MR. SMYTH:  Leading.
2    BY MR. GOFF:
3    Q.      You -- and you were never -- were you ever
4    convicted of the charges that were issued on this
5    ticket?
6    A.      No.
7    Q.      Were you ever even prosecuted for the
8    charges?
9    A.      No.
10   Q.      Why is that?
11           MR. SMYTH:  Relevance.
12   BY MR. GOFF:
13   Q.      Why is that?
14           MR. SMYTH:  And calls for a legal conclusion.
15           THE WITNESS:  I don't know.
16           MR. SMYTH:  Calls for speculation.
17   BY MR. GOFF:
18   Q.      Were you ever summoned to court to answer for
19   the charges that were on this ticket?
20           Did you ever have to go to court based on
21   this ticket?
22   A.      No.
23   Q.      Okay.  How long were you on the ground once
24   Officer Tonn pulled you out of the car, do you
25   recall?

Page 124

1    A.      I was on the ground for a good two minutes.
2    Two to three minutes I was on the ground, total.
3    Q.      And you said that Officer Tonn, when he
4    pulled you up, you were already handcuffed -- strike
5    that.
6            Once -- Officer Tonn winded up pulling you up
7    from the ground by your hair?
8    A.      Yes.
9    Q.      When he pulled you up from the ground by your
10   hair were you handcuffed?
11   A.      Yes.
12   Q.      When he pulled you up from the ground by your
13   hair did it hurt?
14   A.      Yes.
15   Q.      On a scale of one to ten, what level of pain
16   did you experience when he pulled you up by your
17   hair?
18   A.      Ten.
19   Q.      Did he even try to pull you up by your arms?
20   A.      No.
21   Q.      And at that time that he pulled you up by
22   your hair were there other officers present?
23   A.      Yes.
24   Q.      How many?
25   A.      Two.  Three in total.

Page 125

1    Q.      And you said you were thrown -- when you were
2    thrown in the police cruiser you hit your head on the
3    window?
4    A.      Yes.
5    Q.      What officer was that that put you in the
6    police cruiser?
7    A.      Tonn.
8    Q.      It was Officer Tonn?
9    A.      Yes.
10   Q.      Did you hit your head on the window with a
11   lot of force, or just -- or just skinned the window?
12   A.      With a good amount of force.
13   Q.      Did it hurt?
14   A.      Yes.
15   Q.      Scale of one to ten, how much did it hurt?
16   A.      Eight.
17   Q.      Officer Tonn asked you what are you doing
18   in the neighborhood?
19   A.      Just got off work.
20   Q.      No, I'm saying --
21   A.      Oh.
22   Q.      -- he asked you what are you doing in the
23   neighborhood?
24   A.      Oh.  Yes.
25   Q.      So before -- strike that.

Page 126

1      Was that the first thing that Officer Tonn
2  told you?
3  A.     Yes.
4  Q.     First thing that came out of his mouth was,
5  "What are doing in the neighborhood?"
6  A.     Yes.  And after, my registration is expired.
7  Q.     But he didn't approach you initially and say
8  that your registration is expired?
9  A.     No.
10  Q.     How much did you -- how much were you paying
11  a month for your car?  What were the monthly
12  payments?
13  A.     Three ten.
14  Q.     And you had been making these monthly
15  payments for at least a year?
16  A.     Yes.
17  Q.     It was another, what, $8,000 owed,
18  approximately?
19  A.     Correct.
20  Q.     Did you ever try to run from Officer Tonn --
21  A.     No.
22  Q.     -- when you -- let me ask you.
23  A.     I apologize.
24  Q.     When Officer Tonn was pulling you out of the
25  car did you ever try to run away from him?

Page 127

1  A.     No, I did not.
2  Q.     When Officer Tonn was pulling you out of the
3  car were you ever trying to resist him?
4  A.     No, I was not.
5       MR. GOFF:  That's it.  No other questions.
6       MR. SMYTH:  Okay.
7       THE VIDEOGRAPHER:  All right then.  This is
8  going to conclude the August 9th, 2019, deposition of
9  Robert Strong.  The number of disks used was two, and
10  we're off the record at 2:00 o'clock.
11           --oOo--
12       (The deposition concluded at 2:00 p.m.)
13           --oOo--
14
15
16
            ROBERT EVERETT STRONG
17
            --oOo--
18
19
20
21
22
23
24
25

Page 128

1  STATE OF CALIFORNIA    )
                          ) ss:
2  COUNTY OF SOLANO       )
3
4       I, REBECCA K. DOWELL, a duly licensed
5  Certified Shorthand Reporter, State of California,
6  hereby certify that the witness in the foregoing
7  deposition, named
8           ROBERT EVERETT STRONG,
9  was duly sworn to testify to the truth, the whole
10  truth and nothing but the truth in the within-
11  entitled cause; that said deposition was taken at the
12  time and place therein named; that the testimony of
13  said witness was reported by me, and was thereafter
14  transcribed under my direction by computer-aided
15  transcription; that the foregoing is a full,
16  complete, and true record of said testimony.
17       I further certify that I am not related to
18  any party or counsel or attorney for any of the
19  parties to said deposition, nor in any way interested
20  in the outcome of the cause named in said caption.
21       I have hereunto set my hand this 20th day of
22  August, 2019.
23
24
            REBECCA K. DOWELL, RPR
25          CSR License No. 8043

33 (Pages 126 to 128)