# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road, Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

December 6, 2019

Stanley Goff, Esq.
Law Office of Stanley Goff
15 Boardman Place, Suite 2
San Francisco, CA 94103

**Regarding:   *Robert Strong v. City of Vallejo, Jarrett Tonn, Andrew Bidou, et al., Case No.: 2:18-CV-01246-WBS-AC.***

Dear Mr. Goff:

Thank you for retaining me to analyze and render opinions regarding the April 19, 2017 use of force inflicted on Mr. Robert Strong (Mr. Strong) by Vallejo Police Department (VPD) Officer Jarrett Tonn (Officer Tonn).   Pursuant to the requirements of Federal Rule 26, I have studied the reports, deposition transcripts, audio and video recordings, medical records, training, and other material (as listed below) provided to me thus far regarding this case.  Please be advised that if any additional material develops and/or is submitted to me for my review, a supplementary report may be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by Officer Tonn, and witnesses, versus testimony proffered by Mr. Strong, and/or other witnesses, I do not opine for the trier of fact regarding who are the more believable witnesses.  The resolution of any such conflicts are obviously the purview of a jury to decide.

## **Materials Reviewed Thus Far:**

1.      Complaint for Damages.

2.      Vallejo Police Department Narrative, Bate Stamp COV000012-
        COV000013.

3.      Vallejo Police Department Notice to Appear, Robert Strong,
        Misdemeanor, Violation Date April 19, 2017.

4.      Vallejo Police Department Policy Manual, Bate Stamp COV000061-
        COV000068.

5.      Proof of Service July 3, 2019.

6.      Medical Records, Kaiser Permanente, VAL Hospital, April 19, 2017,
        000006-000027.

7.      Deposition Transcripts:
        a.      Robert Everett Strong (Plaintiff), August 9, 2019.
        b.      Officer Jarrett Tonn (Defendant), August 9, 2019.

8.      Video Recordings:
        a.      Mr. Strong's Cell Phone Video.
        b.      Body worn camera recordings.


9.      California POST Basic Learning Domains as Follows:
        a.      #1.  "Leadership, Professionalism & Ethics."
        b.      #2:  "Criminal Justice System."
        c.      #3:  "Policing in the Community."
        d.      #5:  "Introduction to Criminal Law."
        e.      #15: "Laws of Arrest."
        f.      #20: "Use of Force."
        g.      #21: "Patrol Techniques."
        h.      #22: "Vehicle Pullovers."
        I.      #23: "Crimes in Progress."
        j.      #28: "Traffic Enforcement."
        k.      #33: "Arrest Methods/Defensive Tactics."
        l.      #34: "First Aid ,CPR, and AED."

10.     *"Dr. Smock's Top 25 Medical Consequences Resulting from
        Strangulation and Lateral Vascular Neck Restraint."*  By: Bill
         Smock, MD, Police Surgeon, Louisville Metro Police Department,

Clinical Professor of Emergency Medicine, University of Louisville
School of Medicine.  (Bill.smock@louisvilleky.gov).

11.     Overview of the incident scene via the internet.


**Apparent Uncontested Facts:**

1.     Mr. Strong never threatened or assaulted Officer Tonn.

2.     Mr. Strong was unarmed throughout the entirety of the incident.

3.     Officer Tonn removed Mr. Strong from his (Mr. Strong's) car by
        pulling his hair.

4.     Officer Tonn forced Mr. Strong to the ground and caused Mr. Strong
        to lacerate his lip on the asphalt.

5      Officer Tonn wrapped his forearm around Mr. Strong's neck causing
        a muscle strain in Mr. Strong's neck.

6.     Mr. Strong never made any furtive movements toward his waistband
        or any other area of his body.

7.     Mr. Strong suffered contusions, and lacerations to his body, arms,
        face, and head.

8.     Officer Tonn never reported seeing any weapon during the entirety
        of the incident.

9.     Officer Tonn was not injured during the the use of force he inflicted
        on Mr. Strong.


**Brief Overview of Events and Commentary:**

In April of 2019, Mr. Strong resided in the Vallejo area.  Mr. Strong was gainfully
employed by McGrew Behavior Intervention Services (MBIS).  Mr. Strong was not on
probation or parole and was not wanted for questioning in connection with any crime.

At approximately 2:15 p.m. on April 19th, 2017 at the location of Springs Road/Lassen Street, in the city of Vallejo, Mr. Strong was performing his expected duties as a behavior associate. As his shift came to a close, Mr. Strong was riding on the bus with his special needs client to the client's house, where he would drop the client off.

Mr. Strong dropped the MBIS client off and then made a phone call as he walked to his parked car near the client's home.

As Mr. Strong crossed the street, a Vallejo Police Officer (Officer Tonn) drove past Mr. Strong. Officer Tonn was on the opposite side of the street. Mr. Strong made eye contact with Officer Tonn, as Officer Tonn passed by.

According to Mr. Strong, as soon as he opened the door to his parked car, and while on the phone, Officer Tonn had already made a U-Turn and pulled up in front of Mr. Strong's car.

Officer Tonn got out of his patrol car, and approached Mr. Strong and asked what was he doing in the neighborhood. According to Officer Tonn, Mr. Strong was in a high-crime area and appeared suspicious. Mr. Strong responded that he had dropped off his client at his client's house. Officer Tonn then told Mr. Strong that he ran the plates of his car and that they came up expired on, as of April 2, 2017.

Mr. Strong politely corrected Officer Tonn and informed him that his registration did not expire until the end of April 2017. The two continued to assert their version of the truth, back and forth.

Officer Tonn informed Mr. Strong that he was recording on his body camera, and Mr. Strong informed Officer Tonn that he was recording the interaction on his cell phone.

At this point in the sequence of events, Officer Tonn reached for Mr. Strong's cell phone, and Mr. Strong pulled away so that Officer Tonn couldn't grab his phone. It is important to note that Officer Tonn had not told Mr. Strong that he (Mr. Strong) was detained or under arrest, prior to reaching for Mr. Strong's cell phone. Although Officer Tonn has stated that he feared that Mr. Strong was in the process of informing others of his whereabouts, Officer Tonn had not made that known to Mr. Strong.

Based on video evidence, Officer Tonn, after Mr. Strong leaned away from him, reached into the cab of Mr. Strong's vehicle, grabbed Mr. Strong by the hair, pulled Mr. Strong out his vehicle, and threw Mr. Strong onto the ground.

According to Officer Tonn's narrative, he contemplated placing Mr. Strong in a choke hold, but instead, he merely placed his arm around Mr. Strong's neck.  However based on the audio portion of the video, Mr. Strong's breathing and voice became labored, which could be heard by the pace of his breathing and tone of voice - both signs that Mr. Strong had been chocked.  It appears that Officer Tonn placed Mr. Strong in a carotid/LVNR (aka "choke hold"), despite his written assertion and deposition testimony that he had not.

Officer Tonn told Mr. Strong to stop resisting.  According to Mr. Strong, he merely attempted to breathe, while being choked by Officer Tonn.

After choking Mr. Strong for several seconds, Officer Tonn put his knee onto Mr. Strong's head and forced it into the asphalt.  Mr. Strong's lip scraped the concrete and started bleeding.  In addition to scraping his lip, Mr. Strong testified that he suffered an immediate strain to his neck muscles.

Officer Tonn has testified that Mr. Strong did not verbally threaten Officer Tonn and did not assault, or attempt to assault, Officer Tonn.  Mr. Strong has also testified that he did not assault or verbally threaten Officer Tonn.

> Q.    And how did you guys wind up on the ground? Did the Plaintiff wrestle you to the ground or was he taken to the ground?
> A.    He was taken to the ground.
> Q.    And prior to the Plaintiff being taken to the ground and you placing your arm around his neck, he did not swing at you; is that correct?
> A.    Correct.
> Q.    Okay. And prior to you placing the Plaintiff – prior to placing your arm around the Plaintiff's neck while he was on the ground he did not lunge at you; is that correct?
> A.    That's correct.
> Q.    Okay. And prior to you placing the Plaintiff – or placing your arm around his neck when you guys were on ground he did not verbally threaten you; is that correct?
> A.    Correct.
> Q.    And same question: He didn't kick at you; is that correct?
> A.    Correct.  (Deposition Officer Tonn, Pages 19-20)
>
> Q.    Did he ever tell you that you were under arrest and now he was going to pull you out of the car?
> A.    No, he didn't.

Q.    Did you ever threaten Officer Tonn during the incident at that
        moment in time?
A.    No, I didn't.
Q.    Did you ever swing at Officer Tonn?
A.    No, I didn't.
Q.    Did you ever kick at Officer Tonn?
A.    No, I didn't. (Mr. Strong Deposition, Pages 119-120)

Mr. Strong was subsequently handcuffed, arrested, and detained for two hours.  After
being detained for two hours, Officer Tonn finally released Mr. Strong without any
medical evaluation (as required by VPD policy).  According to Mr. Strong, Officer Tonn
said, "You seem like a nice guy and you're working so I'll let you go".  He walked Mr.
Strong outside and Mr. Strong left the police station.

**Force Used Against Mr. Strong:**

•      Officer Tonn grabbed Mr. Strong's hair and yanked him out his car
        by his hair.

•      Officer Tonn put his arm around Mr. Strong's neck.

•      Officer Tonn proceeded to choke Mr. Strong, as evinced by video
        evidence.

•      While choking Mr. Strong, Officer Tonn forced Mr. Strong to the
        ground, and he mounted Mr Strong's back.

•      Officer Tonn forced Mr. Strong's face onto the asphalt and scraped
        Mr. Strong's lip.

•      Officer Tonn placed his knee on the back of Mr. Strong's head.

•      Officer Tonn placed his body weight on Mr. Strong's upper body
        and head.

It cannot be overstated that Mr. Strong did not assault, attempt to assault, verbally accost,
or verbally threaten Officer Tonn.  Furthermore, Officer Tonn testified that he never
observed a weapon, and never observed Mr. Strong reach or attempt to conceal a weapon.
Therefore, Officer Tonn was not justified in using force against Mr. Strong.

**<u>Officer Tonn Report Narrative:</u>**

*On 4-19-17 at approximately 1312 hours I was driving north on Lassen Street near Glenwood while on patrol in a all-black Ford Police SUV. I was wearing a marked Vallejo police tactical vest. From my prior dealings I know this to be a high crime are, especially the area of Lassen Street at Eastwood Street.*

*As I drove north on Lassen I saw a vehicle parked on Glenwood, just east of Lassen Street. I saw a black male adult sitting in the driver's seat. I ran the vehicle's registration and found it to be expired on 4-2-17. I also saw that the vehicle was registered to an address in north Vallejo. I made a U-Turn and pulled in front of the vehicle. I activated my emergency red/blue lights.*

*The driver, identified as Brandon Strong, attempted to exit the car. Strong aggressively said something similar to "What do you want, why are you stopping me." I told him to get back inside the car and place his hands on the steering wheel. Strong sat back in the car, but did not put his hands on the steering wheel. I immediately told him his vehicle registration was expired in an attempt to deescalate the situation and accommodate his questions.*

*Strong began to argue about how his registration isn't expired and he told me to look at the tab. I tried to explain that it had expired on 4-2-17, but he would not listen. I activated my body camera approximately 20 seconds into the contact. Strong was extremely hostile and appeared angry. He kept leaning in toward the center of the vehicle. I had not patted him down for weapons and did not know if there were any weapons in the car. I could not even ID Strong as he would not listen to me.*

*Strong did not place his hands on the steering wheel. He attempted to make a phone call. I told him to put his phone down. I did not want him to be able to call someone over my location that could potentially be a threat to my safety. Strong did not put his phone down. Several seconds later he attempted to make what I believed to be a phone call. I attempted to grab the phone and told him to hand it to me. He pulled the phone away from me and pulled his body toward the center of the vehicle. Fearing that he might be calling "backup" and also not knowing if he had a weapon on him or in*

*the vehicle and not knowing who he was I decided to pull him out of the car.*

*I attempted to place Strong's arm in a rear wrist lock. I then grabbed his hair and conducted a hair pull take down out of the vehicle onto the ground. I then placed my arm around his neck area. I did this so that I was ready to apply a carotid maneuver if he became more combative. I did not conduct a carotid. It should be noted that during my struggle with Strong my body camera shut off, presumable from laying on the button or the switch getting bumped.*

*I told Strong to place his arm behind his back. At one point he yelled "Bitch" and continued to refuse to place his hands behind his back. I gave him commands and eventually was able to handcuff him.*

*After being handcuffed Strong was extremely agitated and would not listen to officers commands on where to walk. He tried walking away in the wrong direction and had to be pulled back towards a patrol car and placed in the rear.*

## Policy And Training Regarding The Carotid/LVNR Restraint:

The recorded application of the LVNR - Carotid Restraint - is very alarming.  I do not agree with Officer Tonn that he was justified in using any style of choke restraint.   It must be noted that POST specifically identifies the Carotid Restraint Hold as an extremely dangerous use of force that should not be deployed except in extreme circumstances - none of which existed in this set of facts.  Once it has been used, strict guidelines for subsequent medical monitoring and care are required.  These guidelines are taught in the Basic POST Academy to all police officers in California and are expressed in the Vallejo Policy Manual.

Officers are taught at the POST academy that the Carotid Restraint Hold has caused death and permanent injury on many occasions and that it is such a serious use of force that the suspect must be monitored from the time it is used until he is medically cleared for booking.

If the Carotid Restraint Control Hold is not properly applied, the risk of injury to the subject increases significantly.  The following chart as provided by POST illiterates some of the possible dangers of an improperly applied hold:

Maintaining the hold after the subject has been rendered unconscious:

> If oxygenated blood flow to the brain is restricted for more than one minute irreversible brain tissue damage may occur.

Tilting, turning, or jerking the subject's neck and/or pressure applied to the back of a subject's head or neck:

> Fracture of the neck resulting in serious injury permanent paralysis, or death.

Pressure applied to the front of a subject's head or neck:

> Rupture, fracture or collapse of the larynx or trachea causing suffocation; fracture of the hyoid bone, tip of the thyroid cartilage, or hyoid bone causing swelling and possible suffocation (POST Learning Domain # 33, page 4-9, "Effects of the Carotid Restraint Hold on the Body.")

"The Carotid Restraint Control Hold should *not* be confused with the bar-arm choke hold or any other form of choke hold where pressure is applied to restrict the flow of air into the body by compression of the airway at the front of the throat."

"Choke holds are considered ineffective and *create the potential for a subject to panic and react with greater resistance when pressure is applied in this manner by a peace officer.* Also, there is greater risk of serious injury to the subject." (POST Learning Domain # 33, page 4-9, "Effects of the Carotid Restraint Hold on the Body." Emphasis added.)

Many agencies forbid the use of the LVNR/Carotid Restraint Hold altogether except when the use of deadly force is justified and the life of the officer is at stake. If the LVNR/Carotid Restraint Hold is not performed properly, the perception of the suspect is much the same as a person who is being held under water and not allowed to breathe. Mr. Strong has testified that he was choking and having difficulty breathing.

Officer Tonn's department policy required Officer Tonn to alert medical whenever a choke hold, or attempted choke hold, occurred. Officer Tonn has testified that he did not apply the "carotid restraint", which was based on his definition of the restraint. However,

video evidence depicted Officer Tonn's arm around Mr. Strong's neck, while mounted on the back of Mr. Strong.  Video and audio also captured Mr. Strong making gaging sounds and struggling to breathe.  Whether Officer Tonn believes his restraint rose to the level of a carotid restraint does not matter.  The facts, according to Officer Tonn, clearly show that he placed his arm around Mr. Strong's neck.  Officer Tonn violated policy by administering the choke hold, when no threat of life was imminent, and when he failed to notify medical.


## POST Force Options

Subjects' resistance/actions to an arrest will determine the type of force used by peace officers.   The following chart illustrates how a subject's resistance/actions can correlate to the force applied by an officer.  (Listed as Subject's Actions, Description of Resistance and Possible Force Option):

*Cooperative* - Subject offers no resistance:

- Mere professional appearance
- Nonverbal actions
- Verbal requests and commands

*Passive non-compliance* - Does not respond to verbal commands but also offers no physical form of resistance:

- Verbal requests and commands
- Officer's strength to take physical control, including lifting/carrying
- Control holds and techniques to direct movement or immobilize a subject

*Active resistance* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody:

- Control holds and techniques to control the subject and situation
- Use of personal weapons in self-defense and to gain advantage over the subject
- Use of devices to secure compliance and ultimately gain control of the situation

*Assaultive* - Aggressive or combative; attempting or threatening to assault the officer or another person:

- Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to gain advantage over the subject

*Life-threatening* - Any action likely to result in serious injury or possibly the death of the officer or another person

- Utilizing firearms or any other available weapon or action in defense of self and others

NOTE: Officers must take into account the *totality of the circumstances* when selecting a reasonable force option.  It is not the intent of this chart to imply that an officer's force options are limited based on any single factor.

NOTE: Officers must be aware of and comply with their specific agency policies regarding appropriate force options.

*Constant reevaluation requirement:*

Peace officers must use the force option appropriate for the situation as conditions may change rapidly. Officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options.  (LD 20: Chapter 2 – Force Options, pages 2-6 & 2-7 )

Based on video evidence, Mr. Strong fell in the active resistant classification.  Therefore, no force was necessary.  It cannot be overstated that Officer Tonn had time on his side.  Mr. Strong's vehicle was not on, and Mr. Strong was not actively combative toward Officer Tonn.  In my opinion, Officer Tonn should have waited the situation out and no force would have been necessary.

### Consequences of Blows/Kicks to the Head:

It is important to note that medical reports uncovered trauma to Mr. Strong's lip and neck, which appears consistent with blows to Mr. Strong's head.  Officers are trained that

blows to the head can result in serious injury and death, and are not to use blows to the head absent the protection of life.  With Mr. Strong piled upon, no Officer's life was in danger; therefore, any blows to the head of Mr. Strong were out of policy, reckless, and excessive–whether those blows were caused by the asphalt or not.  Officer Tonn should have known that placing his knee on the back of Mr. Strong's head and forcing his head to the ground, could cause serious injury.

> "Punches to the head or face can cause severe injuries to the individual, and additionally carry a high risk of injury to the deputy using such force. Deputies should only use this extremely dangerous level of force where lower force levels are not available or are ineffective, especially when the individual is already handcuffed and less severe use of force alternatives are available. See Graham, 490 U.S. at 396. LASD's Deputy Field Operations Manual and Defensive Tactics Manual state that "personnel are discouraged from striking an attacker's head with a fist," and encourages deputies "to use an open hand palm heel strike to lessen the potential of cutting injuries." LASD policy prescribing situational uses of force essentially ranks head strikes as akin to deadly force, stating they are appropriate only when a subject's behavior is "likely to result in serious injury or possibly in the death of a person." Punches to the face, as opposed to the head, are not considered deadly force, but this poor tactic can result in more injury to a subject and a deputy. The pattern of head and face strikes against handcuffed individuals we observed in LASD appears unreasonable under the Fourth Amendment." (DOJ Correspondence: "Investigation of Los Angeles County Sheriffs Department Stations in Antelope Valley," June 28, 2013, Page 32.)

**<u>Training Regarding The Right To Lawful Resistance:</u>**

Officers are trained that although Penal Code Section 834a states that the person being arrested must submit to an arrest, if unlawful or unreasonable force is used to effect the arrest, the person being arrested may lawfully resist to overcome that force.  The following lists the applicable penal code sections:

Section 692:  Lawful resistance to the commission of a public offense may be made by the party about to be injured or by other parties.

Section 693:  Resistance sufficient to prevent the offense may be made by the party about to be injured to prevent an offense against his

person, or his family or some member thereof.  To prevent an illegal attempt by force to take or injure property in his lawful possession.

Section 694:   Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the offense."  (POST Learning Domain #20: *Consequences of Unreasonable Force,* page 6-9.)


## Opinions Thus Far:

1.   Taking Mr. Strong's set of facts as true - that Officer Tonn placed his knee on the back of Mr. Strong's head and forced Mr. Strong's face into the rough asphalt, while Mr. Strong was piled upon by Officer Tonn - then Officer Tonn used excessive force.  Since Mr. Strong was non-combative, there was no justification for any further use of any physical force.  Any use of force after Mr. Strong was taken to the ground was contrary to policy and law (as taught by POST).

Section 149 of the California Penal Code states:

*"Every public officer who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both such fine and imprisonment."*

2.   I am very concerned at the injurious force inflected on Mr. Strong (as alleged).  As stated above, there necessity must be considered by the "objectively reasonable" standard (as taught by POST).  In this regard, it is necessary to include the POST training given to all officers to consider the very serious consequences of blows to specific parts of the body.  The are identified as follows:

### Parts of the Body Vulnerable to Serious Injury:

Upper body head and neck:  The head and neck region can be vulnerable to severe injury during an attack.

An injury to the skull:  Death.

• a blow to the face area, possibly causing disfigurement,

• a blow to the temple or to the skull at the junction of jaw and ear, possibly damaging major blood vessels, or

• a blow at the junction of head and neck, possibly severing the spinal cord.

Neck area:  Damage to the central nervous system.

• a blow to the back of the neck, possibly displacing vertebrae or severing the spinal cord.

Throat area:  Death.

• a blow to the throat, possibly crushing the trachea or fracturing the cricoid or thyroid cartilage, or
• a fracture to the hyoid bone at the base of the tongue, possibly causing swelling and leading to suffocation.

Spine: Partial or complete paralysis.

• a blow to the spine possibly damaging or cutting the spinal cord.

Kidneys: Circulatory damage.

• a blow to the kidneys (located 3/4 of the way down the back).

Joints: Breakage or permanent injury.

• A blow to the joints (elbows, knees, and ankles).

Groin: Severe pain and internal bleeding and injury to the reproductive organs (for both males and females).

•     a blow to the groin or crotch.

(Learning Domain #33: "Arrest Methods/Defensive Tactics," page 1-13 and 1-14.)

3.     Given the quality/completeness of the department's use of force investigation conducted in this incident (that it was justified) vis-a-vis the apparent excessive use of force as indicated by Mr. Strong's numerous and obvious injuries (as listed above), it indicates that the customs and practices of the Vallejo Police Department encourage their Officers to ignore POST standards and use excessive force. As such, their collective approval of these tactics puts the general public at unnecessary future risk of death and/or injury from Officer Tonn, and others on the department, who have been or are now, similarly trained and/or supervised.

4.     As noted above, (at page 11), after being pulled from his car by his hair, choked, and pinned to the ground, it should have been clear to Officer Tonn that Mr. Strong was not a threat to him, which should have prompted a different approach than the force that was used.

**POST Re-evaluation of Force Requirement:**

"Peace officers must use the force option appropriate for the situation as conditions may change rapidly. Officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options." (POST Learning Domain 20, page 2-7.)

5.     When juxtaposing Officer Tonn's narrative, which stated that he did not place Mr. Strong in a choke hold, with video evidence, which depicted Mr. Strong choking as Officer Tonn mounted Mr. Strong's back and wrapped his arm around Mr. Strong's neck, then Officer Tonn filed a false police report in violation of VPD policy, POST training and the Law (as taught by POST), because stated that he did not place Mr. Strong in a choke hold.

"Any officer who knowingly files a false report will be guilty of a crime. (Penal Code Section 118.1)" (POST Learning Domain #18: "Investigative Report Writing," page 1-4.)

"All reports are to be true, unbiased, and unprejudiced.  These are easy words to say, but sometimes hard to live by.  It is not always easy to know or find out the truth.  Clearly it is the peace officer's moral obligation to seek the truth, lying is wrong.  *Truth and public trust cannot be separated.*"  (POST Learning Domain #18: "Investigative Report Writing," pages 1-5.  Emphasis Added.)

"When writing a report, the minimum requirements to accomplish your job ethically and preserve the integrity of the criminal justice system are:

"Never falsify any portion of your report or modify any aspect of the report away from the factual truth.

"*Objectively document every fact (or piece of evidence) known to you that could prove or disprove the event you are reporting.  If you are not sure, include the fact or piece of evidence anyway and qualify it as possible evidence or investigative information.*

"Be clear. A well-written report does not raise questions, it answers them.

"Write your report free of speculation or personal opinions. You are there to gather facts.

"You are responsible for the quality of each report you write. Each report is an opportunity to build or destroy your credibility.  Always write precisely what happened to the best of your knowledge.  A report determined by a court to be compromised or unethical not only topples your credibility, but your agency's as well – plus it opens the door to challenge every past enforcement action you have performed.

Compromising your report is just not worth it and it will raise questions about your effectiveness as a peace officer and may ultimately lead to termination of your employment.  *It is your obligation to report incidents just as they occurred; anything*

*else is unethical*."  (POST Learning Domain #1: Chapter 2 -
"Professionalism and Ethics in Policing."  Emphasis Added.)

6.      Officer Tonn violated POST Basic training and Vallejo Police
        Department policy when applied a choke hold to Mr. Strong, when
        no threat-of-life condition existed.  Officer Tonn also failed to notify
        medical, after he applied a choke hold–despite his assertion that he
        did not apply a complete carotid restraint.  The fact that Mr. Strong
        struggled to breath, while Officer Tonn had his arm around Mr.
        Strong's neck required Officer Tonn to notify medical.  His failure to
        abide by written policy placed Mr. Strong at risk of serious injury
        and/or death.


**My Qualifications To Review This Case:**

My opinions are based in part on my training, professional experience and education.  I
am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD).
I was hired on December 1, 1965, and I retired from active service on March 31, 1993.
My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and
fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and
Training (POST) Advanced Certificate, and I am a graduate of the POST Command
College (class #5, 1988).  The POST Command College was a Masters level two-year
course of study requiring a thesis, in Police Administration, with the diploma awarded by
the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties.  Those
duties included an 18 month assignment as a staff jail deputy and two years as an
Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on
the department as a patrol officer, field supervisor, jail watch commander and
administrator, station watch commander, and commanding officer of investigative units.
I was a field training officer while assigned as a patrol deputy, and I trained new officers
in POST and department approved patrol procedures, field investigations, apprehension
techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by
the patrol officers.  Those cases included possible complaints relating to both
misdemeanor and felony crimes.  They frequently required follow up investigations and
interviews before the exact nature of the case could be determined.  As a field officer and

detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer.  Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator.  At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance.  This process gave me an expertise in the POST Basic curriculum.  I also supervised the training of cadets at our Reserve Training Academy.  They were taught proper investigation, interview, and apprehension procedures.  Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.),

which was created to investigate, locate, observe and arrest major (career) criminals.  I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption.  The majority of our cases were homicide cases, including the murder of police officers.  Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings.  We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations.  These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations.  In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1900 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.  This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been

presented to the United States Senate, the Secretary of Homeland Security, and other
government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of
Redwood City*, 737 F.Supp2nd.1047.  I have been recognized, and my expert report was
quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police
Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463,
485 (9th Cir. 2007).  The Ninth Circuit also drew from my expert report in a second
published case involving Police Detective Investigations. *Torres, et al. v. City of Los
Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008).  The *Torres* case was appealed to
the U.S. Supreme Court and returned for trial.  I provided the expert opinion in *Chavies
Hoskin v. City of Milwaukee, et al.*  (USDC Case No. 13-cv-0920), regarding field strip
and cavity searches, hiring, training, discipline and supervision, and which resulted in
significant policy changes within the MPD.  My opinions supported argument in the
Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014).
The Ninth Circuit also drew from my expert reports regarding credible threats justifying
the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young
v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011).  The Ninth Circuit also drew
from my expert reports regarding Jail Administration and Administrative Responsibilities,
*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).  The Ninth Circuit also drew from my
expert reports regarding an officer's violation of the 14th Amendment if an officer kills a
suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement
objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013).  The Fifth
Circuit drew from my expert report regarding search and seizure, investigations and no-
knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012).  The
Ninth Circuit also drew from my expert report regarding the use of impact weapons
(PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012).  I was
the expert in the Ninth Circuit opinion regarding the allegations proffered by police
officers and their use/display of firearms against civilians in *Green v. City and County of
San Francisco*, 751 F. 3d 1039 (9th Cir. 2014).  Most recently, I was the expert in an
important Ninth Circuit opinion regarding the allegations proffered by police officers and
their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of
Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014).  I was the expert at trial in the Ninth
Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City
of Anaheim*, et al., No. 14-55644.  My opinion is quoted in the Ninth Circuit opinion
regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-
55184.  My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez,
et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth
Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions

supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force. I participated as a retained expert in the USDC Fifth District case, Stephen McCollum et al., v. Texas Department of Criminal Justice, et al., Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness. My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity. My

opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and Jonathan Michael Castro v. County of Los Angeles, et al, D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding in-custody suicidal prisoners and qualified immunity.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal

devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed December 6, 2019, at Santee, CA.

Roger A. Clark